IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>Phillip ROBINSON<br>Joseph CLANCY<br>Tyree CAMPBELL<br>Tracy BULLOCK<br>Sanzio WILLIAMS | Magistrate No. 20-1004<br>**[UNDER SEAL]** |
| UNITED STATES OF AMERICA<br><br>v.<br><br>James BRYANT Jr.<br>Andre MOORE-COLEMAN | Magistrate No. 20-1005<br>**[UNDER SEAL]** |
| UNITED STATES OF AMERICA<br><br>v.<br><br>Ronald LEWIS III<br>Victor SIMMONS | Magistrate No. 20-1006<br>**[UNDER SEAL]** |
| IN RE SEARCHES OF:<br><br>130 Santron Avenue<br>Pittsburgh, PA 15210 | Magistrate No. 20-1007<br>**[UNDER SEAL]** |
| 311 Burrows Street<br>Pittsburgh, PA, 15213 | Magistrate No. 20-1008<br>**[UNDER SEAL]** |
| 22D Locust Street<br>McKees Rocks, PA 15136 | Magistrate No. 20-1009<br>**[UNDER SEAL]** |

| | |
|---|---|
| 820 Bryn Mawr Street<br>Pittsburgh, PA 15219 | Magistrate No. 20-1010<br>**[UNDER SEAL]** |
| 757 6th Street<br>Pitcairn, PA 15140 | Magistrate No. 20-1011<br>**[UNDER SEAL]** |
| 1318 Orangewood Avenue<br>Pittsburgh, PA 15216 | Magistrate No. 20-1012<br>**[UNDER SEAL]** |
| 708 Webster Terrace<br>Pittsburgh, PA 15219 | Magistrate No. 20-1013<br>**[UNDER SEAL]** |
| 338 Russellwood Avenue #3<br>McKees Rocks, PA 15136 | Magistrate No. 20-1014<br>**[UNDER SEAL]** |
| 924 Malvern Road, Apt. C<br>Bellevue, PA 15202 | Magistrate No. 20-1015<br>**[UNDER SEAL]** |
| 1880 Lincoln Road<br>Pittsburgh, PA 15235 | Magistrate No. 20-1016<br>**[UNDER SEAL]** |
| 111 Hyman Place #208<br>Pittsburgh, PA 15213 | Magistrate No. 20-1017<br>**[UNDER SEAL]** |
| 2013 Honda Accord<br>PA Registration KYL-8079 | Magistrate No. 20-1018<br>**[UNDER SEAL]** |
| 906 Memory Lane<br>Pittsburgh, PA 15219 | Magistrate No. 20-1019<br>**[UNDER SEAL]** |
| 924 Princeton Boulevard<br>Pittsburgh, PA 15221 | Magistrate No. 20-1020<br>**[UNDER SEAL]** |
| 2012 Buick Sedan<br>PA Registration KGZ-7829 | Magistrate No. 20-1021<br>**[UNDER SEAL]** |
| 412 Church Street<br>Turtle Creek, PA 15145 | Magistrate No. 20-1022<br>**[UNDER SEAL]** |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINTS AND SEARCH WARRANTS

I, Karen L. Springmeyer, being duly sworn, depose and state as follows:

## I.     INTRODUCTION AND AGENT BACKGROUND

1.     I have been a Special Agent with the FBI since January 2010.  During that time, I have been assigned to an investigative unit dealing with organized crime, drug trafficking, gangs, and violent crimes. In addition, from July 2017 through January 2019, I was assigned in a supervisory capacity to an FBI Headquarters Criminal Investigative Division Unit, where I oversaw complex drug trafficking investigations across the Western Hemisphere, including the United States, Mexico, Colombia, and the Dominican Republic. During my training at the FBI Academy in Quantico, Virginia, I received extensive training in a variety of investigative and legal matters, including the topics of Fourth Amendment searches and the legal requirements for the interception of telephone communications.

2.     As a Special Agent with the Federal Bureau of Investigation (FBI), I am an "Investigative or Law Enforcement Officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

3.     I have been involved in many narcotics-related arrests and the service of many narcotics-related search warrants.  I have handled cooperating sources of information who were involved in narcotics acquisition and/or trafficking. In addition, I have reviewed thousands of communications between drug traffickers as a result of my participation in multiple wiretap investigations.  As a result of my narcotics-related training and experience, I am familiar with the methods and language used to distribute narcotics, to launder proceeds, and to operate drug-trafficking conspiracies.

4.     This investigation is being conducted by Special Agents of the Federal Bureau of Investigation Greater Pittsburgh Safe Streets Task Force ("GPSSTF" – which is a group of federal, state, and local agencies that work together in the Pittsburgh area to focus efforts on violent crimes); Special Agents of the Federal Bureau of Investigation in numerous other states and territories of the United States;  Agents of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"); investigators from the Pittsburgh Bureau of Police - Narcotics, among other agencies.

## II.     PURPOSE OF THIS AFFIDAVIT

a.     Criminal Complaint #1: this affidavit is submitted in support of Criminal Complaint #1, filed at Magistrate No. 20-1004, charging the following individuals with conspiracy to distribute and possess with intent to distribute 28 grams or more of a mixture and substance containing a detectable amount of cocaine base (in form commonly known as "crack"), a Schedule II controlled substance, from in and around January 2020, and continuing thereafter to in and around May 2020, in violation of 21 U.S.C. § 846: **Joseph CLANCY, Phillip ROBINSON (a/k/a "Pape"), Tyree CAMPBELL, Tracy BULLOCK, and Sanzio WILLIAMS**;

b.     Criminal Complaint #2: this affidavit is being submitted in support of Criminal Complaint #2, filed at Magistrate No. 20-1005, charging the following individuals with conspiracy to distribute and possess with intent to distribute a quantity of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance, from in and around February 2020, and continuing thereafter to in and around March 2020, in violation of 21 U.S.C. § 846: **Andre MOORE-COLEMAN (a/k/a "Drizz") and James BRYANT Jr.**;

c.     Criminal Complaint #3: this affidavit is being submitted in support of Criminal Complaint #3, filed at Magistrate No. 20-1006, charging the following individuals

4

with conspiracy to distribute and possess with intent to distribute 28 grams or more of a mixture and substance containing a detectable amount of cocaine base (in the form commonly known as "crack"), a Schedule II controlled substance, from in and around December 2019, and continuing thereafter to in and around January 2020: **Ronald LEWIS III** and **Victor SIMMONS**.

5.      This affidavit is also submitted in support of search warrants for locations associated with and utilized by the following subjects (which are described in more detail below and in Attachments A-1 through A-16): **Phillip ROBINSON, Tyree CAMPBELL, Tracy BULLOCK, Javon EMBRY, Sanzio WILLIAMS, Joseph CLANCY, Quamane BRYANT, James BRYANT Jr., Martin LANGFORD, Ronald LEWIS III, Andre MOORE-COLEMAN, and Victor SIMMONS** (collectively referred to herein as **"the SUBJECTS"**), who, as explained below, have violated the federal narcotics laws by conspiring to distribute and possess with intent to distribute cocaine and/or cocaine base (in the form commonly known as "crack"), and/or heroin, which are scheduled controlled substances under federal law, in the Western District of Pennsylvania.

6.      Accordingly, I believe that there is probable cause that a search of these locations will produce fruits of, or evidence of, violations of federal felony offenses enumerated in Title 18, United States Code, Section 2516; including, violations of Title 21, United States Code, Sections 841(a)(1)(possession with intent to distribute a controlled substance), 843(b)(unlawful use of a communication facility), and 846 (conspiracy), Title 18, United States Code, Sections 1956 and 1957, (money laundering), 922(g)(1)(possession of a firearm or ammunition by a convicted felon), 924(c)(possession of a firearm in furtherance of a drug trafficking crime), and Section 2 (aiding and abetting) (collectively referred to herein as "**the TARGET OFFENSES**").

7.     Your Affiant has personally participated in the investigation outlined herein. In addition, your Affiant has reviewed information obtained from law enforcement and commercial databases, and has discussed this case with, and reviewed the reports of, other law enforcement officers who have been involved in this investigation or who have investigated SUBJECTS and their associates in the past.  This affidavit is being submitted for the limited and specific purpose of supporting an application for search and seizure warrants.  Your Affiant has not, therefore, included every fact known to her concerning the investigation.

8.     As explained below, there is probable cause to conclude that evidence of the above stated offenses will be found in the businesses, residences, and vehicles of SUBJECTS, which are the subject of these search warrants (hereafter occasionally referred to collectively as "the Search Locations"). It should be noted that as a result of your Affiant's training and experience and your Affiant's conversations with prosecutors, your Affiant is aware that people who are involved in distributing illegal drugs commonly store or retain evidence of their involvement in drug trafficking at their residences or at the residences of relatives or other trusted associates, and courts have recognized these facts. See United States v. Whitner, 219 F.3d 289, 297-98 (3d Cir. 2000) (collecting cases); United States v. Burton, 288 F.3d 91, 103-104 (3d Cir. 2002) (explaining that it is a common sense proposition that drug dealers commonly keep evidence of their drug-dealing activities at their residences, and direct evidence linking a residence to a particular type of criminal activity is not required to establish probable cause to search the residence for evidence of that criminal activity).

## III.     THE SEARCH LOCATIONS

9.     This affidavit is submitted in support of search warrants for the following locations, which I collectively refer to herein as "the Search Locations":

6

        a.    **The residence located at 130 Santron Avenue, Pittsburgh, PA 15210** ("**Search Location 1**"), which is a residence utilized by Phillip ROBINSON. <u>See</u> Attachment A-1 for description.

        b.    **The residence located at 311 Burrows Street, Pittsburgh, PA 15213** ("**Search Location 2**"), which is a residence utilized by Tyree CAMPBELL. <u>See</u> Attachment A-2 for description.

        c.    **The residence located at 22 Locust Street, Apt. 22D, McKees Rocks, PA 15136** ("**Search Location 3**"), which is a residence utilized by Tracy BULLOCK. <u>See</u> Attachment A-3 for description.

        d.    **The residence located at 820 Bryn Mawr Street, Pittsburgh, PA 15219** ("**Search Location 4"),** which is a residence utilized by Javon EMBRY. <u>See</u> Attachment A-4 for description.

        e.    **The residence located at 757 6th Street, Pitcairn, PA 15140** ("**Search Location 5"),** which is a residence utilized by Sanzio WILLIAMS. <u>See</u> Attachment A-5 for description.

        f.    **The residence located at 1318 Orangewood Avenue, Pittsburgh, PA 15216** ("**Search Location 6**"), which is a residence utilized by Joseph CLANCY. <u>See</u> Attachment A-6 for description.

        g.    **The residence located at 708 Webster Terrace, Pittsburgh, PA 15219** ("**Search Location 7**"), which is a residence utilized by Quamane BRYANT. <u>See</u> Attachment A-7 for description.

h.      **The residence located at 338 Russellwood Avenue, Apt. #3, McKees Rocks, PA 15136** ("**Search Location 8**"), which is a residence utilized by James BRYANT Jr. See Attachment A-8 for description.

i.      **The residence located at 924 Malvern Road, Apt. C, Bellevue, PA 15202 ("Search Location 9")**, which is a residence utilized by Martin LANGFORD. See Attachment A-9 for description.

j.      **A 2012 blue Buick sedan ("Search Location 10")** bearing Pennsylvania registration KGZ-7829, and bearing VIN 1G4PP5SK6C4167106, registered to Jvon Phillips, 400 Swissvale Ave Apt 22, Pittsburgh, PA 15221, operated by Sanzio WILLIAMS. See Attachment A-10 for description.

k.      **The residence located at 1880 Lincoln Road, Pittsburgh, PA 15235 ("Search Location 11"),** which is a residence utilized by Andre MOORE-COLEMAN. See Attachment A-11 for description.

l.      **The residence located at 111 Hyman Place, #208, Pittsburgh, PA 15213 ("Search Location 12"),** which is a residence utilized by Phillip ROBINSON. See Attachment A-12 for description.

m.      **A 2013 black Honda Accord ("Search Location 13")** bearing Pennsylvania registration KYL-8079, and bearing VIN 1HGCR3F80DA017724, registered to Tracy DARBY/Philicia PETERSON, 130 Santron Avenue, Pittsburgh, PA 15210, operated by Phillip ROBINSON.  See Attachment A-13 for description.

n.      **The residence located at 906 Memory Lane, Pittsburgh, PA 15219** ("**Search Location 14**"), which is a residence utilized by Phillip ROBINSON. See Attachment A-14 for description.

   o. **The residence located at 924 Princeton Boulevard, Pittsburgh, PA 15221 ("Search Location 15"),** which is a residence utilized by Victor SIMMONS.  <u>See</u> Attachment A-15 for description.

   p. **The residence located at 412 Church Street Extension, Turtle Creek, PA 15145 ("Search Location 16"),** which is a residence utilized by Ronald LEWIS III. <u>See</u> Attachment A-16 for description.

## IV. YOUR AFFIANT'S KNOWLEDGE OF EVIDENCE COMMONLY ASSOCIATED WITH DRUG TRAFFICKING OFFENSES

   10. Your Affiant is aware, based upon my training and experience, that the following kinds of evidence have been recovered in a substantial number of residential and/or vehicle searches executed in connection with drug trafficking investigations:

   a. controlled substances, such as heroin, cocaine, crack cocaine, marijuana, Oxycodone, Percocet, etc.;

   b. paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, "stamp bags", microwave ovens, heat-sealing devices, and dilutants such as mannitol, mannite, inositol, fentanyl, and vitamin B12;

   c. books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances and to monetary transactions involving the proceeds from the sale of controlled substances;

   d. personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances, money laundering, and the criminal use of communication facilities;

   e. cash, currency, and records relating to the generation of income from the sale of controlled substances and the expenditure of such income, including money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, as well as consumer items such as expensive televisions and other electronic equipment, high-end vehicles, precious metals such as gold and silver, and precious gems such as diamonds (this evidence often is located in a safe) -- unexplained wealth is probative evidence of crimes motivated by greed, including trafficking in controlled substances;

f. documents indicating travel in interstate and foreign commerce, such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts and telephone bills;

g. computers, cellular telephones, and/or other electronic media utilized for communication and data-saving purposes, as well as documents relating thereto;

h. firearms, ammunition, and other dangerous weapons; and

i. identification evidence and/or indicia (such as mail, deeds, leases, rental agreements, photographs, bills, and identification documents) that tend to identify the person(s) in residence, occupancy, control, or ownership of subject premises.

11. Based upon your Affiant's training and experience, as well as the collective knowledge and experience of other agents and officers associated with this investigation, your Affiant is aware that it is generally a common practice for drug traffickers to store their drug inventory, drug-related paraphernalia, and drug-related and personal records (as described above) in their residences, vehicles, and/or in the residences and/or vehicles of relatives or other trusted associates. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, and/or will be "fronted" controlled substances from their suppliers, such record keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances and to keep track of how proceeds are being expended. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the traffickers' supplier(s) and the traffickers' dealer(s). Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and must keep them immediately available to efficiently conduct their drug trafficking business.

12. It is also a generally common practice for traffickers to conceal at their residences and/or vehicles large sums of money, either the proceeds from drug sales or money to be used to purchase controlled substances. Drug traffickers often make use of wire transfers,

cashier's checks, and money orders to pay for controlled substances.  Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking and money laundering would also typically be maintained in the residences and/or vehicles of those involved in selling drugs or in the residences and/or vehicles of relatives or trusted associates.

13.     Often, drug traffickers possess firearms, ammunition, and other dangerous weapons in their residences, businesses, and automobiles to protect their profits, drug supply, and persons from others who might attempt to forcibly take the traffickers' profits and/or supply of drugs.  Typically drug traffickers maintain possession of the firearms for extended periods of time.

14.     When drug traffickers amass proceeds from the sale of drugs, they often attempt to launder/"legitimize" these profits, or otherwise conceal them from discovery by law enforcement.  In an effort to accomplish these goals, drug traffickers often place assets, such as vehicles and residences, in the names of other persons to conceal their true ownership and the manner in which they were acquired.  Records reflecting the implementation of such deceptive practices, such as deeds, titles, and service records, are likely to be found either at the residence and/or vehicles of the drug trafficker or at the residence of the person in whose name the asset is listed.

15.     Your Affiant is aware that drug traffickers sometimes take trophy photographs of their drugs and drug proceeds and retain them in their residences and/or vehicles. Your Affiant is aware that drug traffickers, like law-abiding citizens, sometimes take photographs of themselves with their friends, relatives, and associates and keep the photographs in their residences.  When they are taken or retained by drug traffickers, such photographs can be evidence,

or can lead to evidence, of drug trafficking and money laundering by identifying closely associated people who are actively assisting and/or supporting the drug trafficking activity.

16.     Drug traffickers often operate under assumed names to conceal their true identities from law enforcement officers and, in so doing, acquire or rent property, services, and personal identification items (such as driver's licenses and birth certificates) under their assumed or alias names, and they maintain such items, as well as records relating to such items, in their residences, businesses, and vehicles, together with evidence of their true identities.

17.     Drug traffickers commonly conceal their activities from members of the public by transacting their business in a covert manner and/or during the nighttime hours when darkness helps to conceal their activities.  In addition, large-scale drug traffickers often have multiple locations (including residences and/or "stash houses") from which they operate their illegal activities and in which they maintain evidence of said illegal activities.  Finally, it has become common for drug traffickers to utilize computers, cellular telephones, and/or other electronic media for communication and data-acquisition and data-saving purposes.

18.     Evidence of drug crimes can be found in the electronic media such as computers and cellular telephones.  Such evidence can include internet searches for drug-related paraphernalia, addresses, telephone numbers and contacts, as well as incriminating communications via emails or instant messages.  It should be noted that, with the advance of technology, the distinction between computers and cellular telephones is quickly becoming less clear.  Actions such as internet searching or emailing, in addition to calling and text messaging, can now be performed from many cell phones.  In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones and computers. Contemporaneous possession of multiple cellular telephones is, therefore, evidence of drug

trafficking.  Moreover, the particular numbers of and the particular numbers dialed by particular cellular telephones can be evidence of drug trafficking, particularly in a case involving the interception of communications between drug traffickers.  Such numbers can confirm identities of particular speakers and the occurrence of certain events.   As with most electronic/digital technology items, communications made from an electronic device, such as a computer, are often saved or stored on the device.

19.     Your Affiant's awareness of these drug trafficking practices, as well as your Affiant's knowledge of drug use and distribution techniques as set forth in this Affidavit, arise from the following:  a) your Affiant's involvement in prior drug investigations and searches during her career, as previously described; b) your Affiant's involvement on a number of occasions in debriefing confidential informants and cooperating individuals in prior drug investigations, as well as what other agents and police officers have advised your Affiant of when relating the substance of their similar debriefings and the results of their own drug investigations; c) discussions with members of the FBI and/or other federal, state, and local law enforcement officers, both about the facts of this case in particular and about trafficking in general; and d) other intelligence information provided through law enforcement channels.

## V.      BACKGROUND OF INVESTIGATION

20.     Beginning in January 2019, agents and task force officers with the Pittsburgh FBI Greater Pittsburgh Safe Streets Task Force met with agents of the Pittsburgh Alcohol, Tobacco, Firearms, and Explosives (ATF) and initiated an investigation concerning the narcotics trafficking activities of members of a neighborhood street gang operating in the Hill District neighborhood of Pittsburgh – the gang is known as "11 Hunnit".

21.     Subsequently, investigators began telephone analysis, including through toll record and pen register analysis of numerous telephone numbers utilized by members and associates of 11 Hunnit.  In addition, investigators conducted controlled purchases[1], surveillance, and executed search warrants, among other investigative techniques, which are described in more detail herein.

22.     Beginning on November 18, 2019, investigators began a Title III wiretap investigation during which various telephones utilized by members, associates, and/or their narcotics suppliers were intercepted, including those utilized by Victor SIMMONS (who utilized telephone number (412) 609-6813, which was identified in the wiretap applications, affidavits, and orders as "TARGET TELEPHONE #2"); Phillip ROBINSON (who utilized telephone number (646) 469-0831, which was identified in the wiretap applications, affidavits, and orders as "TARGET TELEPHONE #4"); Quamane BRYANT (who utilized telephone number (412) 867-8076, which was identified in the wiretap applications, affidavits, and orders as "TARGET TELEPHONE #5"); and Martin LANGFORD (who utilized telephone number (404) 788-6580, which was identified in the wiretap applications, affidavits, and orders as "TARGET TELEPHONE #8").[2]

23.     As will be detailed below, and based on your affiant's awareness of the current status of the law regarding searches and seizures relating to residences and vehicles utilized by those involved in narcotics distribution, your affiant has probable cause to believe the types of items described in Attachment B will be found in the search locations mentioned in this section

---

[1]     For example, in early and mid-2019, investigators utilized confidential sources to purchase narcotics from Phillip ROBINSON and Victor SIMMONS.

[2]     These orders were filed in the Western District of Pennsylvania at Misc. Nos. 19-1200, 19-1200(a), 19-1200(b), 19-1200(c), 19-1200(d), and 19-1200(f).

belonging to Phillip ROBINSON, Tyree CAMPBELL, Tracy BULLOCK, Javon EMBRY, Sanzio WILLIAMS, Joseph CLANCY, Quamane BRYANT, James BRYANT Jr., Martin LANGFORD, Ronald LEWIS III, Andre MOORE-COLEMAN, and Victor SIMMONS (collectively the "SUBJECTS").  This belief is based the recent telephone communications, which were intercepted pursuant to the above-described wiretap orders; physical and electronic surveillance; continued pen register analysis, geolocation "ping" data associated with cellular telephones, through which I believe that based on the long term, sophisticated, high-level narcotics trafficking that has been ongoing involving the SUBJECTS. Consequently, your affiant is seeking search warrants for Search Location 1 through Search Location 15 as a result.

## VI.    PROBABLE CAUSE

### A.    COMPLAINT #1: THE SUBJECTS AND THEIR ASSOCIATION WITH THE SEARCH LOCATIONS

#### i.    *Phillip ROBINSON – Identity and Association to Search Locations*

24.    The investigation has revealed that Phillip ROBINSON (who utilized TARGET TELEPHONE #4) is a mid-level trafficker of cocaine base (in the form commonly known as "crack").  Moreover, agents have identified a source of supply for ROBINSON as Joseph CLANCY.  Agents have identified co-conspirators to whom ROBINSON supplies with quantities of cocaine base (in the form commonly known as "crack") – these individuals have been identified as mid-level distributors of cocaine base (in the form commonly known as "crack"): Tyree CAMPBELL, Tracy BULLOCK, Javon EMBRY, Sanzio WILLIAMS, Quamane BRYANT.

25.    Through the above-referenced wiretap investigation, which included the use of physical surveillance and GPS/E911 geolocation "ping" data associated with TARGET TELEPHONE #4 (utilized by ROBINSON), law enforcement has determined that Phillip ROBINSON is the user of TARGET TELEPHONE #4 (646-469-0831), as well as cellular

telephone number (904) 613-2941 and, as of May 2, 2020, telephone number (646) 831-7631. More specifically, on January 4, 2020, investigators obtained authority to intercept wire and electronic communications, in addition to GPS/E911 geolocation "ping" data, for TARGET TELEPHONE #4. During this time, investigators were able to confirm, by pairing intercepted communications, location data, and physical surveillance, that the user of TARGET TELPHONE #4 was Phillip ROBINSON. ROBINSON discontinued the use of TARGET TELEPHONE #4 on or about March 2, 2020, and activated telephone number (904) 613-2941 on or about March 3, 2020, as a replacement phone for TARGET TELEPHONE #4. Your affiant obtained an Order authorizing the disclosure of GPS/E911 geolocation data for telephone number (904) 613-2941 on March 10, 2020. Your affiant has confirmed, via physical surveillance paired with location data, as well as intercepted communications over TARGET TELEPHONE #5, utilized by Quamane BRYANT, that the user of telephone number (904) 613-2941 is Phillip ROBINSON. ROBINSON discontinued the use of (904) 613-2941 on or about May 2, 2020, and activated (646) 831-7631 on or about May 2, 2020, as a replacement phone for (904) 613-2941. Your affiant obtained an Order authorizing the disclosure of GPS/E911 geolocation data for telephone number (646) 831-7631 on May 7, 2020. Your affiant confirmed, via physical surveillance paired with location data, that the user of (646) 831-7631 is Phillip ROBINSON.

26.     Law enforcement has determined that Phillip ROBINSON primarily resides at **130 Santron Avenue, Pittsburgh, PA 15210 (Search Location 1)**. Investigators obtained warrants authorizing the disclosure of GPS/E911 geolocation "ping" data associated with

TARGET TELEPHONE #4[3], as well as telephone numbers (904) 613-2941[4] and (646) 831-7631[5], all of which were utilized by ROBINSON during the course of this investigation. Your affiant learned that these telephones were routinely located in the area of **Search Location 1,** especially during the overnight hours. Furthermore, beginning on November 26, 2019, investigators installed a fixed surveillance camera in the area of **Search Location 1**; since the installation of this camera, and continuing through the present date, agents have observed ROBINSON going to/from **Search Location 1**. Through surveillance, agents have observed ROBINSON park various vehicles, including a black Honda Accord (**Search Location 13**) and various rental vehicles, in front of the residence and/or across the street.

27.    Law enforcement has learned, via subpoenaed records, that Philicia PETERSON is the current[6] Duquesne Light account holder for the residence at 130 Santron Avenue, Pittsburgh, PA 15210 (**Search Location 1**); PETERSON is the current[7] Comcast account holder for the residence at 130 Santron Avenue, Pittsburgh, PA, 15210; and PETERSON is also listed as the co-registrant of the black Honda Accord (**Search Location 13**), which agents have observed ROBINSON operate regularly.

---

[3]    Investigators obtained this data for the approximate date range of November 19, 2019 through March 2, 2020.

[4]    Investigators obtained this data for the approximate date range of March 10, 2020 through May 2, 2020.

[5]    Investigators obtained this data for the approximate date range of May 7, 2020 through the present date.

[6]    This information is current as of May 1, 2020.

[7]    This information is current as of April 27, 2020.

28.     Law enforcement has also determined that Phillip ROBINSON utilizes the residence at **111 Hyman Place, #208, Pittsburgh, PA 15213** (**Search Location 12**), as a secondary residence. ROBINSON's Pennsylvania driver's license indicates that ROBINSON resides at **Search Location 12**.[8]  In addition, I am aware that ROBINSON, who is currently supervised by the Pennsylvania Board of Probation and Parole, reported **Search Location 12** as his address.[9]  Your affiant is aware that Tracy DARBY, whom I know to be ROBINSON's mother, also lists **Search Location 12** as her address on her Pennsylvania driver's license.[10] As stated above, your affiant obtained numerous warrants authorizing the disclosure of GPS/E911 geolocation "ping" data for TARGET TELEPHONE #4, in addition to telephone number (904) 613-2941, both of which were utilized by ROBINSON during the course of this investigation. Your affiant learned that these telephones were routinely located in the area of **Search Location 12,** on an almost daily basis. For example, based on the cell phone geolocation "ping" data combined with physical surveillance, I am aware that ROBINSON would commonly stay the overnight hours at **Search Location 1;** then in the late morning/early afternoon hours, he would leave **Search Location 1**, which is located in Carrick, and go to either **Search Location 12** or **Search Location 14**, both of which are located in the Hill District neighborhood of Pittsburgh. An example of this is detailed in paragraph 32 (below).

---

[8]     ROBINSON's PA Driver's License containing this information was issued on July 13, 2019.

[9]     This was confirmed by investigators on April 27, 2020.

[10]    DARBY's PA driver's license containing this information was issued on October 10, 2019.

29.     In addition, through subpoenaed records, I am aware that Tracy DARBY is the current[11] Duquesne Light account holder for the residence located at **111 Hyman Place, #208, Pittsburgh, PA 15213** (**Search Location 12**); moreover, DARBY is the current[12] Comcast account holder for the residence located at **111 Hyman Place, #208, Pittsburgh, PA, 15213** (**Search Location 12**). Furthermore, DARBY is listed as the co-registrant of the black Honda Accord (**Search Location 13**), which ROBINSON routinely operates. Lastly, your affiant conducted a query of ROBINSON through the CLEAR database, which I have found to be a reliable source of information, which reported that ROBINSON is associated with **Search Location 12.**[13] On April 28, 2020, utilizing GPS/E911 location data for telephone number (904) 613-2941 (utilized by ROBINSON), investigators saw that he was in the area of **Search Location 12**; investigators went to the area of 111 Hyman Place at this time and witnessed ROBINSON sitting in the driver's seat of a white Nissan Pathfinder rental vehicle, parked in front of the building which houses **Search Location 12** (this vehicle had also been seen, via surveillance camera, parked in the area of **Search Location 1** that morning).

30.     Lastly, law enforcement has learned that ROBINSON has access to, and commonly utilizes the residence located at **906 Memory Lane, Pittsburgh, PA 15219** (**Search Location 14**), to facilitate his drug trafficking activities. As will be shown below, your affiant has identified a pattern in which ROBINSON commonly leaves his primary residence (**Search**

---

[11]     This information is current as of May 1, 2020.

[12]     This information is current as of April 27, 2020

[13]     Accurint and CLEAR are open-source databases frequently utilized by law enforcement investigators to obtain information on individuals. In your Affiant's experience, these databases have proven to be reliable sources of information, to include addresses, telephone numbers, associates, and relatives.

**Location 1**) and immediately travels to **Search Location 14** (on an almost daily basis); ROBINSON commonly remained at **Search Location 14** for varying periods of time, after which he commonly proceeded to meet with his source of supply of cocaine base (in the form commonly known as "crack"), who has been identified as CLANCY; or proceeded to meet his narcotics customers, such as BULLOCK. Examples of this type of activity are described below; specifically, on February 11, 2020, on February 21, 2020, and on May 2, 2020.

31.     Furthermore, throughout the course of this investigation, agents have witnessed ROBINSON enter **Search Location 14** and appear to utilize a key, indicating that he has full access to the residence. For example, on April 1, 2020, investigators were conducting surveillance in the area of **Search Location 14**; at approximately 12:12 p.m., ROBINSON parked his vehicle (**Search Location 13**) in front of the residence; at approximately 12:35 p.m., ROBINSON exited his vehicle, and appeared to use a key to open the front door of **Search Location 14**, and went inside the residence. On April 16, 2020, investigators were again conducting surveillance of **Search Location 14**; at approximately 1:22 p.m., ROBINSON arrived, parked his vehicle (a rental vehicle) in front of the residence, and went to the front door of **Search Location 14** and entered the residence. Investigators noted that ROBINSON, wearing a grey hooded sweatshirt, appeared to be concealing a large object in the front pocket of the sweatshirt. On April 29, 2020, at approximately 12:03 p.m., Phillip ROBINSON was seen, via surveillance camera, leaving **Search Location 1** carrying a small, black bag. ROBINSON entered his white Nissan Pathfinder rental vehicle and left the area. At approximately 12:34 p.m., investigators on surveillance of **Search Location 14** witnessed ROBINSON arrive in the Nissan Pathfinder and park near the residence. A minute later, ROBINSON exited the vehicle carrying the black bag and used keys to enter **Search Location 14**; after approximately 20 seconds, ROBINSON exited

**Search Location 14**, got into his rental vehicle, and left the area. Lastly, on May 7, 2020, at approximately 2:59 p.m., investigators on surveillance of Search Location 14 witnessed Phillip ROBINSON arrive in his Honda Accord (**Search Location 13**), and park in front of the residence. Moments later, Tracy DARBY (ROBINSON's mother), arrived in a gold Ford Edge and parked near the residence. ROBINSON greeted DARBY, who had two small children with her. At approximately 3:07 p.m., DARBY and the children went towards 912 Memory Lane, and ROBINSON went to and entered **Search Location 14**. DARBY, speaking with someone at 912 Memory Lane, obtained face masks and walked over to **Search Location 14** and went inside for approximately 15 seconds, at which time she and ROBINSON exited **Search Location 14**. Minutes later, DARBY and the children drove away, and ROBINSON went back into **Search Location 14**.

32.     On May 2, 2020, based on GPS/E911 geolocation data for (904) 613-2941 (abbreviated as "phone" in the below timeline), your affiant observed the following "ping" data, which shows the above described pattern of movement (all times are approximate), in which ROBINSON spent the overnight hours at **Search Location 1**, and then travelled to both **Search Locations 12 and 14** during the day and evening hours, where he spent a majority of his time::

> 10:28 a.m. – ROBINSON left **Search Location 1** (observed via surveillance camera); Phone was "pinging" at **Search Location 1;**

> 10:43 a.m. – Phone "pinging" in Oak Hill, which is the neighborhood where **Search Locations 2 and 12** are located;

> 10:58 a.m. through 12:30 p.m. – Phone "pinging" in area of **Search Location 14;**

> 12:45 p.m. through 1:16 p.m. – Phone "pinging" in area of **Search Location 12;**

> 1:47 p.m. – Phone "pinging" in area of **Search Location 14;**

2:03 p.m. through 3:05 p.m. – Phone "pinging" at other locations;

3:20 p.m. through 4:53 p.m. – Phone "pinging" in area of **Search Location 14;**

5:09 p.m., through 5:39 p.m. – Phone "pinging" in area of **Search Location 2** (residence of Tyree CAMPBELL);

5:54 p.m. through 11:19 p.m. – Phone "pinging" at other locations;

11:34 p.m. through 1:07 a.m. (May 3, 2020) - Phone "pinging" in area of **Search Location 14**

1:38 a.m. – Phone "pinging" in area of **Search Location 1**

33.    Based on the intercepted communications (detailed below), along with surveillance of ROBINSON either meeting with narcotics suppliers or his customers, your affiant believes that ROBINSON is utilizing **Search Location 14** as a "stash house" and/or narcotics packaging and processing location.

34.    I have queried ROBINSON's criminal history, which is as follows:

a.     On October 31, 2005, ROBINSON was adjudicated delinquent as a juvenile of felony robbery;

b.     On November 21, 2006, he was adjudicated delinquent as a juvenile on misdemeanor drug charges.

c.     On April 13, 2010, ROBINSON pled guilty to misdemeanor drug charges and was sentenced to six (6) months of county probation.

d.     On January 4, 2011, ROBINSON was convicted of a felony drug offense involving the possession with intent to deliver/delivery of cocaine base (i.e., "crack"), for which he was sentenced to serve prison time followed by two (2) years' county probation.

e.      On June 27, 2011, ROBINSON was convicted of unlawfully possessing a firearm (.357 caliber revolver) as a prohibited person (which was graded as a misdemeanor offense).

f.      On August 5, 2013, ROBINSON was convicted of a felony drug offense involving the possession with intent to deliver/delivery of heroin. ROBINSON served a state prison sentence for that offense, and he is currently on parole under the supervision of the Pennsylvania Board of Probation and Parole (with an anticipated release date of December 23, 2022).

### ii.   *Tyree CAMPBELL – Identity and Association to Search Location(s)*

35.      The investigation has revealed that Tyree CAMPBELL is a street-level distributor of cocaine base (in the form commonly known as "crack"), and is supplied by Phillip ROBINSON.

36.      Law enforcement has determined that Tyree CAMPBELL is the user of telephone number (412) 728-5989, and that he resides at **311 Burrows Street, Pittsburgh, PA 15213 (Search Location 2)** based in part on the following: your affiant has discussed CAMPBELL with his previous probation officer, through which I learned that CAMPBELL provided telephone number (412) 728-5989 as his contact number to the Allegheny County Probation & Parole (ACPP) during his period of supervision. I am aware that CAMPBELL was contacted by ACPP on telephone number (412) 728-5989 as recently as January 2020.

37.      Investigators obtained a warrant/order authorizing the disclosure of GPS/E911 location data for the telephone utilized by CAMPBELL – (412) 728-8959 – during the course of this investigation (for the approximate date range of January 15, 2020 through February 29, 2020), through which I learned that telephone number (412) 728-8959 (utilized by

CAMPBELL) was routinely located (especially in the overnight hours) in the area of **Search Location 2.** Furthermore, along with paired physical surveillance and the interception of wire and electronic communications, investigators confirmed the user of the telephone is CAMPBELL. For example, on January 28, 2020, investigators intercepted communications between ROBINSON, using TARGET TELEPHONE #4, and the user of (412) 728-5989. During these communications, ROBINSON indicated he was on his way to meet with the user of the phone; investigators then saw ROBINSON arrive at **Search Location 2** and go inside the residence.

38.     In addition, throughout January, February, March 2020, April 2020, and May 2020, agents observed rental vehicles that were utilized by CAMPBELL parked in front of **Search Location 2.** For example, on February 5, 2020, at approximately 6:58 p.m., surveillance agents witnessed CAMPBELL exit **Search Location 2** and get into a grey in color Dodge Journey rental vehicle. Investigators followed CAMPBELL to a nearby location, where he remained in his vehicle and facilitated what appeared to be drug transactions in and around his vehicle.

39.     On March 25, 2020, your affiant saw a white Dodge Challenger rental vehicle parked in front of **Search Location 2**. Enterprise Rental Company advised that said vehicle was rented by "Denise Tillman, 475 Gardner Court, #203, Pittsburgh, PA 15213".

40.     On April 23, 2020, investigators saw a maroon Dodge Charger rental vehicle parked in front of **Search Location 2**. Enterprise Rental Company advised that said car was again rented by Denise Tillman, 475 Gardner Court, #203, Pittsburgh, PA 15213". Your affiant is aware that CAMPBELL reported the same address (475 Gardner Court, #203, Pittsburgh, PA 15213) to the Pennsylvania Department of Transportation in connection with his Pennsylvania state Identification Card. Based on my training and experience, I know that narcotics traffickers

will often utilize vehicles which are rented by relatives or close associates in order to evade law enforcement detection.

41.     On April 23, 2020, investigators conducting surveillance of **Search Location 2** witnessed Tyree CAMPBELL occupying the above mentioned Dodge Charger rental vehicle, which was parked in front of the residence. CAMPBELL was observed exiting the vehicle and entering **Search Location 2**; minutes later, CAMPBELL exited the residence, got into the Charger, and left the area.

42.     On May 5, 2020, at approximately 3:56 p.m., the above Dodge Charger was seen parked in front of **Search Location 2**, and on May 6, 2020, at approximately 3:25 p.m., CAMPBELL, driving the above mentioned Charger, pulled up to **Search Location 2** and parked. CAMPBELL then went to the front door and used a key to enter **Search Location 2**.

43.     Therefore, based on the GPS/E911 location data for (412) 728-5989, which showed CAMPBELL routinely in the area of **Search Location 2**, ROBINSON meeting CAMPBELL at **Search Location 2** (as described above on January 28, 2020), rental vehicles known to be utilized by CAMPBELL parked in front of **Search Location 2** on a daily basis for several months, including as recently as May 6, 2020, and CAMPBELL utilizing a key to enter the residence, I believe that CAMPBELL resides at **Search Location 2**.

44.     I have queries CAMPBELL's criminal history, which is as follows:

a.     On October 28, 2009, CAMPBELL was convicted of a felony drug offense.

b.     On November 30, 2011, CAMPBELL was convicted of a misdemeanor drug offense.

c.      On November 15, 2012, CAMPBELL was convicted of a misdemeanor drug offense.

d.      On July 10, 2013, CAMPBELL was convicted of a felony drug offense.

e.      On October 23, 2013, CAMPBELL was convicted of a misdemeanor drug charge.

f.      On March 11, 2019, CAMPBELL was convicted of a misdemeanor drug charge.

### iii. *Tracy BULLOCK – Identity and Association to Search Location(s)*

45.     Law enforcement has determined that Tracy BULLOCK is a street-level cocaine base (i.e., "crack") distributor, and is supplied by Phillip ROBINSON.

46.     Law enforcement has determined that Tracy BULLOCK is the user of (412) 871-8435 and that she resides at **22D Locust Street, McKees Rocks, PA 15136** (**Search Location 3**) based in part by the following: on January 10, 2020, at approximately 3:57 p.m., Phillip ROBINSON, using TARGET TELEPHONE #4, made an outgoing call to (412) 871-8435, which was intercepted pursuant to the above-described wiretap orders; however, the call was answered by an Unknown Male. When the Unknown Male answered the call, ROBINSON stated, "Hello yeah, uh, is Tracy there? I'm outside". Furthermore, on February 11, 2020, investigators were conducting surveillance on Phillip ROBINSON who I believe was planning to meet with BULLOCK based on intercepted telephone calls between ROBINSON and the user of (412) 871-8435. At approximately 3:51 p.m., investigators witnessed BULLOCK, who was positively identified via her Pennsylvania driver's license photograph, meet with ROBINSON near the 22

26

building of the Hays Manor Apartments (which is the apartment building where **Search Location 3** is housed).

47.     BULLOCK's Pennsylvania driver's license indicates that BULLOCK resides at **Search Location 3**.

48.     I am aware that BULLOCK was on federal supervised release following her conviction for conspiracy to distribute narcotics (in violation of 21 U.S.C. § 846), that she was supervised by the United States Probation Office for the Western District of Pennsylvania (until March 2020), and that she reported **Search Location 3** as her residence address.

49.     Investigators obtained a warrant/order authorizing the disclosure of GPS/E911 geolocation data for (412) 871-8435 (utilized by BULLOCK) from approximately January 15, 2020, through February 29, 2020. Your affiant learned that this telephone was routinely located (especially in the overnight hours) in the area of **Search Location 3**.

50.     On April 30, 2020, a law enforcement officer, acting in an undercover capacity, went to **Search Location 3** and knocked on the door; BULLOCK answered the door. The officer asked if anyone in the residence had ordered a food delivery, and BULLOCK responded that she was the only person that lived there, and did not order anything.

51.     Therefore, based on the GPS/E911 location data for (412) 871-8435, which showed BULLOCK routinely in the area of **Search Location 3**, ROBINSON meeting BULLOCK in front of the building that houses **Search Location 3** (as described above on February 11, 2020), the fact that BULLOCK lists "22D Locust Street" (**Search Location 3**) as her address on her Pennsylvania driver's license as well as with the United States Probation Office, and that she answered the door of **Search Location 3** on April 30, 2020, I believe that BULLOCK resides at **Search Location 3**.

52.    I have queried BULLOCK's criminal history, which is as follows:

a.    On February 14, 2018, BULLOCK was convicted of violating 21 U.S.C. § 841, distribution of cocaine, in the U.S. District Court for the Western District of Pennsylvania. BULLOCK was on federal supervised release with the United States Probation Office out of the Western District of Pennsylvania and was released from supervision in and around March 2020.

iv.    **_Javon EMBRY – Identity and Association to Search Location(s)_**

53.    Law enforcement has determined that Javon EMBRY is a street-level distributor of cocaine base (in the form commonly known as "crack"), and is supplied by Phillip ROBINSON.

54.    Law enforcement has determined that Javon EMBRY is the user of (412) 927-9248 and that he resides at **820 Bryn Mawr Street, Pittsburgh, PA 15219** (**Search Location 4**) based in part on the following: investigators obtained a warrant/order authorizing the disclosure of GPS/E911 geolocation data for telephone number (412) 927-9248, and paired with physical surveillance and the interception of wire and electronic communications, agents confirmed the user of the telephone is EMBRY.

55.    Moreover, EMBRY's Pennsylvania driver's license indicates that EMBRY resides at **Search Location 4**.

56.    Through GPS/E911 geolocation data for the telephone utilized by EMBRY, (412) 927-9248, between the period of January 15, 2020, through February 29, 2020, your affiant learned that this telephone was routinely located (especially in the overnight hours) in the area of **Search Location 4.**

57.     On April 20, 2020, investigators were conducting surveillance of **Search Location 4**; at approximately 2:37 p.m., a vehicle pulled up in front of the residence and Javon EMBRY exited **Search Location 4** and got into the passenger side of the vehicle. Just minutes later, EMBRY exited the vehicle and went back inside of **Search Location 4**. Based on your affiant's training and experience, this brief meeting inside of a vehicle is indicative of a narcotics transaction.

58.     Therefore, based on the GPS/E911 location data for (412) 927-9248, which showed EMBRY routinely in the area of **Search Location 4**, ROBINSON meeting EMBRY at **Search Location 4** (as described in a below call and surveillance, which occurred on January 9, 2020), the fact that EMBRY lists "820 Bryn Mawr Street" (**Search Location 4**) as his address on his Pennsylvania Driver's License, and the recent surveillance of EMBRY at **Search Location 4**, I believe that EMBRY resides at **Search Location 4**.

  v.   ***Sanzio WILLIAMS*** *– Identity and Association to Search Location(s)*

59.     As set forth herein, law enforcement has determined that Sanzio WILLIAMS is a street-level narcotics trafficker; that he is supplied with narcotics by Phillip ROBINSON; and that he has brokered narcotics deals between ROBINSON and Quamane BRYANT.

60.     Law enforcement has determined that Sanzio WILLIAMS is the user of telephone number (412) 689-3577, that he resides at **757 6th Street, Pitcairn, PA 15140** (**Search Location 5**), and that he utilizes the blue in color Buick sedan, PA Registration KGZ-7829 (**Search Location 10**), based in part by the following: via law enforcement subpoena, your affiant learned that telephone number (412) 689-3577 is subscribed to "Sanzio WILLIAMS, 757 6th St., Pitcairn, PA 15140".

61. Furthermore, on March 14, 2020, investigators intercepted communications through the above-described wiretaps, which led investigators to believe that the user of (412) 689-3577 was planning to meet with Quamane BRYANT. Through physical and electronic surveillance (surveillance cameras), agents identified WILLIAMS through his Pennsylvania driver's license photograph as the user of (412) 689-3577 meeting with Quamane BRYANT.

62. Investigators obtained a warrant/order authorizing the disclosure of GPS/E911 geolocation data for telephone number (412) 689-3577 (utilized by WILLIAMS), between approximately April 20, 2020, and the present, through which your affiant learned that this telephone is routinely located, especially in the overnight hours, in the area of **Search Location 5.**

63. I am aware that WILLIAMS lists "400 Swissvale Avenue, Apt. 2, Pittsburgh, PA 15221" as his address on his Pennsylvania driver's license. On March 14, 2020, WILLIAMS was observed operating a blue Buick sedan, bearing PA registration plate KGZ-7829 (**Search Location 10**), which is registered to "Jvon Phillips, 400 Swissvale Avenue, Apt. 2, Pittsburgh, PA 15221", which leads your affiant to believe that WILLIAMS is a close associate of Jvon Phillips. Furthermore, a check of Phillips' Pennsylvania Driver's License, which was issued on January 10, 2020, shows that Phillips lists her current address as "757 6th Street, Pitcairn, PA 15140", which is **Search Location 5**.

64. On April 21, 2020, at approximately 12:45 p.m., investigators on surveillance at **Search Location 5** witnessed WILLIAMS exit the residence with an Unknown Female and get into the blue in color Buick sedan, PA Tag KGZ-7829 (**Search Location 10**).

65. Therefore, based on the GPS/E911 location data for (412) 689-3577, which shows WILLIAMS routinely in the area of **Search Location 5**, the fact that WILLIAMS lists "757

6th Street" (**Search Location 5**) as the subscriber information for (412) 689-3577, and the recent surveillance of WILLIAMS and the vehicle associated with him (**Search Location 10**) at **Search Location 5**, I believe that WILLIAMS resides at **Search Location 5**.

66.     I have queried Sanzio WILLIAMS's criminal history, which includes his conviction on April 10, 2013, for a felony drug offense.

### vi.   _Joseph CLANCY – Identity and Association to Search Location(s)_

67.     As set forth herein, law enforcement has determined that Joseph CLANCY is a high-level distributor of cocaine base (in the form commonly known as "crack") and is a source of supply to Phillip ROBINSON.

68.     As set forth herein, law enforcement has determined that Joseph CLANCY is the user of telephone number (412) 459-8735, and that he resides at **1318 Orangewood Avenue, Pittsburgh, PA 15216** (**Search Location 6**) based in part by the following: on February 21, 2020, investigators intercepted communications between Phillip ROBINSON, using TARGET TELEPHONE #4, and telephone number (412) 459-8735, which led agents to believe that the users of the telephones were planning to meet to conduct a narcotics transaction. Utilizing GPS/E911 geolocation "ping" data for TARGET TELEPHONE #4 and surveillance, investigators witnessed ROBINSON meet with an individual believed to be the user of telephone number (412) 459-8735 in front of 143 Oak Hill Drive, Pittsburgh, PA 15213; however, agents were unable to confirm the identity of the individual who met with ROBINSON at that time.

69.     On February 27, 2020, ROBINSON and the user of telephone number (412) 459-8735 exchanged communications regarding a meeting to conduct another narcotics transaction.  Once again, agents utilized geolocation "ping" data for TARGET TELPHONE #4, combined with the intercepted communications and physical surveillance, through which

investigators were able to surveil ROBINSON meet with Joseph CLANCY, who was identified using his Pennsylvania driver's license photograph, on Webster Avenue in Pittsburgh, PA. On this date, CLANCY was the passenger in a cream Lincoln sedan, bearing PA registration KRA-0937, which is registered to Jenelle JENNINGS, 1318 Orangewood Ave., Pittsburgh, PA 15216 (**Search Location 6**).

70.     Investigators obtained a warrant/order authorizing the disclosure of GPS/E911 location data for telephone number (412) 459-8735, and utilized said data from approximately March 10, 2020, through April 23, 2020.  Through that data, your affiant learned that this telephone was routinely located (especially in the overnight hours) in the area of **Search Location 6**.

71.     In addition, through subpoenaed records, I am aware that Jenelle JENNINGS is the current[14] Duquesne Light account holder for the residence located at **1318 Orangewood Avenue, Pittsburgh, PA 15216** (**Search Location 6**). As stated, JENNINGS is the registered owner of the Lincoln sedan utilized by CLANCY on February 27, 2020 when he supplied ROBINSON with what your affiant believes is a distribution quantity of cocaine base (i.e.,"crack").

72.     On March 12, 2020, investigators were analyzing the location data for (412) 459-8735, and saw that the telephone was "pinging" in the area of 143 Oak Hill Dr., Pittsburgh, PA 15213. Investigators on surveillance went to that location, and witnessed a navy Volvo SUV, bearing PA registration KVT-6761, which is registered to Joseph CLANCY, 131 Moultrie St., Pittsburgh, PA 15219, parked in front of the residence.

---

[14]     This information is current as of May 1, 2020.

73.     On March 18, 2020, investigators installed a surveillance camera in the area of **Search Location 6**. Your affiant is aware that since establishing this fixed surveillance, several vehicles have been seen parked at or in front of **Search Location 6**, including the above mentioned cream in color Lincoln sedan, which CLANCY occupied on February 27, 2020, as well as the navy Volvo SUV, bearing PA registration KVT-6761, which is registered to Joseph CLANCY. Notably, the navy Volvo is routinely parked in front of **Search Location 6**, and is frequently driven/occupied by a black male fitting the description of CLANCY.

74.     Investigators have been reviewing the surveillance camera footage for **Search Location 6**, and have witnessed a black male, fitting the description of CLANCY routinely utilize the navy in color Volvo, the silver in color Camaro, and a black in color SUV, which is usually parked in the driveway and often also utilized by an unknown black female. For example, on April 30, 2020, a black male, fitting the description of CLANCY, was seen walking from the direction of **Search Location 6** on the walkway toward the navy Volvo; this black male got into the driver's seat of the Volvo and left the area. Furthermore, on May 4, 2020, a black male, positively identified as CLANCY[15], was seen getting into the silver Camaro parked in front of **Search Location 6**; and on May 5, 2020, at approximately 1:18 p.m., CLANCY was seen getting into his navy Volvo, which was parked in front of **Search Location 6**.

75.     Therefore, based on the GPS/E911 location data for (412) 459-8735, which showed CLANCY routinely in the area of **Search Location 6**, the fact that vehicles registered to, and associated with CLANCY are routinely parked at or near **Search Location 6**, and the current

---

[15]     Investigators familiar with CLANCY from previous encounters on surveillance confirmed his identity, as the surveillance camera was zoomed in on the front door area of the Camaro.

surveillance of CLANCY and the vehicles associated with him at **Search Location 6**, I believe that CLANCY resides at **Search Location 6**.

76.     I have queries CLANCY's criminal history, which includes the following convictions:

a.      On February 7, 1995, CLANCY was convicted of felony aggravated assault.

b.      On June 8, 1995, CLANCY was convicted of a misdemeanor firearms offense and a felony drug offense.

c.      On February 11, 2010, CLANCY was convicted of a felony firearms offense.

d.      On May 26, 2011, CLANCY was convicted of a felony drug offense.

vii.    ***Quamane BRYANT – Identity and Association to Search Location(s)***

77.     As set forth herein, law enforcement has determined that Quamane BRYANT is a street-level narcotics (e.g., cocaine base, cocaine, and heroin) dealer, who is supplied by Phillip ROBINSON, Martin LANGFORD, Andre MOORE-COLEMAN, and possibly others.

78.     Law enforcement has determined that Quamane BRYANT is the user of TARGET TELEPHONE #5 based, in part, on the following: on February 6, 2020, at approximately 10:37 a.m., an Unknown Female, using telephone number (412) 918-9720, sent a text message to TARGET TELEPHONE #5 stating, "Quamane".  On February 6, 2020, at approximately 3:02 p.m., an Unknown Female using (412) 432-7755 made an outgoing call to TARGET TELEPHONE #5, and at the beginning of the call, the Unknown Female stated, "Hello Quamane?", to which the user of TARGET TELEPHONE #5 replied, "Yeah".  On or around February 15, 2020,

34

the user of TARGET TELEPHONE #5 received numerous text messages and telephone calls wishing him a happy birthday, and the user told others that it was his birthday; through Quamane BRYANT's Pennsylvania Driver's License, that Quamane BRYANT's date of birth is February 15, 1990.

79.    Law enforcement has determined that Quamane BRYANT primarily resides at **708 Webster Terrace, Pittsburgh, PA 15219** (**Search Location 7**), which is also the residence of his mother [16], Kimberly KIDD. Your affiant is aware, based on Pennsylvania Department of Transportation information, that KIDD lists "708 Webster Terrace, Pittsburgh, PA 15219" (**Search Location 7**) on her driver's license.  Furthermore, via law enforcement subpoena, investigators learned that KIDD is the current Duquesne Light account holder for **Search Location 7**, and reported her telephone number as (412) 736-2389. In addition, via law enforcement subpoena, your affiant learned that Quamane BRYANT is the current Comcast account holder for **Search Location 7**, and reported his telephone number as (412) 867-8076 (TARGET TELEPHONE #5).[17]

80.    Investigators obtained a warrant/order authorizing the disclosure of GPS/E911 geolocation "ping" data for TARGET TELEPHONE #5 (utilized by Quamane BRYANT), during the course of this investigation, and utilized that data from approximately January 15, 2020, through April 8, 2020.  Through that geolocation "ping" data, your affiant learned that TARGET TELEPHONE #5 was routinely located (especially in the overnight hours) in the area of **Search Location 7.**  On or about April 18, 2020, investigators saw that BRYANT

---

[16]    During several telephone calls with the number associated with KIDD (412-736-2389), BRYANT referred to her as "Mom".

[17]    This information from Comcast was provided on April 27, 2020.

appeared to discontinue the use of TARGET TELEPHONE #5. Therefore, your affiant conducted telephone analysis on several telephone numbers that BRYANT had frequent contact with, including (904) 613-2941, utilized by ROBINSON, (412) 689-3577, used by WILLIAMS, and (412) 689-4617, used by James BRYANT Jr., in an attempt to locate a replacement telephone for BRYANT.

81.     Based on the above described telephone analysis, your affiant saw that all three of the above subjects had contact with a common number, being (412) 327-1067, beginning on or about April 19, 2020. Furthermore, your affiant learned via law enforcement subpoena that (412) 327-1067 was activated on April 18, 2020, and is subscribed to "James Bryant", which is the same name that BRYANT used for the subscriber information for TARGET TELEPHONE #5. Lastly, in addition to contacting ROBINSON, WILLIAMS, and BRYANT Jr. from (412) 327-1067, pen register data showed that (412) 327-1067 is in contact with (412) 862-9867, which your affiant knows to be utilized by Markita COPELAND (whom I know to have a child with Quamane BRYANT), as well as (412) 496-1395, used by Ronald CIOTTI, a cocaine base customer of BRYANT (as described above). Therefore, your affiant believes that BRYANT discontinued the use of (412) 867-8076 on or about April 18, 2020, and replaced it with (412) 327-1067, which, based on pen register data for (412) 327-1067, is currently being utilized by BRYANT in the same manner in which he utilized TARGET TELEPHONE #5.

82.     Your affiant obtained a warrant/order authorizing the disclosure of GPS/E911 geolocation "ping" data for TARGET TELEPHONE #5 (utilized by Quamane BRYANT), during the course of this investigation, and utilized that data from approximately January 15, 2020, through April 8, 2020.  Through that geolocation "ping" data, your affiant learned that TARGET TELEPHONE #5 was routinely located (especially in the overnight hours)

in the area of **Search Location 7**.  Your affiant also obtained a warrant/order authorizing the disclosure of  GPS/E911 geolocation "ping" data for (412) 327-1067, (utilized by Quamane BRYANT), on May 4, 2020. Through that geolocation "ping" data, your affiant learned that (412) 327-1067 is routinely located (especially in the overnight hours) in the area of **Search Location 7**.

83.    In addition, law enforcement has determined that BRYANT occasionally stays with his father, James BRYANT Jr., at his residence (**Search Location 8**).  I am aware that geolocation "ping" data showed that TARGET TELEPHONE #5 commonly "pinged" in the area of **Search Location 8**, including in the overnight hours.

84.    During the period of interception of wire and electronic communications over TARGET TELEPHONE #5, your affiant learned that Quamane BRYANT would refer to **Search Location 7** as his "raises", which I know to slang used to describe one's mother, and would refer to **Search Location 8** as his "Dad's" or his "Pop's".

85.    Therefore, based on the GPS/E911 location data for TARGET TELEPHONE #5, which showed BRYANT routinely in the area of **Search Location 7**, the GPS/E911 location data for (412) 327-1067, which also has shown BRYANT in the area of **Search Location 7,** the fact that BRYANT is the customer of record for the Comcast Account at **Search Location 7**, intercepted communications between BRYANT and his mother, KIDD, in which they discuss "BRYANT's room" at the residence, I believe that BRYANT primarily resides at **Search Location 7**.

viii.***James BRYANT Jr.*** *– Identity and Association with Search Location(s)*

86.    Law enforcement has determined that James BRYANT Jr. is a street-level narcotics trafficker, who conspires with Quamane BRYANT (his son) to distribute heroin and

cocaine base (in the form commonly known as "crack"), and is supplied with those narcotics by

Quamane BRYANT, Martin LANGFORD, Andre MOORE-COLEMAN (and possibly others).

87.    Law enforcement has determined that James BRYANT Jr. is the user of

telephone number (412) 689-4617 based, in part, by the following: via subpoenaed records, I am

aware that James BRYANT Jr. provided the telephone number (412) 689-4617 as his contact

number to Duquesne Light[18] in connection with the electric utility for the residence at **Search**

**Location 8** and to Comcast[19] in connection with the cable/internet utility for the residence at

**Search Location 8**.

88.    Law enforcement has determined that J. BRYANT Jr. resides at **338**

**Russellwood Drive, Apt. 3, McKees Rocks, PA 15136** (**Search Location 8**) through the

following: via subpoenaed records, I am aware that J. BRYANT Jr. is the current  Duquesne Light

account holder for the residence located at 338 Russellwood Avenue, FLR 3, McKees Rocks, PA

15136 (**Search Location 8**); via subpoenaed records, I am aware that J. BRYANT Jr. is the current

Comcast account holder for the residence located at 338 Russellwood Ave. Apt 3, McKees Rocks,

PA 15136 (**Search Location 8**). J. BRYANT Jr., who is currently supervised by Allegheny County

Probation & Parole, indicated that J. BRYANT Jr. provided **Search Location 8** as his residence.[20]

In addition, on numerous occasions throughout the investigation, agents intercepted

communications over TARGET TELEPHONE #5, utilized by Quamane BRYANT, indicating that

he was going to, or was presently located at his father's residence; as previously stated, through

---

[18]    This information is current as of May 1, 2020.

[19]    This information is current as of April 27, 2020.

[20]    BRYANT Jr. provided the address of 338 Russellwood Drive, McKees
Rocks, PA 15136, but did not list an apartment number.

GPS/E911 geolocation "ping" data for TARGET TELEPHONE #5 (utilized by Quamane BRYANT), agents observed that when BRYANT indicated he was at his father's residence (which were made known to investigators through intercepted communications over TARGET TELEPHONE #5), the geolocation "ping" data for TARGET TELEPHONE #5 revealed that TARGET TELEPHONE #5 (utilized by Q. BRYANT) was "pinging" in the area of **Search Location 8**.

89.     Therefore, based on the GPS/E911 location data for TARGET TELEPHONE #5, which showed James BRYANT Jr.'s son, Quamane BRYANT, routinely in the area of **Search Location 8**, the fact that BRYANT Jr. is the customer of record for the Duquesne Light and Comcast Accounts at **Search Location 8**, and the fact that BRYANT Jr. reports his current address as **Search Location 8** to Allegheny County Probation & Parole, I believe that BRYANT Jr. primarily resides at **Search Location 8**.

90.     I have queried J. BRYANT Jr.'s criminal history, which revealed as follows:

a.      On each of July 26, 2005, and March 2, 2009, J. BRYANT Jr. was convicted of a misdemeanor drug offense.

b.      On May 22, 2012, J. BRYANT Jr. was convicted of a felony drug offense.

c.      On September 15, 2016, J. BRYANT Jr. was convicted of a felony drug offense.

91.     I am aware that J. BRYANT Jr. is currently supervised by Allegheny County Probation & Parole, with an anticipated release date of September 15, 2021.

**B.      COMPLAINT #1: INTERCEPTED COMMUNICATIONS EVIDENCING A CONSPIRACY TO DISTRIBUTE 28 GRAMS OR MORE OF COCAINE BASE (IN THE FORM COMMONLY KNOWN AS "CRACK")**

92.      Through the intercepted wire and electronic communications set forth below, along with surveillance and other investigative techniques described herein, I believe that from in and around January 2020 and continuing thereafter until in and around May 2020, Phillip ROBINSON, Tyree CAMPBELL, Tracy BULLOCK, Javon EMBRY, Sanzio WILLIAMS, Joseph CLANCY, and others known and unknown, conspired to possess with intent to distribute and distribute 28 grams or more of cocaine base (in the form commonly known as "crack"), a Schedule II controlled substance, in the Western District of Pennsylvania. Moreover, I submit that the following evidence demonstrates probable cause to conduct searches at Search Locations 1, 2, 3, 4, 5, 6, 7, 8, 10, 12, 13, and 14, for evidence of the TARGET OFFENSES.

93.      As discussed herein, I believe that CLANCY supplied distribution amounts (i.e., multiple ounces) of cocaine base to ROBINSON. I believe that ROBINSON then redistributed cocaine base (i.e., "crack") to CAMPBELL, BULLOCK, EMBRY, WILLIAMS, Q. BRYANT, and others, with smaller distribution amounts of cocaine base (such as half-ounce or quarter-ounce quantities of cocaine base (i.e., "crack")), and these subjects (including CAMPBELL, BULLOCK, EMBRY, WILLIAMS, and Q. BRYANT) then re-distributed smaller quantities of cocaine base (i.e., "crack") (such as $20 worth (0.2 grams) or $100 worth (1 gram)) of cocaine base (i.e., "crack") to end-users.  Below are examples of intercepted communications involving these subjects, which I believe demonstrate the existence of a conspiracy to distribute and possess with intent to distribute 28 grams or more of cocaine base (in the form commonly known as "crack"):

94.     Beginning on January 7, 2020, at approximately 4:44 p.m., Phillip ROBINSON (PR), using **TARGET TELEPHONE #4**, exchanged several text messages with Javon EMBRY (JE), using (412) 927-9248, stated below:

> 1/7/2020, 4:44 p.m., from PR to JE: "Yo"
>
> 1/7/2020, 4:45 p.m., from JE to PR: "**Not yet waitin on bro**"
>
> 1/9/2020, 12:40 p.m., from PR to JE: "Yo"
>
> 1/9/2020, 12:49 p.m., from JE to PR: "**Slide without**"
>
> 1/9/2020, 12:49 p.m., from PR to JE: "Aite"
>
> 1/9/2020, 1:12 p.m., from PR to JE: "Outside"

95.     Following these text messages, at approximately 1:15 p.m., Phillip ROBINSON (PR), using **TARGET TELEPHONE #4**, made an outgoing call to Javon EMBRY, using (412) 927-9248. Below is a draft transcription of the call:

> JE:     **Here I come**
>
> PR:     Alright

96.     Based on my training and experience, and my knowledge of this case in particular, in the above text messages and call, I believe that EMBRY told ROBINSON that he was not ready to meet with ROBINSON yet to pay ROBINSON for previously supplied narcotics because EMBRY was still waiting to receive money from one of his customers ("Not yet waitin on bro"). Two days later, on January 9, 2020, I believe that EMBRY told ROBINSON that he could meet and pay ROBINSON for previously supplied narcotics, but advised that he did not need to be re-supplied by ROBINSON ("Slide without") at that time. Shortly thereafter, I believe that ROBINSON advised EMBRY that he was at EMBRY's location ("Outside"), and then called EMBRY, who stated he would come outside ("Here I come").

97.     Your affiant is aware that EMBRY lists 820 Bryn Mawr Rd., Pittsburgh, PA 15219 (**Search Location 4**) on his Pennsylvania driver's license; based on this information, as well as information obtained from GPS/E911 geolocation data for TARGET TELEPHONE #4, which showed ROBINSON in the area of 820 Bryn Mawr Rd. at the time of the above text messages, investigators set up physical surveillance in the area of 820 Bryn Mawr Road (**Search Location 4**). At approximately 1:15 p.m., investigators witnessed ROBINSON arrive in a Jeep Grand Cherokee, bearing Pennsylvania registration plate LDB-4686, and park in front of the residence. At approximately 1:16 p.m., EMBRY exited the residence and got into the front passenger seat of the Jeep; one minute later, at approximately 1:17 p.m., EMBRY exited the Jeep and returned to his residence, after which ROBINSON left the area. Based on the intercepted communications stated above, and the surveillance observations noted above, your affiant believes that EMBRY met ROBINSON to pay him money that was owed for previously supplied narcotics.

98.     On January 26, 2020, at approximately 5:39 p.m., Phillip ROBINSON, using TARGET TELEPHONE #4, received an incoming text message from Tyree CAMPBELL, using (412) 728-5989, which stated "**Yo**". Approximately one hour later, at 6:39 p.m., Phillip ROBINSON (PR), using TARGET TELEPHONE #4, received an incoming call from Tyree CAMPBELL (TC), using (412) 728-5989. Below is a draft transcription of the call:

PR:     Yo.

TC:     What's the deal?

PR:     Shit, chillin, what you doin?

TC:     **Shit, you get back on yet?**

PR:     Oh yeah **it's tomorrow for what you want, but I uh, have a little bit til it's gone**

TC:     **What, some shit done up?**

PR:     Yeah, **tomorrow I'll have that other for you**

TC:     Alright, shit I need, I got, I got 3 for you and I'ma need some of that

PR:     What you say?

TC:     I said I'ma need some of that. **I got 3 for you.**

PR:     Alright I'ma um**, I'ma call you when I get over and get you some that's done already**

TC:     Yeah **I ain't got none.**

PR:     **Oh (laughing) you dry**. (laughing) Alright.

TC:     Swear I was just knocked out though. Swear I been meanin to hit you all day but I was tired as hell bro.

PR:     **Yeah, alright don't leave I'll be over there in like 20 minutes**.

TC:     Alright I'm waiting for you I ain't got nothing.

PR:     Oh alright.

TC:     Alright.

99.     Based on my training and experience, and my knowledge of this case in particular, in the above text message and call, I believe that CAMPBELL reached out to ROBINSON ("Yo") because CAMPBELL was out of cocaine base (i.e., "crack"). I believe that CAMPBELL asked ROBINSON if he had cocaine base (i.e., "crack") for sale ("Shit, you back on yet?), and ROBINSON replied that he would have more the following day, but had a small amount remaining that he could supply to CAMPBELL ("it's tomorrow for what you want, but I uh, have a little bit til it's gone"). I believe that CAMPBELL asked if ROBINSON was referring to cocaine base ("What, some shit done up?"), which ROBINSON confirmed, and stated he would have a second type of narcotics for him the following day ("tomorrow I'll have that other for you"). I believe that CAMPBELL advised that he had an amount of U.S. currency for ROBINSON when he stated, "I got 3 for you."  Based on my training and experience, I believe that CAMPBELL communicated to ROBINSON that he intended to provide ROBINSON with $300, which your affiant believes to be consistent with the purchase price of a quarter-ounce (i.e., seven (7) grams)

of cocaine base (i.e., "crack").  Alternatively, if CAMPBELL was communicating to ROBINSON that "3" was $3,000 that he intended to provide to ROBINSON, I believe this to be consistent with the purchase price of two (2) ounces (i.e., 56 grams) of cocaine base (i.e., "crack").

100.    I believe that ROBINSON told CAMPBELL that he would bring him cocaine base "(I'ma call you when I get over and get you some that's done already"). I believe that CAMPBELL went on to tell ROBINSON that he currently did not have any cocaine base to sell ("I ain't got none."), and ROBINSON laughed that CAMPBELL had nothing left ("Oh (laughing) you dry").  I believe that ROBINSON then instructed CAMPBELL to stay at his current location and ROBINSON would deliver the cocaine base to him. ("Yeah, alright don't leave I'll be over there in like 20 minutes").

                i.    *February 2, 2020: ROBINSON Supplies EMBRY with $900 worth of cocaine base*

101.    On February 2, 2020, beginning at approximately 2:23 p.m., Javon EMBRY (JE), using (412) 927-9248, exchanged a series of text messages with Phillip ROBINSON (PR), using TARGET TELEPHONE #4, as stated below:

        2:23 p.m. – From JE to PR: "**Slide got 9**"

        5:15 p.m. – From PR to JE: "Aite"

        6:51 p.m. – From PR to JE: "Wya"

        6:51 p.m. – From JE to PR: "**Crib**"

102.    Based on your affiant's training and experience, and my knowledge of this case in particular, in the above text messages, I believe that EMBRY advised ROBINSON that he had $900 to use toward the purchase of approximately 21 grams[21] of cocaine base (i.e., "crack")

---

      [21]    Based on your affiant's experience, I am aware that in the Pittsburgh area, a distributor who purchases an ounce of cocaine base (i.e., "crack") commonly pays approximately

from ROBINSON. I believe that ROBINSON agreed to supply EMBRY, and later asked where EMBRY was located, to which EMBRY replied that he was at his residence ("crib"), which your affiant is aware is **Search Location 4**.

   ii. *February 6, 2020 – February 7, 2020: ROBINSON supplies BULLOCK with $600 worth of cocaine base*

103.    On February 6, 2020, beginning at approximately 11:05 a.m., Phillip ROBINSON (PR), using **TARGET TELEPHONE #4**, exchanged a series of text message with Tracy BULLOCK (TB), using (412) 871-8435, which are set forth below:

| | |
|---|---|
| 11:05 a.m., from TB to PR: | "**U good**" |
| 1:06 p.m., from PR to TB: | "**Yea**" |
| 1:06 p.m., from PR to TB: | "Give me a sec" |
| 1:07 p.m., from TB to PR: | "Okay" |
| 4:13 p.m., from TB to PR: | "**How on before you come got six**" |
| 5:25 p.m., from PR to TB: | "Aite give me 30min my fault" |
| 5:27 p.m., from TB to PR: | "Okay" |
| 7:07 p.m., from TB to PR: | "Still coming" |
| 7:11 p.m., from PR to TB: | "Yea on way" |

104.    Based on my training and experience, and my knowledge of this case in particular, in the above string of text messages, I believe that BULLOCK asked ROBINSON if he had cocaine base (i.e., "crack") to supply her with ("U good"), to which ROBINSON replied in the affirmative ("Yea"). I believe that BULLOCK asked ROBINSON how long he would be ("How on before you come"), and indicated that she "got six", referring to $600 of U.S. currency,

---

$1,200 per ounce.  Therefore, I believe that $900 would equate to approximately three-quarters of an ounce of cocaine base, or 21 grams.

with which she intended to use to purchase cocaine base (i.e., "crack") from ROBINSON (or was repaying ROBINSON for previously acquired cocaine base).

105.     On February 6, 2020, at approximately 8:02 p.m., Phillip ROBINSON (PR), using **TARGET TELEPHONE #4**, made an outgoing call to Tracy BULLOCK (TB) using (412) 871-8435. Below is a draft transcription of the call:

TB:     Hello?

PR:     Hello, hey, hey my fault, I, I meant to call you. **This uh, I gotta fix it, this is too soft.**

TB:     Oh okay, you want me to wait until tomorrow?

PR:     Nah it will be today, it will be today.

TB:     Okay

PR:     Aight

TB:     Okay

106.     Based on my training and experience, and my knowledge of this case in particular, in the above call, I believe that ROBINSON, who was arranged to re-supply BULLOCK with a quantity of cocaine base (based on the above exchange of text messages), stated that he would not be able to distribute her the cocaine base (i.e., "crack") when he stated, "I gotta fix it, this is too soft".  Your affiant is aware that ROBINSON distributes multiple types of narcotics, including cocaine base, and that cocaine base is "cooked" down from powder cocaine into a rock-like form. Therefore, based on the above statement by ROBINSON, your affiant believes that ROBINSON advised BULLOCK that the cocaine base was not properly "cooked", and that he would needed time to correct the cocaine base so that it was in the proper rock-like form.  Based on the above text messages and the above call, I believe that ROBINSON either intended to distribute BULLOCK $600 worth of cocaine base (i.e., "crack"), which based on my experience,

46

would be an appropriate price for a half-ounce of cocaine base (i.e., 14 grams), or that BULLOCK previously acquired $600 worth of cocaine base (i.e., 14 grams) on consignment, and was now repaying ROBINSON for that cocaine base, and was going to acquire more cocaine base on consignment.

107.    On February 7, 2020, at approximately 12:54 p.m., Phillip ROBINSON (PR), using **TARGET TELEPHONE #4**, made an outgoing call to Tracy BULLOCK (TB) using (412) 871-8435. Below is a draft transcription of the call:

TB:   Hello

PR:   Hello?

TB:   Yeah

PR:   **Yeah, where you at?**

TB:   **In the house**

PR:   **Aite, I'm on my way.**

TB:   Alright

PR:   Aite

108.    Shortly after this call, at approximately 1:13 p.m., Phillip ROBINSON (PR), using **TARGET TELEPHONE #4**, made an outgoing call to Tracy BULLOCK (TB) using (412) 871-8435. Below is a draft transcription of the call:

TB:   Hello?

PR:   **Yeah, I'm pullin up**

TB:   Okay

PR:   Aite

109.     Based on my training and experience, and my knowledge of this case in particular, in the above calls, I believe that ROBINSON asked BULLOCK her location ("In the house"), and ROBINSON stated that he was on his way ("Aite, I'm on my way"), which I believe was for the purpose of conducting the cocaine base transaction. Shortly thereafter, I believe ROBINSON advised that he was at her location ("Yeah, I'm pullin up"), leading your affiant to believe that ROBINSON collected the $600 from BULLOCK and supplied her with additional cocaine base.

iii.   *February 7, 2020 through February 21, 2020: CLANCY supplied ROBINSON with Cocaine Base, which ROBINSON redistributed*

110.     On February 7, 2020, at approximately 12:55 p.m., Phillip ROBINSON (PR), using TARGET TELEPHONE #4, made an outgoing call to Tyree CAMPBELL (TC), using (412) 728-5989. Below is a draft transcription of the call:

TC:   Yo

PR:   Yo

TC:   U/I

PR:   What you say?

TC:   What's the deal? U/I

PR:   Shit, chillin. What you doin'?

TC:   On my way back to the Hill. **What's good wit it?**

PR:   Oh yeah? **Uh, soon as my peoples get off, at like 3.**

TC:   Aite look, U/I til later.

PR:   Yeah nephs

TC:   U/I I'm hold off, I U/I prolly get, **I'll prolly get like two all together**, grab one off U/I, I ain't hear shit.

PR:     Yeah, nephs

TC:     U/I, I'm definitely, definitely gonna need like two U/I

PR:     Aite, aite, yeah, huh?

TC:     **I said I'm a definitely need two when you get it.**

PR:     Aite, **I'm a call you soon as uh, I get it.**

TC:     Aite, **what's up with some of that gas?**

PR:     No, oh, **yeah yeah yup**, yup yup yup, um, it's um, it's like that, **it's some, I forget what it's called, it's some crazy shit.** I'm um, I'm bout to run to the west real quick, **I'm a call you soon as I get back.**

TC:     Aite, hit me.

PR:     Aite

111.   Based on my training and experience, and my knowledge of this case in particular, in the above call, I believe that CAMPBELL asked ROBINSON if ROBINSON had narcotics available ("What's good wit it?"), and ROBINSON indicated that he would have more cocaine base when his supplier became available after 3 p.m., ("Uh, soon as my peoples get off, at like 3"). I believe that CAMPBELL told ROBINSON that he would need a quantity of two units of cocaine base when he stated, "I'll prolly get like two all together" and "I said I'm a definitely need two when you get it". Based on my knowledge of this investigation, I believe that CAMPBELL was requesting two ounces (i.e., 56 grams) of cocaine base from ROBINSON.  I believe that ROBINSON told CAMPBELL that he would contact CAMPBELL as soon as ROBINSON had the cocaine base ("I'm a call you soon as uh, I get it"). I believe that CAMPBELL then asked ROBINSON if ROBINSON had any marijuana for sale ("what's up with some of that gas?")[22], to which ROBINSON stated that he did, but he did not remember the name of the

---

[22]     During this investigation, your affiant has learned that members and

particular strand of marijuana he had but would contact CAMPBELL later about it ("yeah yeah yup", "it's some, I forget what it's called, it's some crazy shit", and "I'm a call you soon as I get back."). Based on the second portion of this communication regarding marijuana, as well as additional communications intercepted on February 21 and February 22, 2020, your affiant believes that the type of narcotics that CAMPBELL expressed wanting to purchase two ounces of was not marijuana, and was likely cocaine base (i.e., "crack").

112. On February 8, 2020, beginning at approximately 7:18 p.m., Phillip ROBINSON (PR), using TARGET TELEPHONE #4, exchanged a series of text messages with Tyree CAMPBELL (TC), using (412) 728-5989, which are stated below:

> 7:18 p.m., from PR to TC:  "I got a on some gas"
>
> 7:23 p.m., from TC to PR:  **"No work yet"**
>
> 7:24 p.m., from PR to TC:  **"Nope thought it was glin be yesterday"**

113. Based on my training and experience, and my knowledge of this case in particular, in the above string of text messages, I believe that ROBINSON notified CAMPBELL that he had marijuana available ("I got a on some gas"), but CAMPBELL replied asking if ROBINSON had any cocaine base yet ("No work yet"), to which ROBINSON replied that he did not, and thought that he was going to get re-supplied the day prior, but was not ("Nope thought it was glin be yesterday").  Based on my training and experience, I know that "work" is coded language commonly used to describe cocaine base (i.e., "crack").

114. On February 9, 2020, at approximately 1:02 p.m., Phillip ROBINSON (PR), using TARGET TELEPHONE #4, made an outgoing call to Tyree CAMPBELL (TC), using (412) 728-5989. Below is a draft transcription of the call (U/I: Unintelligible):

---

associates of 11 Hunnit, including Phillip ROBINSON, Tyree CAMPBELL, Victor SIMMONS, and others commonly refer to marijuana as "gas".

TC:   Yo

PR:   Yo yo

TC:   U/I **the same**?

PR:   What you say?

TC:   U/I

PR:   **Yeah, when I talked to him yesterday, it prolly be tomorrow, he said a couple, he said a couple days. I talked to him yesterday.**

TC:   Aite, **you ain't got none, you ain't got none laying around?**

PR:   **Nope**, nephs, none.  U/I, nephs.

TC:   U/I

PR:   Fuckin U/I

TC:   U/I, I be like, damn.

PR:   Yeah, U/I, **he said hopefully tomorrow, cause I ain't got shit.**

TC:   U/I I ain't tryin U/I

PR:   I'm uh, I'm a, I'm a see if my man has some, he ugly U/I. You hear me?

TC:   Let me know if you like come across some, I'm, I'm tryin to hold off for real and wait, U/I

PR:   Yeah but if you uh, if you, if you got some uh, when I do get it, I'll still, I'll give you a few. U/I grab U/I

TC:   Aite, just let me know.

PR:   Aite

115.   Based on my training and experience, and my knowledge of this case in particular, in the above call, I believe that CAMPBELL asked ROBINSON if he had any cocaine base (i.e., "crack") with which to supply CAMPBELL ("the same?"), to which ROBINSON replied that he still did not, but that his supplier indicated that he would likely have more the

51

following day.  I believe that ROBINSON advised CAMPBELL that he spoke with his supplier the previous day ("Yeah, when I talked to him yesterday, it prolly be tomorrow, he said a couple, he said a couple days. I talked to him yesterday."). I believe that CAMPBELL asked ROBINSON if he had any quantity of cocaine base that ROBINSON could provide CAMPBELL with until then ("you ain't got none, you ain't got none laying around?"), to which ROBINSON stated he did not ("Nope"). I believe that ROBINSON told CAMPBELL that he was hoping to be resupplied the following day because ROBINSON had no cocaine base to sell ("he said hopefully tomorrow, cause I ain't got shit.").

116.    On February 11, 2020, beginning at approximately 1:50 p.m., Phillip ROBINSON (PR), using TARGET TELEPHONE #4, exchanged a series of text messages with Tyree CAMPBELL (TC), using (412) 728-5989, which are stated below:

> 1:50 p.m., from TC to PR:     "Yo"
>
> 2:31 p.m., from PR to TC:     "Yoyo"
>
> 2:31 p.m., from TC to PR:     "**Back on**"
>
> 3:23 p.m., from PR to TC:     "**Not yet**"

117.    Based on my training and experience, and my knowledge of this case in particular, in the above string of text messages, I believe that CAMPBELL asked ROBINSON if he obtained cocaine base yet ("Back on"), and ROBINSON replied that he did not ("Not yet").

118.    On February 11, 2020, beginning at approximately 3:23 p.m., Phillip ROBINSON (PR), using TARGET TELEPHONE #4, exchanged a series of text messages and telephone calls with Tracy BULLOCK (TB), using (412) 871-8435, as detailed below:

> 3:23 p.m., from PR to TB:     "**U ready**"
>
> 3:25 p.m., from TB to PR:     "**Yeah**"
>
> 3:26 p.m., from PR to TB:     "**Here I come**"
>
> 3:47 p.m., from PR to TB:     "**Pullin up**"

52

119.     At approximately 3:50 p.m., Phillip ROBINSON (PR), using TARGET TELEPHONE #4, made an outgoing call to Tracy BULLOCK (TB) using (412) 871-8435. Below is a draft transcription of the call:

| | |
|---|---|
| TB: | Hello |
| PR: | **Yeah I'm outside** |
| TB: | Aite |
| PR: | Aite |

120.     Based on my training and experience, and my knowledge of this case in particular, in the above string of text messages and telephone call, I believe that ROBINSON asked BULLOCK if she was ready to pay ROBINSON for the cocaine base he previously supplied her with on February 7, 2020 ("U ready"), to which BULLOCK indicated that she was ("Yeah"), so ROBINSON advised he was on his way to her location ("Here I come", Pullin up", and "Yeah I'm outside").

121.     Investigators surveilled ROBINSON in the area of 906 Memory Lane, Pittsburgh, PA, (**Search Location 14**) and at approximately 3:32 p.m., ROBINSON was seen leaving the area in a black Honda Accord, bearing PA registration KYL-8079 (**Search Location 13**). At approximately 3:51 p.m., investigators witnessed ROBINSON arrive in the area of Locust Street, McKees Rocks, PA, 15136, specifically, the 22 building of the Hays Manor Apartments, (the building that houses **Search Location 3**).  There, agents observed a black female, later positively identified as BULLOCK, wearing a grey sweat suit walk up to ROBINSON's Honda Accord, and lean in through the window.  After a few seconds, BULLOCK walked away, and ROBINSON drove out of the area. Based on the above calls and text message, and my training and experience, I believe that during this meeting BULLOCK paid ROBINSON for cocaine base (i.e., "crack") that he previously supplied to her on February 7, 2020 on credit.

122.    On February 14, 2020, at approximately 10:45 a.m., Phillip ROBINSON (PR), using TARGET TELEPHONE #4, received an incoming text message from Tracy BULLOCK (TB), using (412) 871-8435, which stated "**I got six**". Based on my training and experience, and my knowledge of this case in particular, I believe that BULLOCK was advising ROBINSON that she had an additional $600 to give ROBINSON for cocaine base (i.e., "crack") that ROBINSON previously supplied to her on credit. Based on my experience, your affiant is aware that $600 is an appropriate price for a half-ounce of cocaine base (i.e., "crack").

123.    On February 14, 2020, at approximately 12:17 p.m., Phillip ROBINSON (PR), using **TARGET TELEPHONE #4**, received an incoming call from Tracy BULLOCK (TB) using (412) 871-8435. Below is a draft transcription of the call (U/I: Unintelligible):

| | |
|---|---|
| PR: | Hello |
| TB: | Hello how you doin? |
| PR: | I'm good. Yeah, U/I |
| TB: | U/I |
| PR: | Huh? |
| TB: | You see my text? |
| PR: | Huh? |
| TB: | **You see my text? You get my text?** |
| PR: | Yeah, **yeah, but I ain't, uh, get none yet. I'm fuckin still waitin'**. |
| TB: | Oh, okay. I didn't mean to wake you up then |
| PR: | Naw it's cool, I was up. I was U/I on my car |
| TB: | Okay |
| PR: | Aite yeah, **soon as I'll let you know** |
| TB: | Okay |
| PR: | Aite |

124.    Based on my training and experience, and my knowledge of this case in particular, in the above call, I believe that BULLOCK asked ROBINSON if he saw her text message, which I believe was a reference to the above message in which she indicated that she "had six".  I believe BULLOCK expressed that she received no reply from ROBINSON when she stated, "You see my text? You get my text?"  I believe that ROBINSON indicated that he did receive it, but he did not have any more cocaine base to supply her with at that time ("yeah, but I ain't, uh, get none yet. I'm fuckin still waitin"). I believe that ROBINSON told BULLOCK that he would let her know as soon as he obtained more cocaine base ("soon as I'll let you know").

125.    On February 20, 2020, beginning at approximately 8:02 p.m., Phillip ROBINSON, (PR), using TARGET TELEPHONE #4, exchanged a series of text messages with Tracy BULLOCK (TB) using (412) 871-8435, stated below:

> 8:02 p.m., From PR to TB:    "**Tomorrow**"
>
> 8:12 p.m., From TB to PR:    "Okay about what time"

126.    Based on my training and experience, and my knowledge of this case in particular, in the above text messages, I believe that ROBINSON notified BULLOCK that he would have more narcotics to distribute to her the following day, and BULLOCK asked what time (to which ROBINSON did not immediately reply).

127.    On February 21, 2020, at approximately 3:11 p.m., Phillip ROBINSON, (PR), using **TARGET TELEPHONE #4**, received an incoming call from Joseph CLANCY (JC) using (412) 459-873523. Below is a draft transcription of the call (U/I: Unintelligible):

> PR:    Yo yo
>
> JC:    What's up bro?
>
> PR:    Shit, cool man, **you around**?
>
> JC:    **Naw I uh, out here with my grandson**, **I'll be over there like 7, is that**

---

23      CLANCY was positively identified at a later date.

**cool**?

PR:    Yeah that's cool

JC:    **Aite, you gonna come up my way?**

PR:    **Yeah yup**

JC:    U/I a deuce?

PR:    Say, say that again?

JC:    **I said what are you doin, a deuce a them things**?

PR:    Yeah

JC:    **Aite yeah, I'll catch you at 7 bro**

PR:    Aite

JC:    My man

128.    Based on my training and experience, and my knowledge of this case in particular, in the above call, I believe that ROBINSON asked CLANCY if he was available to meet to conduct a narcotics-related transaction ("you around"), but CLANCY indicated that he was not because he was with his grandson, but would be available at 7:00 p.m. ("Naw, I uh, out here with my grandson, I'll be over there like 7, is that cool?").  I believe that CLANCY asked if ROBINSON was going to come to his location, to which ROBINSON replied that he would ("Aite, you gonna come up my way?", and "Yeah yup").

129.    I believe that when CLANCY asked ROBINSON, "I said what are you doin, a deuce a them things?", he was asking ROBINSON whether he wanted to purchase two ounces of cocaine base (in the form commonly known as "crack"), which ROBINSON confirmed ("Yeah").

130.    I am aware from my training and experience and my knowledge of this investigation, that the term "deuce" is commonly used to describe a quantity of two (2).  In this instance, I believe that a "deuce of them things" was coded language used by CLANCY to describe

two ounces (i.e., 56 grams) of cocaine base. I believe this to be two ounces (as opposed to two grams) because the quantity of U.S. currency that ROBINSON was collecting from his customer base, and the fact that in order to supply multiple other cocaine base distributors, including BULLOCK, CAMPBELL, EMBRY, and others, ROBINSON would need a much larger quantity of cocaine base than only two (2) grams.[24]

131.    Finally, I believe that CLANCY expressed that he would see ROBINSON at 7:00 p.m. to obtain those narcotics from CLANCY ("Aite yeah, I'll catch you at 7 bro").

132.    Shortly after this call, at approximately 3:37 p.m., Phillip ROBINSON (PR), using **TARGET TELEPHONE #4**, made an outgoing call to Tracy BULLOCK (TB) using (412) 871-8435. Below is a draft transcription of the pertinent portions of the call:

> PR:    Yeah, I thought it was gonna, **I thought I was gonna have it um, now, but uh, it's, it's gonna be seven, it's gonna be for sure today though, like for sure for sure**.
>
> TB:    Later?
>
> PR:    **Yeah, round, like round like 8 or something**
>
> TB:    Okay

133.    Based on my training and experience, and my knowledge of this case in particular, in the above call, I believe that ROBINSON called BULLOCK (right after confirming his meeting with CLANCY, his source of supply of cocaine base (i.e., "crack")) and indicated that he would have cocaine base (i.e., "crack") later that day to distribute to her ("I thought I was gonna have it um, now, but uh, it's, it's gonna be seven, it's gonna be for sure today though, like for sure for sure.").  I believe that ROBINSON arranged to meet BULLOCK around 8 p.m. to supply her

---

[24]    Your affiant is aware that 0.1 grams of cocaine base is worth approximately $10; therefore, I believe that two (2) grams of cocaine base is worth approximately $200. In contrast, one ounce of cocaine base (wholesale) is worth between $1,200 and $1,500.

with cocaine base (i.e., "crack") to allow enough time for ROBINSON to meet CLANCY and obtain those narcotics, some of which he would redistribute to BULLOCK around 8:00 p.m. ("Yeah, round, like round like 8 or something"). Thus, I believe that ROBINSON expressed his intentions to purchase a quantity of cocaine base (i.e., "crack") from CLANCY, which he intended to then redistribution a portion thereof to BULLOCK.

134.   Beginning at approximately 6:53 p.m., Phillip ROBINSON (PR), using TARGET TELEPHONE #4, exchanged a series of text messages with Joseph CLANCY (JC), using (412) 459-8735, stated below:

| | | |
|---|---|---|
| 6:53 p.m., From JC to PR: | "Here" |
| 6:54 p.m., From PR to JC: | "**Same place**" |
| 6:55 p.m., From JC to PR: | "**Da oak**" |
| 7:10 p.m., From PR to JC: | "Here" |

135.   Based on my training and experience, and my knowledge of this case in particular, I believe that the above string of text messages were intended to facilitate the meeting between CLANCY and ROBINSON, during which I believe CLANCY was to supply ROBINSON with approximately two ounces of cocaine base (i.e., "crack").  I believe that CLANCY advised ROBINSON that he had arrived to the location of the narcotics distribution ("Here"), to which ROBINSON confirmed that it was a familiar meeting location ("Same place"), indicating to your affiant that ROBINSON had previously met with CLANCY in the past at this location. I believe that CLANCY replied, confirming that he was at the location he called, "Da oak". Shortly thereafter, ROBINSON replied that he had arrived ("Here").

136.   Prior to intercepting these communications, investigators were utilizing GPS/E911 geolocation "ping" data for TARGET TELEPHONE #4 to locate ROBINSON in anticipation of him meeting with CLANCY from the above call. At approximately 6:43 p.m.,

ROBINSON's black Honda Accord, bearing PA registration KYL-8079 (**Search Location 13**), was located along the back side of Memory Lane (in the vicinity of **Search Location 14**). As investigators were positioning themselves to surveil **Search Location 13**, investigators saw that the vehicle had left at some point prior to 6:53 p.m., which is the time of the first intercepted text message described above between CLANCY and ROBINSON.

137.    As noted above, ROBINSON and CLANCY referenced a meeting location, which I believe was known to both of them, and previously utilized by both of them; however, because of the vague, coded language used by CLANCY and ROBINSON, investigators were not privy to the exact location. Therefore, based on knowledge of the Pittsburgh area, as well as GPS/E911 location data for TARGET TELEPHONE #4, which indicated that ROBINSON was still in the Hill District, investigators went to the Oak Hill Complex (believing it to be a possible interpretation of the term "da oak", which was used by ROBINSON and CLANCY in the above text messages) in an attempt to locate and surveil the meeting that was discussed in the above-described intercepted communications between ROBINSON and CLANCY.

138.    At approximately 7:14 p.m., investigators located ROBINSON's black Honda Accord, bearing PA registration KYL-8079 (**Search Location 13**), parked in front of 143 Oak Hill Drive, Pittsburgh, PA (located in the Oak Hill Complex), where agents observed an unknown black male wearing a maroon sweatshirt, a dark tossel cap, and dark pants walking away from ROBINSON's Honda Accord (**Search Location 13**) and onto the porch of 143 Oak Hill Drive where he entered a townhouse. At the same time, ROBINSON departed in the Honda Accord (**Search Location 13**), however investigators did not attempt to follow ROBINSON based on his history of conducting counter-surveillance to uncover the presence of law enforcement.

139.    Knowing that ROBINSON was on Memory Lane prior to being supplied with cocaine base (i.e., "crack") by CLANCY, investigators on surveillance went to that area and located ROBINSON's Honda Accord (**Search Location 13**) sitting at the stop sign of Memory Lane and White Hill Drive at approximately 7:21 p.m.

140.    Your affiant conducted analysis of the GPS/E911 location data for TARGET TELEPHONE #4 for the next several hours, and saw that for a majority of the time between 7:21 p.m., and 10:23 p.m., ROBINSON was along the back side of Memory Lane, near **Search Location 14**.

141.    Therefore, I believe that after ROBINSON obtained approximately two ounces (i.e., 56 grams) of cocaine base (i.e., "crack") from CLANCY, he returned to **Search Location 14**.

142.    Later that evening, on February 21, 2020, at approximately 10:10 p.m., Phillip ROBINSON (PR), using TARGET TELEPHONE #4, made an outgoing call to Tracy BULLOCK (TB) using (412) 871-8435. Below is a draft transcription of the call:

TB:    Hello?

PR:    Yeah

TB:    Hello?

PR:    **Yeah, where you at?**

TB:    **In my house**.

PR:    **Oh aite, I'm on my way.**

TB:    Aite

PR:    Aite

143.    Shortly thereafter, at approximately 10:47 p.m., Phillip ROBINSON (PR), using **TARGET TELEPHONE #4**, made an outgoing call to Tracy BULLOCK (TB) using (412) 871-8435. Below is a draft transcription of the call:

TB:    Hello

PR:    **Yeah, I'm pullin up**

TB:    Alright

PR:    Aite

144.    Based on my training and experience, and my knowledge of this case in particular, in the above two telephone calls, I believe that ROBINSON called BULLOCK and asked where she was located ("Yeah, where you at?"), to which she replied that she was home ("In the house").  I believe that ROBINSON stated that he was on his way to her, later indicating that he was there ("Yeah, I'm pullin up").

145.    Based on these calls, in addition to ROBINSON's communications with CLANCY, as set forth above, I believe that ROBINSON obtained approximately two ounces of cocaine base (i.e., "crack") from CLANCY, which he then redistributed at least a portion of to BULLOCK.

146.    Still on February 21, 2020, at approximately 10:11 p.m., Phillip ROBINSON (PR), using TARGET TELEPHONE #4, made an outgoing call to Tyree CAMPBELL (TC), using (412) 728-5989, however the call went unanswered. As noted above, I believe that ROBINSON had just been resupplied with approximately two ounces of cocaine base (i.e., "crack") by CLANCY, and that ROBINSON was reaching out to CAMPBELL to inquire whether CAMPBELL wanted to purchase any of the same.

147.    Still on February 21, 2020, at approximately 10:12 p.m., Phillip ROBINSON (PR), using TARGET TELEPHONE #4, made an outgoing call to Javon EMBRY (JE), using (412) 927-9248. Below is a draft transcription of the call:

JE:    Yo

PR:    Yo, what's the deal?

JE:    What up bro?

PR:     Shit, where you at?

JE:     The crib

PR:     Oh**, I'm a uh, pull up on you**

JE:     **Aite, don't bring nuttin though**

PR:     **Oh, aite**.

JE:     Aite

PR:     Aite

148.    Based on my training and experience, and my knowledge of this case in particular, in the above call, I believe that ROBINSON called EMBRY and advised EMBRY that he would come to EMBRY's location, which I believe was for the purpose of obtaining U.S. currency from EMBRY for previously supplied cocaine base (i.e., "crack"). I believe that ROBINSON advised EMBRY that he was able to supply EMBRY with cocaine base (i.e., "crack") if EMBRY desired to purchase any from ROBINSON ("I'm a uh, pull up on you"), as ROBINSON had just be resupplied with the same by CLANCY. I believe that EMBRY assented to meeting ROBINSON, but advised ROBINSON not to bring any cocaine base ("Aite, don't bring nuttin though"). I believe that in so stating, EMBRY expressed to ROBINSON that because he had not finished selling the cocaine base (i.e., "crack") that ROBINSON had previously supplied him with, he was not then able to purchase any additional quantities of cocaine base (i.e., "crack").

149.    Still on February 21, 2020, beginning at approximately 11:12 p.m., and continuing into the early morning hours of February 22, 2020, Philip ROBINSON (PR), using TARGET TELEPHONE #4, and Tyree CAMPBELL (TC), using (412) 728-5989, exchanged a series of text messages, which are stated below:

February 21, 2020

11:12 p.m., From TC to PR:   "Yo bro"

February 22, 2020

12:20 p.m., From PR to TC:  "**I got some its done though**"

12:32 p.m., From TC to PR:  "Ite"

12:49 p.m., From PR to TC:  "Wya"

2:25 p.m., From TC to PR:  "**Bout cum hill**"

2:37 p.m., From PR to TC:  "Aite"

150.    Based on my training and experience, and my knowledge of this case in particular, in the above string of text messages, I believe that CAMPBELL tried to get ahold of ROBINSON ("Yo bro"), who had called him approximately one hour before CAMPBELL's text. I believe that ROBINSON replied that he had more cocaine base (i.e., "crack") with which to supply to CAMPBELL ("I got some its done though").[25] I believe that CAMPBELL then told ROBINSON that he was on his way to the Hill District ("Bout cum hill") where the cocaine base (i.e., "crack") transaction would take place.

151.    Later in the afternoon of February 22, 2020, at approximately 5:47 p.m., Phillip ROBINSON (PR), using TARGET TELEPHONE #4, received an incoming call from Tyree CAMPBELL (TC), using (412) 728-5989. Below is a draft transcription of the call:

PR:    Yo

TC:    Yo

PR:    Yeah, what's the deal?

TC:    What's goin on?

PR:    Shit, chillin, **where you at?**

---

[25]    As previously noted, your affiant is aware that powder cocaine is "cooked" down or processed into cocaine base. I believe that in this text message, ROBINSON is advising CAMPBELL that the product he obtained is already in its final form, meaning cocaine base.

TC:      **I'm up the way**

PR:      **Aite, I'll be up.**

TC:      Aite

PR:      Aite

152.    Based on my training and experience, and my knowledge of this case in particular, in the above call, I believe that ROBINSON asked CAMPBELL where he was located, and CAMPBELL replied that he was "Up the way", which your affiant believes is a location in the Hill District neighborhood of Pittsburgh.  I believe that ROBINSON indicated that he would come to CAMPBELL's location in order to re-supply CAMPBELL with cocaine base (i.e., "crack"), which was discussed in the previously referenced conversations.

153.    As noted above, I believe that on February 21, 2020, ROBINSON obtained approximately two ounces of cocaine base (i.e., "crack") from CLANCY, which he then redistributed to individuals such as BULLOCK and CAMPBELL (and attempted to sell to EMBRY).

iv.   *February 27, 2020: CLANCY Supplied ROBINSON with cocaine base, which ROBINSON redistributed*

154.    Below are calls and surveillance which illustrate that a cocaine base transaction between CLANCY and ROBINSON occurred on February 27, 2020. On this date, CLANCY was positively identified, and investigators also identified a vehicle associated with him. Following ROBINSON obtaining cocaine base from CLANCY, ROBINSON supplied BULLOCK with a quantity of cocaine base, and requested that she report back to him the quality of the cocaine base from BULLOCK's customer base.

64

155.    On February 27, 2020, beginning at approximately 4:06 p.m., Phillip ROBINSON (PR), using TARGET TELEPHONE #4, exchanged a series of text messages with Joseph CLANCY (JC), using (412) 459-8735, as stated below:

> 4:06 p.m., from PR to JC: "**U around**"
>
> 4:07 p.m., from JC to PR: "**Jabo 435**"
>
> 4:14 p.m., from JC to PR: "Is dat cool"
>
> 4:15 p.m., from PR to JC: "Yra"
>
> 4:15 p.m., from PR to JC: "Yea"
>
> 4:16 p.m., from JC to PR: "Aite"
>
> 4:44 p.m., from JC to PR: "**Here**"
>
> 4:50 p.m., from PR to JC: "Here"
>
> 4:51 p.m., from JC to PR: "**Jabo**"

156.    Based on my training and experience, and my knowledge of this case in particular, in the above string of text messages, I believe that ROBINSON asked CLANCY if he was "around", indicating that he needed to meet with CLANCY to be re-supplied with cocaine base.  CLANCY replied with a coded message stating, "Jabo 435", which investigators later determined to be a meeting location (as set forth herein, "Jabo's" refers to a corner store in the Hill District called "Ann's Market", which is located at 2316 Webster Ave.) and the approximate time of 4:35 p.m.

157.    Based on this information, investigators set up surveillance in the area of 906 Memory Lane (**Search Location 14**), as ROBINSON's vehicle (**Search Location 13**) was parked in front of the residence. At approximately 4:50 p.m., investigators witnessed **Search Location 13** exit Memory Lane onto Bedford Avenue.

158.    Investigators were able to locate ROBINSON's vehicle (**Search Location 13**) parked on Webster Avenue near Ann's Market (which I believe to be the location referred to as "Jabo's"); at approximately 4:52 p.m., investigators witnessed Joseph CLANCY exit the front passenger seat of **Search Location 13** and walk away. ROBINSON drove away, and CLANCY got into the front passenger seat of a cream Lincoln sedan, bearing PA registration KRA-0937, which is registered to January / Jenelle JENNINGS, 1318 Orangewood Ave., Pittsburgh, PA 15216 (**Search Location 6**).

159.    Later that evening, beginning at approximately 7:09 p.m., Phillip ROBINSON (PR), using TARGET TELEPHONE #4, exchanged a series of text messages with Tracy BULLOCK (TB), using (412) 871-8435, as stated below, in which I believe ROBINSON told BULLOCK he did not forget about her request for cocaine base, and was about to meet her to re-supply her with cocaine base:

7:09 p.m., from TB to PR: "**U didn't forget about me**"

7:10 p.m., from PR to TB: "Naw I didn't"

7:10 p.m., from PR to TB: "**Bout to come**"

7:10 p.m., from TB to PR: "Okay"

160.    At approximately 7:47 p.m., Phillip ROBINSON (PR), using TARGET TELEPHONE #4, made an outgoing call to Tracy BULLOCK (TB), using (412) 871-8435. Below is a draft transcription of the call:

TB:    Hello?

PR:    **Yeah, I'm pullin up**

TB:    Okay

PR:    Aite

161.    At approximately 7:52 p.m., Phillip ROBINSON (PR), using TARGET TELEPHONE #4, made an outgoing call to Tracy BULLOCK (TB), using (412) 871-8435. Below is a draft transcription of the call:

TB:    Hello?

PR:    Yeah, um, and um, **let me know what's good too**?

TB:    Say that again?

PR:    Let me know what's, what, what, what, what it's hittin for

TB:    **Why, somethin different?**

PR:    Naw, **yeah yeah. It is, it is, but, I U/I it was, I just wanna make sure**

TB:    Okay

PR:    Aite, let me know soon as.

TB:    Okay, okay

PR:    Aite

TB:    Aite

162.    Based on your affiant's training and experience, and my knowledge of this case in particular, in the above calls, I believe that ROBINSON advised BULLOCK that he was pulling up to her residence to re-supply her with cocaine base (i.e., "crack"). In the second call, I believe that ROBINSON called BULLOCK back and asked that she ask her customer base about the quality of cocaine base ("let me know what's good too"). I believe that BULLOCK asked if the cocaine base was different ("Why, something different?"), and ROBINSON replied that it was different from the cocaine base that he previously supplied her with, and ROBINSON wanted to make sure that the quality was still good ("yeah yeah. It is, it is, but, I U/I it was, I just wanna make sure").

163.    At approximately 8:07 p.m., Phillip ROBINSON (PR), using TARGET TELEPHONE #4, received an incoming text message from Tracy BULLOCK (TB), using (412)

871-8435, which stated, "**It's wonderful**". I believe that BULLOCK was describing the quality of the cocaine base (i.e., "crack") that ROBINSON had supplied her with, as he directed her to do.

164.    Later that evening, at approximately 9:50 p.m., Phillip ROBINSON (PR), using TARGET TELEPHONE #4, made an outgoing call to Tracy BULLOCK (TB), using (412) 871-8435. Below is a draft transcription of the call:

TB:    Hello?

PR:    Yeah

TB:    **Yeah, I text you**. It um, **that guy that was wit me that came to the building, he had went, I called you right back cause he done went home. He said yeah, alright.**

PR:    So everythin, aite.

TB:    Mmn hmn.

PR:    Aite

TB:    Okay

165.    Based on my training and experience, and my knowledge of this case in particular, in the above call, I believe that ROBINSON called BULLOCK regarding the quality of the cocaine base he had supplied to her. I believe that BULLOCK indicated that she sent him a text message ("Yeah, I text you"), and that her cocaine base customer that was with her tried the product and told her that the quality was good ("that guy that was wit me that came to the building, he had went, I called you right back cause he done went home. He said yeah, alright.").

166.    Therefore, I believe that CLANCY supplied ROBINSON with an unknown quantity of cocaine base, and that ROBINSON redistributed at least a portion of that cocaine base to BULLOCK who, in turn, redistributed (at least a portion) of the cocaine base to an unknown male.  I believe that ROBINSON confirmed with BULLOCK that the quality of the cocaine base was good ("So everythin, aite").

v. *January 2020 through April 2020: ROBINSON supplies WILLIAMS and Q. BRYANT with cocaine base, which is redistributed.*

167.    On January 6, 2020, at approximately 5:54 p.m., Phillip ROBINSON (PR), using TARGET TELEPHONE #4, made an outgoing call to Quamane BRYANT, using TARGET TELEPHONE #5. Below is a draft transcription of the call (U/I: Unintelligible):

QB:    What up bro?

PR:    Yo, what's the deal? Hey you, **hey you wasn't done with that?**

QB:    **Yeah, I'm done**. I didn't even come over that mother fucker uh, U/I **tell them niggas to um give give you give you some bread** but U/I I'm about to call the trap. I'm coming over I didn't even come out that day. I was over to U/I

PR:    Aight

QB:    Yeah, I'll, **I'll be calling you bro...today**

PR:    Aight

168.    Based on my training and experience, and my knowledge of this case in particular, in the above call, I believe that ROBINSON asked Q. BRYANT if he had sold all the narcotics that ROBINSON had previously provided him with ("hey you wasn't done with that?"). I believe that Q. BRYANT replied that he was, but did not have the money he owed ROBINSON, and was going to have other unknown conspirators give ROBINSON on his behalf ("Yeah I'm done"… "tell them niggas to um give give you give you some bread"). I believe that Q. BRYANT then told ROBINSON that he would call ROBINSON later that day regarding the payment ("I'll be calling you bro…today").

169.    Beginning on January 7, 2020, at approximately 5:53 p.m., Phillip ROBINSON (PR), using TARGET TELEPHONE #4, exchanged several text messages with the Quamane BRYANT (QB)  using TARGET TELEPHONE #5, during which I believe that

ROBINSON was trying to contact Q. BRYANT to collect money that he owed to ROBINSON for previously supplied narcotics:

> 1/7/2020, 5:53 p.m., from PR to QB: "Yo"
>
> 1/8/2020, 10:41 a.m., from PR to QB: "Yo"
>
> 1/8/2020, 4:01 p.m., from PR to QB: "Why u keep ignoring me"

170.     On January 8, 2020, at approximately 11:04 p.m., Phillip ROBINSON (PR), using TARGET TELEPHONE #4, received an incoming call from Quamane BRYANT (QB) using TARGET TELEPHONE #5. Below is a draft transcription of the call:

> PR:     Yeah
>
> QB:     **Bro where you at?**
>
> PR:     **Um, on the H.**
>
> QB:     I'm out here, I'm out the way. **You wanna me to pull up on you?**
>
> PR:     Yeah I'm up uh, I'm up uh, uh Oak Hill. Where, where you at?
>
> QB:     I'm at the, I'm ah, I'm at little bro's. I's bout to run in here and take him somethin real quick
>
> PR:     Oh aite, um, I'm bout ta uh, I'm bout to come out there.
>
> QB:     Aite
>
> PR:     Aite

171.     Based on my training and experience, and my knowledge of this case in particular, in the above call, I believe that BRYANT asked where ROBINSON was located ("Bro where you at?"), and ROBINSON replied that he was in Pittsburgh's Hill District ("Um, on the H"). I believe that BRYANT asked if he could meet ROBINSON ("You wanna me to pull up on you?"), and the two discussed a meeting location so that ROBINSON could obtain money from BRYANT.

172.     On January 12, 2020, at approximately 3:56 p.m., Phillip ROBINSON (PR), using TARGET TELEPHONE #4, made an outgoing call to Quamane BRYANT (QB) using TARGET TELEPHONE #5. Below is a draft transcription of the call:

QB:     Hello

PR:     Yo

QB:     Hey you, you, you got uhh...**you got a Mike Vick?**

PR:     Yea, but I fuckin' had, I'm about to eat real quick, I had left. Would you uh, meet me there right now?

QB:     Yea, I did. But you, you, you at the restaurant and shit?

PR:     Yeah

QB:     Damn.

PR:     Nephs

QB:     Yeah, cause I was about to come grab, come grab you and shit. And I was goin to have em just, you know what I mean?

PR:     Yeah

QB:     Drop me off over there. But I was already connecting them cause I didn't even have it with me. So you feel me?

PR:     Yeah, nephs.

QB:     Oh shit, ohhh.

**PR: I    don't see uhhh...I was about to say, see if your, uh, bro still has some but I just was up there yesterday.**

QB:     Alright, Alright well. Yeah, alright I'll, I'll see.

PR:     Alright, yeah you could get it, you could get it off him and I'll just get it back off

QB:     U/I, yeah yeah yeah. I'll see. I got you. I know what you mean bro

PR:     Alright

173.     Later that evening, at approximately 6:15 p.m., Phillip ROBINSON (PR), using TARGET TELEPHONE #4, received an incoming call from Quamane BRYANT, using TARGET TELEPHONE #5. Below is a draft transcription of the call:

71

PR:     Hello

QB:     Hey bro, what you doing? You still at the house?

PR:     What you say?

QB:     I said what you doing? **You get to the Hill yet?**

PR:     Naw, I ain't get over there yet bro. Where you at?

QB:     I'm up top.

PR:     Uh, Oh, **I'll be up.**

QB:     I'm up, I'm up a little bro's

PR:     Alright

QB:     H-h-h-how long 'cause I'm, I'm waitin' on this ride right now. But I, I ain't going far.

PR:     In like 20 minutes.

QB:     Alright, alright, alright. Call, just call me when you're on your way.

PR:     Alright

174.    Based on my training and experience, and my knowledge of this case in particular in the above calls, I believe that Q. BRYANT asked ROBINSON for approximately seven (7) grams of cocaine base ("you got a Mike Vick"), which your affiant knows is slang for "7".[26] I believe that ROBINSON advised that he had that quantity of cocaine base available to distribute; however, ROBINSON expressed that he was currently eating and could not meet BRYANT. I believe that ROBINSON told BRYANT to check with another male, whom ROBINSON supplied the previous day, to see if BRYANT could obtain the cocaine base from him ("I was about to say, see if your, uh, bro still has some but I just was up there yesterday").

---

[26]     Your affiant is aware that NFL football player Michael Vick wore jersey #7 and, based my experience, I am aware that this is a common term used by narcotics traffickers when discussing a quantity of narcotics equaling seven (e.g., seven grams).

175.    In the second call, I believe that BRYANT and ROBINSON discussed each other's location ("You get to the hill yet?"…"I'll be up"), as I believe that they were setting up a meeting to conduct a narcotics-related transaction, indicating to your affiant that BRYANT did not obtain cocaine base from the other male that ROBINSON mentioned in the first call, and still needed to meet with ROBINSON to obtain the previously requested quantity of cocaine base (i.e., seven (7) grams).

176.    On January 17, 2020, at approximately 10:27 p.m., Phillip ROBINSON (PR), using TARGET TELEPHONE #4, made an outgoing call to Quamane BRYANT (QB), using TARGET TELEPHONE #5. Below is a draft transcription of the call:

QB:    What up bro bro

PR:    Yo what's the deal?

QB:    Seein what you up to?

PR:    Shit chillin, uh on my way to the stu

QB:    Oh, yeah **I was tryin to get on a little bit earlier and shit but um**

PR:    Oh yeah, **I left my uh, jack in the crib and shit**

QB:    Naw its cool I'm probably gonna need you prolly later on tonight. When my, my peoples comin through and shit

PR:    Aight

QB:    **Anything change though? Anything new?**

PR:    No, nephs

QB:    Okay, I'll hit you man

PR:    Aight

177.    Based on my training and experience, and my knowledge of this case in particular, in the above call, I believe that BRYANT told ROBINSON that he needed to be re-supplied with narcotics by ROBINSON earlier than normal ("Oh, yeah I was tryin to get on a little bit earlier and shit but um").  I believe that ROBINSON told BRYANT that he left his telephone

at his house ("Oh yeah, I left my uh, jack in the crib and shit").  I believe that BRYANT told ROBINSON that he would need to see ROBINSON to obtain narcotics soon because his co-conspirators and/or customers will be coming to see BRYANT for narcotics ("I'm probably gonna need you prolly later on tonight. When my, my peoples comin through and shit"). I believe that BRYANT also asked ROBINSON if anything had changed or if ROBINSON had something new ("Anything change though? Anything new?"), which your affiant believes is either a reference to a new batch of cocaine and/or cocaine base.

178.    On February 7, 2020, at approximately 11:12 a.m., Quamane BRYANT (QB), using **TARGET TELEPHONE #5**, received an incoming text message from Ronald CIOTTI (RC), using (412) 496-1395.[27] Below is a draft transcription of the call:

QB:    Hey, what's up Ron?

RC:    Hey buddy, you okay today?

QB:    Yeah, what's goin' on?

RC:    **I'm headed your direction 'bout 20 minutes, 15 maybe**

QB:    Alright, that's cool.

RC:    You okay?

QB:    Yeah

RC:    **Where you want me to meet you at? Same place?**

QB:    Yeah, you can come up on by the, come up on Web on the side

RC:    Okay, by Duff. Alright, by your road, yeah.

QB:    All the way up though

RC:    Yep.

---

[27]    Your affiant is aware through a search of the databases Accurint and CLEAR, which I have found to be reliable sources of information, that this telephone number is associated with "RC Brothers" and to Ronald CIOTTI. Accurint and CLEAR are open-source databases frequently utilized by law enforcement investigators to obtain information on individuals.

QB:     Aite.

RC:     Aite, I'm, want me to call you when I'm down by the Arena?

QB:     Yeah that's cool

RC:     Okay buddy. **Hey ah, listen, hold on, I owe you $40 from yesterday, right?**

QB:     Yeah

RC:     **Aite, I got, I got $120 so, just an 80 piece I guess**

QB:     Alright

RC:     Alright buddy, thanks.

179.    Still on February 7, 2020, at approximately 11:38 a.m., Quamane BRYANT

(QB), using **TARGET TELEPHONE #5**, received an incoming call from Ronald CIOTTI (RC),

from (412) 496-1395. Below is a draft transcription of the call:

QB:     **You out there**?

RC:     Yep.

QB:     Aite.

RC:     I'm parked.

QB:     Aite.

RC:     Goin' up the hill by, goin up the hill by the old place

QB:     **Okay, just, just, make that um, make that right, remember? At that stop sign on the side, where I be havin you at?**

RC:     **Okay, I'll see you there.**

QB:     Aite

180.    Based on my training and experience, and my knowledge of this case in

particular, in the above calls, I believe that CIOTTI called Q. BRYANT and advised Q. BRYANT

that he would be headed to Q. BRYANT's location shortly ("I'm headed your direction 'bout 20

minutes, 15 maybe"), to which Q. BRYANT replied in the affirmative. I believe that CIOTTI

asked if he should meet Q. BRYANT in the same place ("Where you want me to meet you at?

75

Same place?"), and the two then discussed where they would meet. I believe that CIOTTI then confirmed with Q. BRYANT that he owes Q. BRYANT $40 from a previous transaction ("Hey ah, listen, hold on, I owe you $40 from yesterday, right?"), which Q. BRYANT confirmed, so CIOTTI told Q. BRYANT that he had $120 with him, so he wanted $80 worth of cocaine base (i.e., crack"), when CIOTTI stated, "Aite, I got, I got $120 so, just an 80 piece I guess"). Your affiant is aware that cocaine base (i.e., "crack") users will often refer to cocaine base as a "piece" or a "rock", and that they will preface those terms with the amount of money they have, which equates to the dollar value associated with a quantity.  In this instance, I believe that CIOTTI expressed that he had sufficient funds to purchase an $80 dollar quantity of cocaine base (i.e., "crack"), with an "80 piece" being coded language to describe $80 worth of cocaine base (i.e., "crack").  I believe that this quantity is approximately 0.8 grams, as each 0.1 gram of cocaine base commonly sells for approximately $10.

181.     During the next call, I believe that BRYANT asked CIOTTI if he was there, and directed him to a location where they have met in the past ("Okay, just, just, make that um, make that right, remember? At that stop sign on the side, where I be havin you at?").

182.     Still on February 7, 2020, investigators conducted surveillance in the area of Webster Avenue and Duff Street, which is in Pittsburgh's Hill District (near **Search Location 7**) and, at approximately 11:39 a.m., a white Dodge Ram, bearing PA registration ZKC-4109, which is registered to RC Brothers Inc., 221 Albany Street, Pittsburgh, PA 15220, was seen traveling on Webster Avenue and it proceeded to turn right onto Wandless Street. Moments later, investigators witnessed BRYANT walk from the stairs of Webster Terrace towards Wandless Street. At approximately 11:44 a.m., agents observed the Dodge Ram driving on the block from Webster Avenue to Wandless Street; moments later, agents observed BRYANT walking from

Wandless Street back towards Webster Terrace. Based on the above communications and physical surveillance, I believe that CIOTTI and BRYANT completed a drug transaction for approximately $80 work of cocaine base (i.e., "crack").

183. Beginning on February 28, 2020,[28] at approximately 7:12 p.m., Phillip ROBINSON (PR), using TARGET TELEPHONE #4, and Sanzio WILLIAMS (SW), using (412) 689-3577, exchanged telephone calls and a series of text messages, as stated below. Below is a draft transcription of the call (U/I: Unintelligible), which occurred on February 28, 2020 at 7:12 p.m., as well as a series of text messages exchanged between ROBINSON and WILLIAMS from March 1, 2020:

SW:     Yo

PR:     Yo, what's deal?

SW:     U/I bro?

PR:     Shit, where you at?

SW:     I'm on the east real quick

PR:     Oh, you ain't drivin?

SW:     Yeah, in a little bit. My girl just now went to the gas station real quick. U/I cool

PR:     Yeah, uh, **yeah um, pull up on me.**

SW:     Round the way?

PR:     Yeah

SW:     Aite, I'm a call you when I leave

PR:     Aite

SW:     Aite

---

[28]     Your affiant notes that this is the day after ROBINSON was re-supplied with cocaine base by Joseph CLANCY (February 27, 2020), which was set forth in full above.

7:58 p.m. – text message from PR to SW: "I'm bout to run somewhere let me know wen she there and u ready".

<u>March 1, 2020</u>

11:28 a.m. – From SW to PR: "Yo bro **what you looking like for today**"

3:50 p.m. – From PR to SW; "Wya"

3:50 p.m. – From SW to PR: "Crib right now"

3:51 p.m. – From PR to SW: "**U could pull up**"

3:51 p.m. – From SW to PR: "Wya"

3:51 p.m. – From PR to SW: "H"

3:52 p.m. – From SW to PR: "Yeah I'm bout to slide"

4:50 p.m. – From PR to SW: "Aite"

5:03 p.m. – From SW to PR: "**Outside bro**"

5:03 p.m. – From PR to SW: "Here I come"

184.     Based on my training and experience, and my knowledge of this case in particular, in the above call and text messages, I believe that WILLIAMS asked ROBINSON if he was able to supply WILLIAMS with cocaine base (i.e., "crack") ("what you looking like for today"), and ROBINSON advised WILLIAMS to come meet with him, as I believe that ROBINSON had recently obtained more cocaine base (i.e., "crack") on February 27, 2020, from CLANCY (described above) ("yeah um, pull up on me"). Based on the following text messages set forth above, and the apparent lack of communication on February 29, 2020, I believe that WILLIAMS did not meet with ROBINSON that day.

185.     However, on March 1, 2020, ROBINSON and WILLIAMS communicated again, via text messages set forth above, and in those text messages, I believe that WILLIAMS asked ROBINSON if he could still supply WILLIAMS with cocaine base (i.e., "crack") ("what

78

you looking like for today"), to which ROBINSON replied in the affirmative by advising WILLIAMS that he could come over to ROBINSON's location ("U could pull up"). Later in the afternoon that day, I believe that WILLIAMS indicated to ROBINSON that he was outside of his location ("Outside bro"), and ROBINSON indicated he was coming outside now to meet him ("Here I come") to supply him with a quantity of cocaine base (i.e., "crack").

186.   On March 13, 2020, at approximately 9:11 p.m., Quamane BRYANT, using TARGET TELEPHONE #5, received an incoming call from Sanzio WILLIAMS (SW) using (412) 689-3577. Below is a draft transcription of the call (U/I: Unintelligible):

SW:   **I 'posed to go see ol' boy and shit tonight**

QB:   Yeah? What it look like?

SW:   **He said shit wavy**

QB:   You-you-you good on your end?

SW:   Yeah, yeah, I'm good on my end, definitely good on my end. Uhuh. Said really uhh, he really tryin' uhh, not low, but he tryin' up they count for real for real and shit, feel me?

QB:   Mhm

SW:   Pulled up on his, **I think yesterday I pulled up on him. Drop some bread off to him and shit**, said uhh, he just, he just now hit me and said that U/I, so uhh, I might go see him in here in the next 11 for real. Bout to get the girls to settle down, make my little round out the door.

QB:   **Just hit me**, I'm over here, I'll be over, I'll be already over here. **I'm over my raises**.

SW:   Oh, you in the hood already?

QB:   Yeah

SW:   Aight, bet. I'll meet you when I'm there.

QB:   Aight

187.   Based on my training and experience, and my knowledge of this case in particular, in the above call, I believe that WILLIAMS told Q. BRYANT that he was going to meet with a person he refers to as "ol' boy", ("I 'posed to go see ol' boy and shit tonight") who

79

your affiant believes to be Phillip ROBINSON, for reasons described herein. I believe that WILLIAMS told Q. BRYANT that ROBINSON indicated that he had cocaine base (i.e., "crack") for distribution when he stated, "He said shit wavy".[29]

188.    I believe that WILLIAMS told Q. BRYANT that he dropped off money to ROBINSON the day prior ("I think yesterday I pulled up on him. Drop some bread off to him and shit"). I believe that Q. BRYANT told WILLIAMS to contact him later, and indicated that he was at his mom's residence ("Just hit me…I'm over my raise's"), referring to **Search Location 7**.

189.    The following day, March 14, 2020, at approximately 11:12 a.m., Quamane BRYANT, using TARGET TELEPHONE #5, received another incoming call from Sanzio WILLIAMS (SW), using (412) 689-3577. Below is a draft transcription of the call (U/I: Unintelligible):

QB:    What up, bro?

SW:    Bro, you up bro?

QB:    Yeah, I'm up, I'm chillin'

SW:    You up the hood?

QB:    **Yeah, I'm still in the hood. I'm over my raise's, what's the deal bro?**

SW:    Shit, uhh, '**bout to call him now, U/I I couldn't get out last night.**

QB:    Naw, I figured that. I'm like. That was probably best or whatever anyway. But I ain't do shit last night. Um, shit was ringin' this morning and shit, but I'm still, I'm still, I'm still, I'm still chillin' for real for real. I'm just waitin' on, ya mean?

SW:    Uh uh, **wanna do somethin' today?**

QB:    Uh, yeah! If it, ya mean? Just come, just come, **just come holler at me bro.**

---

[29]    Based on my training and experience, I am aware that the term "wavy" is slang used to mean that the person has narcotics available for sale.

190.     Based on my training and experience, and my knowledge of this case in particular, in the above call, I believe that Q. BRYANT asked WILLIAMS the status of the meeting that was to take place between WILLIAMS and ROBINSON, during which ROBINSON was to provide WILLIAMS with additional quantities of cocaine base (i.e., "crack") on the previous day, and that he was still at **Search Location 7** ("Yeah, I'm still in the hood. I'm over my raise's, what's the deal bro?").   I believe that WILLIAMS indicated that he would call ROBINSON at that time because he never made it out the previous night ("bout to call him now, U/I I couldn't get out last night"). I believe that WILLIAMS asked if Q. BRYANT still wanted to obtain more cocaine base (i.e., "crack") that day ("wanna do somethin' today?), to which Q. BRYANT replied in the affirmative, asking WILLIAMS to contact him ("just come holler at me bro").

191.     Shortly after the above conversation with WILLIAMS, on March 14, 2020, at approximately 12:32 p.m., Quamane BRYANT, using TARGET TELEPHONE #5, received an incoming text message from his father, James BRYANT Jr., using (412) 689-4617, which stated, "**The # I got on paper is 412 853 0004**". Your affiant believes that in this text message, BRYANT Jr. was giving Quamane BRYANT the most recent contact number he had for Phillip ROBINSON, whom I know from my knowledge of this investigation to utilize the alias "Pape" or "Paper".

192.     Following this text message, Quamane BRYANT made two outgoing calls to the number that J. BRYANT Jr. sent to him, which they associated with ROBINSON (412-853-0004), as well as to TARGET TELEPHONE #4 (which was utilized by ROBINSON).  The calls were unanswered.   I believe that these attempted communications were efforts to contact ROBINSON to obtain cocaine base (i.e., "crack"), instead of waiting for WILLIAMS to obtain

cocaine base (i.e., "crack") from ROBINSON, and redistribute a portion thereof to Q. BRYANT

(which was discussed in the above communications between Q. BRYANT and WILLIAMS).

193.     At approximately 2:24 p.m. (and still on March 14, 2020), Quamane

BRYANT, using TARGET TELEPHONE #5, received an incoming call from an Unknown Male

(UM) using (412) 608-6012. Below is a draft transcription of the call:

QB:     What up, bro?

UM:     Shit… **What up?**

QB:     Shit… I am in the hood right now.

UM:     You ain't coming back over here, are you?

QB:     No, not right now. Probably, probably, probably, umm… probably if
anything tonight but I'ma, **I'ma gonna be calling you probably in an hour in
two, I'ma be letting you know somethin'.**

UM:     Why, you need a ride?

QB:     Umm, depends on if I, if I, if I, if I be able to get what I need to get and shit, **I
might be, be trying, you know what I mean, to make a move or some shit**. Get
something over there, will let you know just give me like an hour.

UM:     Alright

194.     Based on my training and experience, and my knowledge of this case in

particular, in the above call, I believe that the Unknown Male asked Q. BRYANT if he had cocaine

base (i.e., "crack") available for distribution, and I believe that Q. BRYANT replied that he would

likely contact the Unknown Male shortly to advise him of the status of the narcotics ("I'ma gonna

be calling you probably in an hour in two, I'ma be letting you know somethin'").  I believe that Q.

BRYANT was trying to obtain more cocaine base (i.e., "crack") at that time ("I might be, be trying,

you know what I mean, to make a move or some shit"), which he expressed an intention to then

sell to the Unknown Male. As noted above, I believe that Q. BRYANT was attempted to source

the cocaine base he intended to redistribute from ROBINSON directly or through WILLIAMS, who would act as a middle man between Q. BRYANT and ROBINSON.

195.    At approximately 2:36 p.m. (and still on March 14, 2020), Quamane BRYANT, using TARGET TELEPHONE #5, received an incoming call from Sanzio WILLIAMS (SW), using (412) 689-3577. Below is a draft transcription of the call (U/I: Unintelligible):

QB:    Yeah bro.

SW:    **Bro, he said do you want it right now?**

QB:     **Yeah**

SW:    Aight, uhh, **I'm outside and shit. I'm 'bout to come to the door, you in the living room still?**

QB:    It's open

SW:    Aight

QB:    Aight

196.    Based on my training and experience, and my knowledge of this case in particular, in the above call, I believe that WILLIAMS called BRYANT to advise BRYANT that he spoke with ROBINSON, who asked WILLIAMS to check with BRYANT to determine if BRYANT wanted to obtain cocaine base (i.e., "crack") at that time ("Bro, he said do you want it right now?"), to which BRYANT confirmed that he did ("yeah"). I believe that WILLIAMS told BRYANT that he would be at his residence shortly, and asked if BRYANT was still in the living room ("Aight, uh, I'm outside and shit. I'm about to come to the door, you in the living room?"), to which BRYANT confirmed. I believe that WILLIAMS obtained cocaine base (i.e., "crack") from ROBINSON, which he intended to redistribute a portion of to Q. BRYANT.

197.    Still on March 14, 2020, investigators conducted surveillance of **Search Location 7**, which is where agents believed Q. BRYANT to be located based, in part, on the above-

described intercepted communications.  Through physical surveillance and the monitoring of a surveillance camera in the area of **Search Location 7**, agents witnessed the following:

a.       At approximately 2:36 p.m., a dark blue Buick sedan, bearing PA registration KGZ-7829 (**Search Location 10**) pulled onto Webster Ave. and a black male wearing a maroon track suit, identified as Sanzio WILLIAMS from his Pennsylvania driver's license photograph, exited the Buick and walked up the stairs to Webster Terrace (area of **Search Location 7**)[30].

b.       Shortly thereafter, at approximately 2:44 p.m., Q. BRYANT and WILLIAMS walked down the stairs of Webster Terrace, entered the Buick (**Search Location 10**) and exited the area.

c.       Approximately two (2) minutes later, at 2:46 p.m., agents observed **Search Location 10** stopped in front of 2411 Bedford Ave., which is an address utilized by Q. BRYANT's brother, and also an address Q. BRYANT uses for the sale and distribution of cocaine base. Q. BRYANT entered the residence at 2:47 p.m.  At approximately 2:49 p.m., WILLIAMS exited **Search Location 10** and entered 2411 Bedford Ave.

d.       Approximately one minute thereafter, at 2:50 p.m., WILLIAMS and Q. BRYANT exited 2411 Bedford Ave., and Phillip ROBINSON arrived in his black Honda (**Search Location 13**) and stopped in front of the residence. At that point, WILLIAMS got into the passenger seat of the ROBINSON's Honda (**Search Location 13**), Q. BRYANT got into the Buick (**Search Location 10**), and both vehicles left the area.

---

[30]       Your affiant notes that Webster Terrace is a foot-traffic only path, which is accessed by a set of stairs off of Webster Avenue, the main roadway. The only way to physically view **Search Location 7** is to walk up the stairs to the small path/sidewalk which is Webster Terrace.

e.       Shortly thereafter, at approximately 2:52 p.m., ROBINSON's Honda (**Search Location 13**) was followed to the intersection of Webster Avenue and Webster Terrace, where WILLIAMS exited the vehicle. ROBINSON left the area and WILLIAMS walked up the steps toward a Webster Terrace residence.  Q. BRYANT arrived in the Buick (**Search Location 10**), parked, and also walked up the steps in the direction of where WILLIAMS had gone.

198.    Based on the above-described intercepted communications, combined with physical and electronic surveillance (described above), I believe that ROBINSON supplied WILLIAMS and Q. BRYANT with a quantity of cocaine base (i.e., "crack").  As set forth below. I believe that Q. BRYANT then redistributed a portion of those narcotics that he obtained from ROBINSON.

199.    More specifically, shortly thereafter, at approximately 3:06 p.m., Quamane BRYANT, using TARGET TELEPHONE #5, made an outgoing call to Ronald CIOTTI (RC), using (412) 496-1395.  Based on my knowledge of this investigation, I know that CIOTTI is a cocaine base (i.e., "crack") customer of BRYANT's. Below is a draft transcription of the call (U/I: Unintelligible):

RC:     **What the hell happened to you?**

QB:     Shit, **I just got into town, Ron.**

RC:     Oh shit, I thought you might have been in trouble, ya know?

QB:     Na, I'm, I'm alright. I told you, I thought I told you I was leaving town for a minute but…

RC:     No I don't think so but anyway, you alright?

QB:     Yeah I just got back, **everything good.**

RC:     Yeah, umm… **I might hook up with ya later on tonight then.**

QB:     U/I Just call, just give me a call.

RC:     I got a birthday party right now I gotta go to.

QB:     It's all good, tell U/I I said what's up.

RC:     Alright, she's right here, she heard ya.

QB:     Alright, just call me later, Ron.

RC:     Will

QB:     Aight

200.    Based on my training and experience, and my knowledge of this case in particular, I believe that Q. BRYANT, who had just obtained cocaine base (i.e., "crack") from ROBINSON, called one of his customers, Ronald CIOTTI for the purpose of redistributing a portion of the same.  I believe that Q. BRYANT had not answered dozens of CIOTTI's calls for several days – I believe that CIOTTI was likely attempting to contact Q. BRYANT to obtain cocaine base (i.e., "crack") from Q. BRYANT, which Q. BRYANT did not then have to supply to CIOTTI.[31] I believe that once Q. BRYANT obtained cocaine base (i.e., "crack") from ROBINSON (described above), he made contact with CIOTTI to conduct this narcotics transaction.  In the above call, I believe that CIOTTI answered, and asked Q. BRYANT what happened ("What the hell happened to you?"), to which Q. BRYANT said that he just got back into town ("I just got into town, Ron"). I believe Q. BRYANT lied to CIOTTI, as your affiant believes that Q. BRYANT was not answering CIOTTI's calls because he did not have any cocaine base (i.e., "crack") for sale, not because he actually went out of town.  I believe that CIOTTI expressed concern that Q. BRYANT had gotten in trouble. ("Oh shit, I thought you might have been in trouble, ya know?"),

---

[31]     There were numerous unanswered, incoming calls to TARGET TELEPHONE #5 from Ronald CIOTTI during the days prior to this event.

to which Q. BRYANT advised that he was fine and that he had cocaine base (i.e., "crack") available for sale ("everything good").  I believe that CIOTTI advised that he would call Q. BRYANT later in regards to conducing a cocaine base (i.e., "crack") transaction ("I might hook up with ya later on tonight then").

201.   On March 19, 2020, at approximately 5:58 p.m., Quamane BRYANT (QB), using TARGET TELEPHONE #5, received an incoming call from James BRYANT Jr. (JB), using (412) 689-4617. Below is a partial draft transcription of the call:

> QB:   Alright Dad, I'm tryin to see what's up, **I'm bout to see what's up with this nigga Pape**. Drizz talkin bout he ah, he said come or whatever, U/I niggas U/I and shit, said it posed, it ain't, it ain't a lot, the shit got fucked up from the little virus or whatever. Said he tryin double back, hurry up and double back an shit. But I ain't really have shit for real, you na mean?
>
> JB:   Mmn hmn.
>
> QB:   So **I'm a see what's up with Pape first and see what he talkin about then I'll, I'll, I'll see what I'm a do from there.**
>
> JB:   Aite

202.   Based on my training and experience, and my knowledge of this case in particular, in the above portion of the call, I believe that Q. BRYANT told his dad, James BRYANT Jr., that he was going to inquire whether Phillip ROBINSON (a/k/a "Pape"), had any narcotics ("I'm bout to see what's up with this nigga Pape" and "I'm a see what's up with Pape first and see what he talkin about then I'll, I'll, I'll see what I'm a do from there").

203.   Later that evening, at approximately 10:02 p.m., Quamane BRYANT (QB), using TARGET TELEPHONE #5, made an outgoing call to Sanzio WILLIAMS (SW), using (412) 689-3577. Below is a partial draft transcription of the call (U/I: Unintelligible):

> SW:   **He hit me and shit I guess he was trying to swing**
>
> QB:   Oh yeah?

SW:    **Yeah but I ain't really in position to go all the way to the hood and go grab it though**

QB:    Um, what was you thinkin'?

SW:    **I was seein' if you had some like wheels or somethin' or had a, had a ride up there or somethin'**

QB:    Uh, yeah let me um, let me see what this nigga gon' do and uh, if I don't come grab you, cause I don't wanna go over there with that shit. If I don't come grab shit, whatchu wan **you want me to try to grab it?**

SW:    **He gon' be funny about it, he already like, bring funny about...I can feel it like he jus, you feel me? Tryin' shorten the leash type shit for real**

QB:    Oh, ok.

SW:    But, **you able to grab me that's what I was really tryin' see. Cause uh, we got a head light out on that shit for real and I definitely wasn't even tryin' to be in the hood like that for real**

QB:    Hell yea. Ain't no motha fuckin' cars or nothin' out that motha fucka

SW:    Swear I don't wanna be down the motha fuckin' road with no headlight man

QB:    Nephs man

SW:    Shit

QB:    It's ugly out there

SW:    I was scared as hell just now comin home, like, and I was over in U/I crib, U/I man I'm tryin' get in the crib though

QB:    They on the highways and everything, I seen the Troopers but naw, I'm ah um, get out there before the night is over, but I ain't tryin make it too late, but I was plannin on it being a little later. I'm a try, I'm a try to get out a little bit earlier.

SW:    Yeah if you could, **definitely let me know so, we can try to talk to him and position for at least tomorrow and shit. It's hard as hell to move around right now.**

QB:    Naw, nephs. I got you. Let me get up here then.

SW:    Aite

204.     Based on my training and experience, and my knowledge of this case in particular, in the above portion of the call, I believe that WILLIAMS told Q. BRYANT that ROBINSON called him and was trying to meet up with WILLIAMS to conduct a cocaine base (i.e., "crack") transaction ("He hit me and shit I guess he was trying to swing"), but WILLIAMS told Q. BRYANT that he was not able to go all the way to the Hill District to get the narcotics from ROBINSON ("Yeah but I ain't really in position to go all the way to the hood and go grab it though"). I believe that WILLIAMS asked Q. BRYANT if he had any transportation ("I was seein' if you had some like wheels or somethin' or had a, had a ride up there or something"). I believe that Q. BRYANT asked if WILLIAMS wanted him to grab the cocaine base (i.e., "crack") from ROBINSON ("you want me to try to grab it?"), but WILLIAMS stated that he did not think ROBINSON would agree to that, and that he was trying to keep them on a short leash ("He gon' be funny about it, he already like, bring funny about...I can feel it like he jus, you feel me? Tryin' shorten the leash type shit for real"). The two then discussed talking at a later time to see if they could arrange a narcotics deal with ROBINSON the following day ("definitely let me know so, we can try to talk to him and position for at least tomorrow and shit. It's hard as hell to move around right now").

205.     On March 28, 2020, beginning at approximately 8:31 a.m., Quamane BRYANT (QB), using TARGET TELEPHONE #5, exchanged a series of text messages with Maurice ADAMS (MA),[32] using (412) 304-4797, described below:

---

[32]     ADAMS was identified as the user of this telephone based on a search of the database CLEAR, which indicated the telephone is associated with Maurice ADAMS, In addition, during this investigation, your affiant was aware that both Q. BRYANT and James BRYANT Jr. referred to the user of this telephone as "Grunt"; during intercepted communications on February 21, 2020, Q. BRYANT indicated he was having "Grunt" deliver a quantity of heroin to James BRYANT Jr. at **Search Location 8**; investigators on surveillance of Search Location 8 then witnessed ADAMS, driving a witnessed a Honda CRV, bearing Pennsylvania registration

8:31 a.m. – From MA to QB: "**Yo u up bro**"

8:53 a.m., - From QB to MA: "Yea"

8:53 a.m. – From QB to MA: "**My pops**"

8:54 a.m. – From MA to QB: "On my way"

9:13 a.m. – From MA to QB: "**Bring out 2 bro dubs**"

9:13 a.m. – From MA to QB: "I'm here"

9:14 a.m. – From QB to MA: "Hold up im in the toilet bro"

9:14 a.m. – From MA to QB: "Ok"

9:15 a.m. – From MA to QB: "Wash our hands Ike"

206.    At approximately 9:28 a.m., Quamane BRYANT (QB), using TARGET TELEPHONE #5, made an outgoing call to Maurice ADAMS (MA), using (412) 304-4797. Below is a draft transcription of the call:

MA:    Yo

QB:    **Hey come to the door bro**. I'm out, I'm right at the door.

MA:    Alright

207.    Based on my training and experience, and my knowledge of this case in particular, in the above text messages and call, I believe that ADAMS, who I believe is supplied with cocaine base by Q. BRYANT, asked if he was awake ("Yo u up bro?"), and BRYANT replied that he was at his father's house (which I believe to be James BRYANT Jr.'s residence – **Search Location 8**).[33] I believe that ADAMS, using coded language, asked Q. BRYANT to bring out a

---

JXA-1676, registered to Maurice ADAMS, arrive in front of the residence (**Search Location 8**). Agents identified ADAMS (a/k/a "Grunt") through his Pennsylvania driver's license photograph.

[33]    BRYANT's location at **Search Location 8** was corroborated via GPS/E911 location data for TARGET TELEPHONE #5, which showed that the telephone was "pinging" in the area of **Search Location 8**.

specific quantity of cocaine base, being two (2) twenty dollars pieces ("Bring out 2 bro dubs"). In the call, I believe that Q. BRYANT told ADAMS to meet him at the door of the residence ("Hey come to the door bro") to complete the deal.

208.    On March 31, 2020, at approximately 5:57 p.m., Quamane BRYANT (QB), using TARGET TELEPHONE #5, received an incoming call from James BRYANT Jr., (JB), using (412) 689-4617. Below is a draft transcription of the call:

QB:    What's up Dad?

JB:    Hey yo

QB:    What's good?

JB:    Did you uh, **did you leave any hard**?

QB:    **Yeah, I put it in that, that um, that tube, that little hair grease tube.**
It's in the smaller one, it's in the smaller uh, container. At, at, on top a the, on top a the, in, in the closet. On top of the um, dish rack.

JB:    Alright.

QB:    Aite

JB:    **What was it?**

QB:    **Dub**

JB:    Aite

QB:    Aite

209.    Based on my training and experience, and my knowledge of this case in particular, in the above call, I believe that James BRYANT Jr. asked his son, Quamane BRYANT, if he left any cocaine base at J. BRYANT Jr.'s residence when he stated, "Did you leave any hard"? Based on my training and experience, I know that "hard" is a slang term commonly used to describe cocaine base (commonly known as "crack") and that "soft" is a slang term commonly

used to describe powder cocaine.  I believe that these slang terms derived from the physical appearances of the substances (i.e., cocaine base is often in a hard, rock-like form, whereas powder cocaine is in a soft, powder like form).

210.    I believe that Q. BRYANT told his father that he had cocaine base (i.e., "crack"), and that he hid it in a hair product container ("Yeah, I put it in that, that um, that little hair grease tube"). I believe that J. BRYANT Jr. asked the quantity that Q. BRYANT possessed ("what was it"), and Q. BRYANT responded that he left a "dub", which I know to be slang commonly used to describe a quantity equal to twenty (such as $20 dollars' worth of crack).

211.    On April 3, 2020, beginning at approximately 7:58 a.m., Quamane BRYANT (QB), using TARGET TELEPHONE #5, exchanged a series of text messages with Ronald CIOTTI (RC), using (412) 496-1395, as described below:

> 7:58 a.m. – From RC to QB: "**Call me when you get up**"
>
> 7:58 a.m. – From QB to RC: "Hey"
>
> 8:05 a.m. – From RC to QB: "What's up You ready???"
>
> 8:06 a.m. – From RC to QB: "**I got $110.00. I owe you 10. So a buck worth**"
>
> 8:11 a.m. – From RC to QB: "Wya an"
>
> 8:11 a.m. – From RC to QB: "When??"
>
> 8:17 a.m. – From RC to QB: "Hello"
>
> 8:18 a.m. – From QB to RC: "**Web**"
>
> 8:46 a.m. – From RC to QB: "**I'm in town**"

212.    Based on my training and experience, and my knowledge of this case in particular, in the above string of text messages, I believe that CIOTTI advised that he wanted to purchase $100 of cocaine base, and also had $10 that he owed Q. BRYANT for previously supplied

cocaine base ("I got $110.00. I owe you 10. So a buck worth"). I believe that Q. BRYANT advised CIOTTI to meet him on Webster Avenue, ("Web") near Webster Terrace, which is where they have met on previous occasions. At approximately 8:46 a.m., CIOTTI advised that he was in the area of Webster Avenue ("I'm in town").

213. Furthermore, based on the above interceptions, investigators set up physical surveillance in the area of Webster Avenue and also were monitoring the surveillance camera that was in the area of Webster Terrace. Your affiant, who was conducting physical surveillance in the area, witnessed a white Dodge Ram truck, fitting the description of one previously seen occupied by CIOTTI, arrive in the area of the Hill District and travel towards Webster Avenue & Webster Terrace at approximately 8:50 a.m.; at approximately 8:54 a.m., the Dodge Ram was seen parked on Webster Avenue near Webster Terrace.

214. On April 3, 2020, at approximately 9:01 a.m., Quamane BRYANT (QB), using TARGET TELEPHONE #5, received an incoming call from Ronald CIOTTI (RC), using (412) 496-1395. Below is a draft transcription of the call:

QB:     Hello?

RC:     Hey!

QB:     Yeah, hey, come, come down on, **come down the other way on Watt for me**. I'm waitin' for you.

RC:     Oh shit, alright, on Watt

QB:     **Where you got me at last time, yeah**.

RC:     I'm gonna have to, that's, that's a one way goin down.

QB:     Naw, I don't want you to turn bro, just pull over.

RC:     Aite, I gotta turn around first.

215.     Based on my training and experience, and my knowledge of this case in particular, in the above call, Q. BRYANT told CIOTTI to move from his current location towards Watt Street, which is a cross-street further down Webster Avenue ("come down the other way on Watt for me"). Q. BRYANT confirmed that it was a location at which they previously met ("Where you got me last time, yeah"). The Dodge Ram was seen turning around on Webster Avenue, and proceeded towards Watt Street.

216.     At approximately 9:14 a.m., your affiant saw the Dodge Ram driving on Webster Avenue, heading out of the Hill District from the same direction the truck initially came from when entering the Hill District. At approximately 9:17 a.m., Pittsburgh Bureau of Police officers conducted a traffic stop on the Dodge Ram and positively identified Ronald CIOTTI as the driver. Furthermore, officers witnessed CIOTTI attempt to conceal narcotics paraphernalia on his person, and later seized approximately 0.7 grams of a rock-like substance from CIOTTI, along with drug paraphernalia (a crack pipe). The substance was field tested by your affiant and FBI SA Thomas Castle, and was presumptive positive for the presence of cocaine. Furthermore, CIOTTI made a statement to officers that he has been smoking crack cocaine since the 1970's.

217.     On April 7, 2020, at approximately 3:37 p.m., Quamane BRYANT (QB), using TARGET TELEPHONE #5, received an incoming call from Phillip ROBINSON (PR), using (904) 613-2941. Below is a draft transcription of the call (U/I: Unintelligible):

QB:     Bro

PR:     Yo

QB:     **Hey, whatchu want for a zip-a-them glues?**

PR:     For who?

QB:     A zip-a-them glues?

94

PR:     Oh, I ain't got, I gave it back. What, ya'll wanted some?

QB:     Oh naw… I told you I-I-I um, I had, I was, ya mean?

PR:     Oh, umm

QB:     But if not, I'm 'bout to be, I'm bout to be ready, ready anyway

PR:     Aight, what did they uhh, want of it?

QB:     Prolly like one or two, 'pending on the price

PR:     **Oh yea, if it was a QP I woulda did it, I-I had gave it back**

QB:     **It's cool, um, naw, I'm-I'm-I'm 'bout to be ready doe**

PR:     Aight

QB:     Like today type shit. I'm, I'm on my way to umm, west now. And then **when I come back to the hood, I'ma be ready.**

PR:     **Aight, aight, well yea just umm… call me**

QB:     Aight

PR:     Aight

218.    Based on my training and experience, and my knowledge of this case in particular, in the above call, I believe that Q. BRYANT asked ROBINSON for an ounce of marijuana, ("Hey, whatchu want for a zip-a-them glues?")[34]. ROBINSON told Q. BRYANT that he no longer had the marijuana, but could get it back if Q. BRYANT wanted a quarter pound of the marijuana, ("Oh yea, if it was a QP I woulda did it, I-I had gave it back."). From my training and experience, I am aware that term "QP" is slang referring to a quarter pound, which is a common weight for the distribution of marijuana.

---

[34]    Your affiant knows that an ounce of marijuana is often referred to as a "zip", and that during this investigation, subjects will often refer to marijuana as "glue".

219.     I believe that Q. BRYANT then told ROBINSON that he did not need the marijuana, and when Q. BRYANT advised ROBINSON, "It's cool, um, naw, I'm-I'm-I'm 'bout to be ready doe", I believe that Q. BRYANT was expressing that he was almost ready to purchase a quantity of cocaine base (i.e., "crack") from ROBINSON.  I believe that Q. BRYANT expressed that when Q. BRYANT came back to the Hill District ("the hood"), he would have sufficient funds to meet and purchase cocaine base (i.e., "crack") from ROBINSON ("I'm a be ready"). I believe that ROBINSON advised Q. BRYANT to call him when he was ready to meet ("Aight, aight, well yea just umm… call me").

220.     On April 7, 2020, at approximately 8:11 p.m., Quamane BRYANT (QB), using TARGET TELEPHONE #5, made an outgoing call to Phillip ROBINSON (PR), using (904) 613-2941. Below is a draft transcription of the call (U/I: Unintelligible):

QB:     Hey bro

PR:     Yea

QB:     **I'm on my way back over there,** Ike, what- what you doin'?

PR:     I'm coming- **I'm over there**

QB:     **You want me to come down there or you gonna come see me?**

PR:     **I'll come up**

QB:     Aight

PR:     Aight

221.     Based on my training and experience, and my knowledge of this case in particular, in the above call, I believe that Q. BRYANT advised that he was on his way to the Hill District ("I'm on my way back over there"), and ROBINSON indicated that he was already in the Hill District (I'm over there").  I believe that Q. BRYANT asked ROBINSON where he wanted

to meet ("You want me to come down there or you gonna come see me?"), and ROBINSON indicated he would come to Q. BRYANT's location ("I'll come up").

222.    On April 7, 2020, at approximately 9:55 p.m., Quamane BRYANT (QB), using TARGET TELEPHONE #5, made an outgoing call to Phillip ROBINSON (PR), using (904) 613-2941 Below is a draft transcription of the call (U/I: Unintelligible):

PR:    **Here I come**

QB:    Aight, you know where I'm at?

PR:    **Where you at? Up top?**

QB:    **Up lil bro's**… yea

PR:    Aight

QB:    Aight

223.    Based on my training and experience, and my knowledge of this case in particular, in the above call, I believe that ROBINSON advised Q. BRYANT that he was on his way to meet Q. BRYANT to distribute cocaine base (i.e., "crack") ("Here I come") and asked Q. BRYANT where he was currently located ("Where you at? Up top?").  I believe that Q. BRYANT responded that he was at his brother's residence, ("Up lil bro's… yea."),[35] which I believe ROBINSON was familiar with because as he responded in the affirmative without requesting directions or additional clarification as to the location.

---

[35]    Information gathered during this investigation reveals that Quamane BRYANT has a younger brother, Khalid BRYANT, who resides at 2411 Bedford Avenue, in the Hill District of Pittsburgh. Physical surveillance has shown that Quamane BRYANT often uses this address for the distribution of cocaine or cocaine base (i.e., "crack"). Also, based on the elevation changes of the Hill District, Bedford Avenue sits at "the top" of the "Hill" and is often referred to as such within the local community.

224.    Therefore, based on the above-described communications, I believe that ROBINSON met with Q. BRYANT on April 7, 2020, in the Hill District neighborhood of Pittsburgh, and distributed to Q. BRYANT a quantity of cocaine base (i.e., "crack").

> vi.   *Intercepted communications evidencing Q. BRYANT's association with Search Locations 7 and 8*

225.    On February 5, 2020, at approximately 8:18 p.m., Quamane BRYANT (QB), using TARGET TELEPHONE #5, made an outgoing call to an Unknown Male (UM), using (412) 482-0000. Below is a draft transcription of the call:

QB:   Hello

QB:   Yo, what you doin?

UM:   What up?

QB:   I'm aite. You, you, can you do me a favor?

UM:   What?

QB:   **I need an Uber**

UM:   Where you going to?

QB:   I'm going to the Hill

UM:   **Where you at now?**

QB:   **I'm over my pops on Russelwood in the Rocks**

UM:   Aite, Ill get you an Uber, just ah, text me the address where you at and uh, what you going up 2-9?

QB:   Yeah

UM:   Aite yeah, just **text me where you at and I'll get you one**

QB:   Aight

UM:   Aight.

226.    Less than a minute later, at approximately 8:20 p.m., Quamane BRYANT, using TARGET TELEPHONE #5, sent a text message to the Unknown Male using (412) 482-0000, which stated "**338 russelwood ave mckees rocks**". In the above call and text message, I

believe that BRYANT was asking the Unknown Male to arrange a ride for him, and provided his current location to the Unknown Male, which was at his father's residence – 338 Russellwood Avenue, McKees Rocks, PA (**Search Location 8**).

227. On February 12, 2020, beginning at approximately 2:18 a.m., Quamane BRYANT (QB), using **TARGET TELEPHONE #5**, exchanged a series of text messages with an Unknown Female (UF), using (412) 328-8491, stated below:

> 2:18 a.m., From UF to QB: "Hey"
>
> 2:20 a.m., From QB to UF: "Wassup"
>
> 2:21 a.m., From UF to QB: "**Wya**"
>
> 2:21 a.m., From QB to UF: "**Moms**"
>
> 2:22 a.m., From UF to QB: "Colin around meet me outside"
>
> 2:22 a.m., From QB to UF: "**What u need**"
>
> 2:26 a.m., From UF to QB: "**20**"
>
> 2:27 a.m., From UF to QB: "Outside"
>
> 2:28 a.m., From QB to UF: "**Nvm miss Jamie mom sleeping in the living room I cnt get to it**"
>
> 2:29 a.m., From UF to QB: "Ok"

228. Based on my training and experience, and my knowledge of this case in particular, in the above text messages, I believe that the Unknown Female asked Q. BRYANT where he was located ("Wya"), to which Q. BRYANT replied that he was at his mother's residence ("moms") – **Search Location 7**. I believe that Q. BRYANT asked the Unknown Female what quantity of narcotics she needed ("What u need"), to which she replied ("20"), which I believe is $20 worth of cocaine base (i.e., "crack"). However, I believe that BRYANT then told the Unknown Female, whom he referred to as "Jamie", that he could not meet her to complete the

transaction because the cocaine base (i.e., "crack") was located in the living room where his mom was currently sleeping, so he could not get to it without waking her up or alerting her to his drug dealing activities ("Nvm miss Jamie mom sleeping in the living room I cnt get to it").

229.    On February 26, 2020, at approximately 11:35 a.m., Quamane BRYANT (QB), using TARGET TELEPHONE #5, made an outgoing call to Kimberly KIDD (KK), BRYANT's mother, using (412) 736-2389. Below is a partial draft transcription of the call, which lasted over 5 minutes in duration (U/I: Unintelligible):

KK:    Hello?

QB:    **Hey what you doing Mom**?

KK:    Nothing, just left out the meetin

QB:    **Oh you on your way home?**

KK:    Um, uh, **I don't know yet** U/I, but I'm hungry as hell so I don't know. Why, what's up?

QB:    **I was on my way over there.** I was gonna stop up there or go workout first if you wasn't there.

KK:    Okay, get your workout done. Um, **I don't usually go up in that room, in your room, but I went in there and fucked with the vent**, right

QB:    Yeah

KK:    You listenin? And uh, **I got the vent open**. So, that room is warm now, but on, on not only that, that little, **that little plastic thing that looks like a tool box**

QB:    Yeah

KK:    Like a suitcase? **I opened it up and seen crack in it.** So, I just wanted you to know, like, um, I don't, I don't go in that room for no other reason, whatever reason, uh, whatever reason I opened that thing up, um, I don't know, to see if it was tools in there**, I definitely wasn't lookin for no drugs, you should know that**! But maybe um

QB:    That's my gun kit.

100

KK:  Huh?

QB:  **That's my gun kit.**

KK:  **Okay well, the, the crack is in it. So maybe, you can try ta, maybe put, you know not in our, in you know, you know, where I can see it!**

QB:  Mom

KK:  I'm nebby, I'm nebby!

QB:  You shouldn'ta opened that up Mom! **I'm tryin very hard to keep everything away from you**, and you not gonna blame me, for going through my stuff when I ask y'all

KK:  Listen boy! I'm not blamin you! I'm just tellin you to put it in another spot!

QB:  Okay

KK:  I haven't, I haven't searched through your shit, I, I don't search through your shit.

QB:  U/I move it, just in case now, cause you already know now, right?

KK:  That's what I'm sayin, yeah.

B:  Okay, alright.

230.    Based on my training and experience, and my knowledge of this case in particular, in the above call, I believe that Q. BRYANT contacted KIDD, who is his mother ("Hey what you doin' Mom?"), to which KIDD responded she was not sure if she was headed back home at that time.  I believe that Q. BRYANT indicated he was on his way to her residence at that time ("I was on my way over there"), referring to **Search Location 7**, as KIDD also resides there.  I believe that KIDD then began to explain how she went into BRYANT's room and opened an air vent ("I don't usually go up in that room, in your room, but I went in there and fucked with the vent"). When KIDD opened the vent, she found what she thought to be a tool box ("I got the vent open" and "that little, that little plastic thing that looks like a tool box").  I believe that KIDD

explained that she opened the box, and found cocaine base (i.e., "crack") inside ("I opened it up and seen crack in it");  I believe KIDD went on to tell BRYANT that she was not snooping through his room looking for drugs on purpose ("I definitely wasn't lookin for no drugs, you should know that!"). I believe that BRYANT told KIDD that the box she found was BRYANT's gun kit ("That's my gun kit."), which leads your affiant to believe that BRYANT is storing at least one firearm in **Search Location 7**.  I believe that KIDD responded that there is cocaine base (i.e., "crack") in the gun kit, and she asked if BRYANT could move the cocaine base (i.e., "crack") somewhere she could not see it ("Okay well, the, the crack is in it. So maybe, you can try ta, maybe put, you know not in our, in you know, you know, where I can see it!"). I believe that BRYANT stated that he tries to keep drugs away from KIDD and/or out of her view ("I'm tryin very hard to keep everything away from you").

231.    In conclusion, I believe that CLANCY supplied distribution amounts (i.e., multiple ounces) of cocaine base to ROBINSON; that ROBINSON then supplied CAMPBELL, BULLOCK, EMBRY, WILLIAMS, and Q. BRYANT with smaller distribution amounts of cocaine base (such as half-ounces or quarter-ounces); and these subjects (CAMPBELL, BULLOCK, EMBRY, WILLIAMS, and Q. BRYANT) then redistributed smaller amounts (such as $20 worth (0.2 grams) or $100 worth (1 gram)) of cocaine base to end-users.

232.    In addition, since the expiration of the wiretaps of the above-mentioned TARGET TELEPHONES, your affiant has continued to monitor pen register/trap and trace device data for telephones utilized by the above subjects, to include (904) 613-2941 & (646) 831-7631, utilized by ROBINSON; (412) 728-5989, utilized by CAMPBELL; (412) 871-8435, utilized by BULLOCK; (412) 689-3577, utilized by WILLIAMS; (412) 927-9248, utilized by EMBRY; and TARGET TELEPHONE #5 and (412) 327-1067, utilized by Q. BRYANT. This pen register data

has confirmed that ROBINSON has been in frequent contact with all of the above numbers throughout March and April 2020. Furthermore, as of May 7, 2020, the following subjects have been in contact as recently as follows: ROBINSON & CAMPBELL: May 5, 2020; ROBINSON & BULLOCK: May 5, 2020; ROBINSON & WILLIAMS: May 5, 2020, ROBINSON and EMBRY: May 3, 2020; Q. BRYANT and R. CIOTTI: May 7, 2020. Based on the intercepted communications set forth above, which I believe demonstrate the existence of a conspiracy to distribute cocaine base (i.e., "crack"), I believe that the continued telephone communications between the SUBJECTS evidences that the conspiracy continued through May 7, 2020.

C.   **COMPLAINT #2: THE SUBJECTS AND THEIR ASSOCIATION WITH THE SEARCH LOCATIONS**

233.   As set forth herein, I believe that from in and around February 2020, and continuing thereafter until in and around March 2020, Andre MOORE-COLEMAN (a/k/a "Drizz"), Quamane BRYANT, and James BRYANT Jr., conspired with one another, and with persons both known and unknown, to distribute and possess with intent to distribute a quantity of heroin, a Schedule I controlled substance, in violation of 21 U.S.C. § 846.

234.   As will be described below, I believe that Andre MOORE-COLEMAN supplied both Quamane BRYANT and James BRYANT Jr. with distribution amounts of heroin, and that Quamane BRYANT and James BRYANT Jr. redistributed smaller amounts of heroin to end-users.

i.   **_Andre MOORE-COLEMAN_** _– Identity and Association to Search Location(s)_

235.   As set forth herein, law enforcement has determined that Andre MOORE-COLEMAN (a/k/a "Drizz") is a mid-level heroin trafficker who supplies Quamane BRYANT and James BRYANT JR.

236.    As set forth below, law enforcement has determined that Andre MOORE-COLEMAN (a/k/a "Drizz") is the user of telephone number (412) 320-6566, and that he resides at 1880 Lincoln Road, Pittsburgh, PA 15235 (**Search Location 11**) based in part by the following:

237.    Your affiant learned, via law enforcement subpoena, that "Andre Moore" is the subscriber for telephone number (412) 320-6566, which I believe is a combination of his first name and a portion of his last name.

238.    Through information received from the Pennsylvania Board of Probation and Parole, I am aware that MOORE-COLEMAN (a/k/a "Drizz") reported to the Pennsylvania Board of Probation and Parole that his primary residence is 1880 Lincoln Road, Pittsburgh, PA 15235 (**Search Location 11**). [36]

239.    Your affiant obtained a court order for the GPS/E911 geolocation data for the telephone utilized by MOORE-COLEMAN – (412) 320-6566 – between the period of March 10, 2020 through April 23, 2020. Your affiant learned that this telephone was routinely located (especially in the overnight hours) in the area of **Search Location 11**.

240.    Investigators have conducted surveillance of **Search Location 11** on numerous occasions, and have routinely seen MOORE-COLEMAN at the location. For example, on March 26, 2020, at approximately 6:12 p.m., investigators witnessed MOORE-COLEMAN exit the front door of **Search Location 11**, walk down the steps, speak with an unknown female, then walk back up the stairs and return to the residence. On May 4, 2020, at approximately 7:54 p.m., investigators observed MOORE-COLEMAN driving a red Ford Expedition, bearing PA Registration LDY-6532, registered to "Andre Maurice MOORE COLEMAN, 5310 Hillcrest St., Pittsburgh, PA 15224", leave the area of **Search Location 11**. Minutes later, at approximately

---

[36]    This information was obtained on April 27, 2020.

8:02 p.m., MOORE-COLEMAN returned in the Expedition, parked in front of **Search Location 11**, walked up the steps, and entered **Search Location 11** through the front door.

241.    In addition, and as set forth below, agents intercepted communications during which the user of telephone number (412) 320-6566 stated that he was on house arrest and investigators confirmed with the Pennsylvania Board of Probation and Parole that MOORE-COLEMAN was on house arrest until March 2, 2020 at **Search Location 11**.

242.    Therefore, based on the GPS/E911 location data for (412) 320-6566, which showed MOORE-COLEMAN routinely in the area of **Search Location 11**, the fact that MOORE-COLEMAN reports his current address as **Search Location 11** to Allegheny County Probation & Parole, and recent surveillance of MOORE-COLEMAN at the residence, I believe that MOORE-COLEMAN primarily resides at **Search Location 11**.

ii.    *Quamane BRYANT and JAMES BRYANT, Jr. – Identity and Association to Search Locations*

243.    See above.

### D.    COMPLAINT #2: INTERCEPTED COMMUNICATIONS EVIDENCING A CONSPIRACY TO DISTRIBUTE A QUANTITY OF HEROIN

244.    Below are examples of intercepted wire and electronic communications, along with surveillance observations, demonstrating the existence of a conspiracy between Andre MOORE-COLEMAN, Quamane BRYANT, and James BRYANT Jr., from in and around February 2020, and continuing thereafter until in and around March 2020, to possess with intent to distribute and distribute a quantity of heroin, a Schedule I controlled substance, in violation of 21 U.S.C. § 846, in the Western District of Pennsylvania.  Moreover, I submit that the following evidence demonstrates probable cause to conduct searches at **Search Locations 7, 8, and 11**, for evidence of the TARGET OFFENSES.

245.    On February 6, 2020, beginning at approximately 10:38 a.m., Quamane BRYANT (QB), using **TARGET TELEPHONE #5**, exchanged a series of text messages and telephone calls with Crystal MEANS[37] (CM), using (724) 882-4697, stated below:

> 10:38 a.m., from QB to CM:  "Hey"
>
> 10:39 a.m., from CM to QB:  "Good Morning :-) **Hey hun, still good on both?**
>
> Call me :-) Yo"

246.    Based on my training and experience, and my knowledge of this case in particular, in the above text messages, I believe that MEANS asked BRYANT if he had two types of narcotics available for her to purchase ("still good on both?").

247.    At approximately 10:39 a.m., Quamane BRYANT (QB), using **TARGET TELEPHONE #5**, received an incoming call from Crystal MEANS (CM), using (724) 882-4697. Below is a draft transcription:

> QB:    Hey babe
>
> CM:    Hey honey, what's up?
>
> QB:    Nothing, just turned my phone on
>
> CM:    I was wondering, I was like your phones off no! Um, **do you still have both?**
>
> QB:    **Yeah**
>
> CM:    Okay, can I come see you?
>
> QB:    Yup
>
> CM:    Ok where am I going?
>
> QB:    You can um, go to the big tree
>
> CM:    Okay, are you out there, now cause I, I'm kind of in a rush, I have to get back to watch grandma

---

[37]    On the date of this call, February 6, 2020, the user of (724) 882-4697 had not yet been identified.  However, as described later in this section, on February 9, 2020, the user of the telephone was identified via physical surveillance as Crystal MEANS.

QB:     Yup

CM:     Okay, I just left

QB:     Where you at?

CM:     What?

QB:     Where you at?

CM:     I just left my step dad's, so I'm turning on to Route 8 right now

QB:     Aite

CM:     So I'll be down there in like twenty five minutes or so.

QB:     Aite

CM:     And um, **give me, a gram and um, 80 in tickets**.

QB:     Ok

CM:     Alright honey, I'll see you soon. Thank you

QB:     Alright

CM:     Alright bye.

248.    At approximately 11:01 a.m., agents intercepted a text message from Crystal MEANS (CM), using (724) 882-4697, to QB, utilizing **TARGET TELEPHONE #5**, which stated, "**On 31st Street Bridge**".

249.    At approximately 10:39 a.m., Quamane BRYANT (QB), using **TARGET TELEPHONE #5**, received an incoming call from Crystal MEANS (CM), using (724) 882-4697. Below is a draft transcription:

QB:     Hey

CM:     Hey **I'm about to be pulling up**, I'm almost, I'm like coming up that hill, Herron, or

QB:     Here I come

CM:     Or sittin' at that light. Okay thanks. Bye.

250.    At approximately 11:10 a.m., agents intercepted a text message from Crystal MEANS (CM), using (724) 882-4697, to QB, utilizing **TARGET TELEPHONE #5**, which stated, "**Im here**".

251.    Based on my training and experience, and my knowledge of this case in particular, in the above call and text message, I believe that MEANS asked Q. BRYANT if he still had two types of narcotics available ("do you still have both?"), to which Q. BRYANT replied that he did ("yeah"). I believe that Q. BRYANT and MEANS discussed a meeting location and her approximate arrival time, and MEANS then asked for one gram of cocaine or cocaine base, and $80 worth of heroin ("give me, a gram and um, 80 in tickets").  Your affiant is aware, based on my experience, that users of cocaine and/or cocaine base will commonly purchase the drug in gram quantities, and that users of heroin commonly refer to dosage units of heroin called "stamp bags" through the slang term, "tickets".  Therefore, I believe that MEANS asked Q. BRYANT to distribute to her approximately one (1) grams of cocaine or cocaine base (i.e., "crack") and $80 worth of heroin, which would equate to one or two bundles of heroin.[38]

252.    In the text message that followed the call, I believe that MEANS advised BRYANT of her current location, which was in and around the 31st Street Bridge in Pittsburgh, PA.  Shortly thereafter, I believe that MEANS called BRYANT to say that she was nearing their meeting location to conduct the narcotics transaction ("I'm about to be pulling up"), and then sent him a text message indicating that she had arrived ("Im here"). Based on these communications, I

---

[38]    Through my experience, I am aware that one (1) brick of heroin contains five (5) bundles of heroin – each bundle of heroin contains ten (10) stamp bags of heroin. Each stamp bag contains approximately 0.02 grams of heroin, thus one bundle contains approximately .2 grams, and one brick contains approximately 1 gram.

believe that BRYANT and MEANS completed a drug transaction for heroin and cocaine or cocaine base (i.e., "crack").

253.    Beginning on February 12, 2020, at approximately 7:32 p.m., and continuing into February 13, 2020, Quamane BRYANT (QB), using TARGET TELEPHONE #5, exchanged a series of text messages with Andre MOORE-COLEMAN (a/k/a "Drizz") (AM), using (412) 320-6566, stated below:

February 12, 2020

7:31 p.m., From QB to AM: "I aint foget about you bro just got back monday getting everything situated tonight"

7:32 p.m., From AM to QB: "Naw u missed out had that cake for the number u wanted been tryna reach u"

February 13, 2020

6:28 p.m., From QB to AM: "Yo"

6:29 p.m., From AM to QB: "Yo"

6:31 p.m., From QB to AM: "You coming by my way anytime today"

6:33 p.m., From AM to QB: "**I'm on house arrest**"

6:34 p.m., From QB to AM: "Damn aight"

6:35 p.m., From QB to AM: "**Trying get to you**"

6:35 p.m., From AM to QB: "Swear Aite"

254.    Based on my training and experience, and my knowledge of this case in particular, in the above string of text messages, I believe that Q. BRYANT advised MOORE-COLEMAN that he was getting money together to pay MOORE-COLEMAN that night for narcotics ("I aint forget about you bro just got back monday getting everything situated tonight"). I believe MOORE-COLEMAN replied that Q. BRYANT missed out on an unknown type of

narcotics ("that cake") that MOORE-COLEMAN had and advised Q. BRYANT he had tried to contact him ("Naw u missed out had that cake for the number u wanted been tryna reach u"). I believe that the next day, Q. BRYANT reached out to MOORE-COLEMAN and asked if he would be coming near BRYANT's location so they could meet up ("You coming by my way anytime today"), but MOORE-COLEMAN replied that he was on house arrest ("I'm on house arrest"), so Q. BRYANT stated that he would try to come to MOORE-COLEMAN's location ("Trying get to you").

255.    On February 13, 2020, at approximately 10:16 p.m., Quamane BRYANT (QB), using TARGET TELEPHONE #5, made an outgoing call to Andre MOORE-COLEMAN (AM), using (412) 320-6566. Below is a draft transcription of the call (U/I: Unintelligible):

AM:    Yo

QB:    What you doin bro?

AM:    Shit, at the crib

QB:    Yeah, I am trying, I was tryin get out there, I'm a prolly come out there tomorrow, I'm gonna get the ride and shit. Prolly be early though, what you gonna be doin early?

AM:    U/I I'm on this anklet bro, I ain't doin shit! (Laughs)

QB:    You ain't never got no windows or nothin?

AM:    Nope

QB:    Damn, U/I I didn't know that was goin on and shit, I'm a definitely get out there to you though. And I'm gonna come out there U/I

AM:    U/I yeah **that shit that you was U/I was in man!**

QB:    **I know I had dips for a minute** and shit cause I hit that, had a little bit, I had a little bit of uh, had a little bit of uh, change and shit. So I had did something when niggas was nigga was goin, mothfuckers was already gone, so I just caught a trip type shit.

AM:     Oh okay

QB:     My birthday this weekend though

AM:     Okay

QB:     But um, other than that, yeah, shit been cool though. Prolly bout to see what's up for tomorrow, U/I tomorrow I was tryin to get at you, I was tryin get at you soon as I came back and shit but, least by tomorrow but I was trying get at you today but at least by tomorrow.

AM:     Aite well shit, I'll be here. Just hit me bro!

QB:     Aite, everyt, everything still situated?

AM:     Yeah, just, just the gas in. The other shit ain't round yet.

QB:     Aite that's cool, that's cool. I'll be out, I'm a come to you tomorrow bro. I'll call you uh, hold, hold, hey, yo bro!

AM:     Yo

QB:     Jim, Jim wanna holler at you

256.    I believe that in the below portion of the call noted below, James BRYANT

JR. began speaking to MOORE-COLEMAN over TARGET TELEPHONE #5:

JB:     Hey Drizz!

AM:     Yo!

JB:     What's up bud?

AM:     What's up U/I!

JB:     Hey did uh, did you talk to Minnie today?

AM:     Naw

JB:     I'm getting ready to call this mothfucker, I'm uh, we uh, he posed to be grabbin 4, told him to call, he said he's gonna call you, he posed to be grabbin 4, givin em to me in the morning.

AM:     Aw that nigga ain't, he ain't called me. I ain't talk to that nigga in U/I

JB:     Bout to hit this nigga bro, I'm bout to call him now.

AM:     Aite

JB:     Like nigga, call that mothfucker, we talkin bout yeah he's gonna grab with me, cause he, if he right he get it, give it to me tomorrow morning, yeah right mothfucker!

AM:     He ain't call me U/I some bull shit. Tell that nigga to call me.

JB:     I gotcha, I'm a, I'm a hit him now. I'm U/I, he know I'm a fuck him up.

AM:     (Laughs) Aite

JB:     I'm callin now bro

AM:     Aite

QB:     Hey I'm a come see you

257.    Based on my training and experience, and my knowledge of this case in particular, in the above call, I believe that Q. BRYANT told MOORE-COLEMAN several times that he was going to try to meet with him the following day. I believe that MOORE-COLEMAN told Q. BRYANT that MOORE-COLEMAN, at one time, had the narcotics that Q. BRYANT wanted to purchase from him ("that shit that you was U/I was in man!").  I believe that BRYANT replied that, at that time, he already had a quantity of heroin ("I know I had dips for a minute and shit cause I hit that, had a little bit, I had a little bit of uh, had a little bit of uh, change and shit"). I believe that Q. BRYANT then asked if MOORE-COLEMAN still had heroin for sale ("everything still situated?") and MOORE-COLEMAN stated that the only narcotics he had at that time was marijuana, and that he did not have heroin ("just the gas in. The other shit ain't round yet"). I believe that Q. BRYANT told MOORE-COLEMAN that his father, James BRYANT Jr. ("Jim") wanted to speak with MOORE-COLEMAN, so Q. BRYANT gave TARGET TELEPHONE #5 to BRYANT Jr.

258.     In the portion of the call in which BRYANT Jr. was speaking with MOORE-COLEMAN, I believe that BRYANT Jr. asked MOORE-COLEMAN if he had spoken with an Unknown Male, referred to as "Minnie", that day, to which MOORE-COLEMAN stated that he had not ("Naw"). I believe that BRYANT Jr. told MOORE-COLEMAN that he and "Minnie" were supposed to be purchasing four (4) bricks[39] of heroin from MOORE-COLEMAN. More specifically, I believe that "Minnie" was supposed to call MOORE-COLEMAN to arrange the deal and "Minnie" would then give the four (4) bricks of heroin to BRYANT Jr. ("we uh, he posed to be grabbin 4, told him to call, he said he's gonna call you, he posed to be grabbin 4, givin em to me in the morning). I believe that MOORE-COLEMAN stated that "Minnie" had not called him ("he ain't called me"), so BRYANT Jr. stated that he would call MOORE-COLEMAN at that time.

259.     On February 21, 2020, at approximately 10:17 a.m., Quamane BRYANT, using TARGET TELEPHONE #5, made an outgoing call to James BRYANT Jr. (JB), using (412) 689-4617. Below is a draft transcription of portions of the call, which lasted over nine (9) minutes (U/I: Unintelligible):

> (Beginning of call)
>
> JB:     Hello.
>
> QB:     Hey what's up dad?
>
> JB:     Ah, you at the crib, **are you at your mom's**?
>
> QB:     Yeah, I'm on the Hill.

---

[39]     Based on my training and experience, I know that the term "brick" is slang used to describe fifty (50) individual dosage units of heroin, which are called "stamp bags". I know that a "brick" of heroin is commonly comprised of five (5) rubber-banded "bundles", and that each "bundle" is comprised of ten (10) robber-banded "stamp bags" containing heroin (or fentanyl).

JB:    I was ah, I need to um, I need to, **I need to go see Drizz.  I got the 360 for the two. Well, I paid him for the one already, but, he was tryin' to give me four**, I said, I need, I might take the four now you know what I mean?

QB:    Yeah.

JB:    But um, I'm just leaving downtown for my eye appointment, they ordered me some new glasses, they said they'd call me next week. **I didn't know what you was lookin' like on your money**; **or if you can go grab it for me and then get your money off of me when you bring it over**, or I can come to get it or Grunt could grab it.  If you could, if you can't don't worry about it, I was just tryin to grab cause niggas is callin me already like a motha fucka, and I'm gonna be done with this shit.  I ain't know what you was doing though, if you was, I ain't know what you was doin I was, I know I'm getting ready to go home and go to sleep for a second, but ah, he gave me one, he gave me two, I bought one he gave me one.  He asked me did I want the four, I was like naw, just give me two right now.  But I ain't know it was gonna rock this shit crazy, yeah I will take the four if you got it. But um just let me, whatever you gonna do but if you move or something out there.

QB:    **Naw I got you, I'm gonna try and get over there today**, well I'm gonna get over there today. I gotta got to the mall and put some shit down, put some money down on Kiera's little outfit, for her birthday.  I'm probably gonna just go back in.

JB:    Well I can get the money and get somebody to come and grab the money, like Uncle Jim, I can get Uncle Jim to bring it to you or something like that. But Jim ain't up yet. I'll just grab, I'll send the money over to you, know what I mean?

QB:    Yeah.

JB:    Call me and let me know if you talk to him, or I'll try to call him. Tell him to bring the money to you, see where you at.

QB:    **Aight, I'm a text Grunt too, I'm a text, I was with Uncle, cuz Jim last night.  I'm gonna text Grunt and see if he can take me over there**.

JB:    Uh huh

QB:    I'm gonna text Uncle Jim, Coach Jim to text me when he get up.

JB:    Alright, cause I'm gonna try a little sooner, I really gotta (u/i).  I'm tryin to grab get this sh, get out the way as soon as I could. I wish I would of had a ride prolly, I don't know early Drizz be up though.

QB:     Yeah, he be up. Yeah, but I don't know what his schedule be like since his shit, since the shit been like that.

JB:     It's 10:30 now. Shit, you know what I mean?

QB:     Yeah, I'm a um.  Shit, I been up since seven but, I'ma I'ma see what's up now.  That's how I be, I don't be knowin how niggas be up, sometimes I be waitin for Grunt to hit me and shit. He usually hit me in the morning. But.

(Several minutes of non-pertinent conversation)
(Portion near end of call)

QB:     **I might just try go over there and get the ride, that's what I think I'm gonna do.**

JB:     U/I grab this shit man, before somebody just called me just now I'm talkin to you

QB:     Bout to see what's up with Grunt or Uncle Jim too

JB:     Aite

QB:     **Yeah um, I think I'm a call Uncle Jim, see if he could grab that off you, come get me and take me to the, take me over there to get the ride**

JB:     **Aite, if he get you, if he come and get the money and you get over there, see if he still got room for me to get four, I'll take two, but if he can give four, I'll take it**

QB:     Aite

JB:     Aite, just hit me let me know, or if I don't answer, text me, I won't be sleep long though

QB:     Aite

JB:     Aite

260.    Based on my training and experience, and my knowledge of this case in particular, in the above call, I believe that Q. BRYANT answered and greeted BRYANT Jr. as "Dad"; I believe that BRYANT Jr. asked Q. BRYANT if he was at his mother's residence ("are you at your mom's?" – **Search Location 7**), to which Q. BRYANT replied that he was. I believe

that BRYANT JR. told Q. BRYANT that he needed to meet with MOORE-COLEMAN ("Drizz")
because he had $360 to pay for two (2) bricks of heroin (one of which he already paid for), and
that MOORE-COLEMAN was going to give him four (4) bricks of heroin ("I need to go see Drizz.
I got the 360 for the two. Well, I paid him for the one already, but, he was tryin' to give me four").
I believe that BRYANT Jr. then asked Q. BRYANT about the state of his finances ("I didn't know
what you was lookin' like on your money") and if Q. BRYANT could pick up and pay MOORE-
COLEMAN for the heroin on behalf of BRYANT Jr. and then get BRYANT Jr.'s money ("or if
you can go grab it for me and then get your money off of me when you bring it over"). I believe
that Q. BRYANT stated that he would do so ("Naw I got you, I'm gonna try and get over there
today"). I believe that Q. BRYANT said that he would text an individual known to them as "Grunt"
(identified as Maurice ADAMS) to see if he could take Q. BRYANT to meet with MOORE-
COLEMAN (a/k/a "Drizz") to obtain the heroin ("Aight, I'm a text Grunt too, I'm a text, I was
with Uncle, cuz Jim last night.  I'm gonna text Grunt and see if he can take me over there"). I
believe that Q. BRYANT and BRYANT Jr. discussed options of how they should handle the
transportation of Q. BRYANT, the heroin, and the money, and Q. BRYANT stated that he would
get a vehicle so that he could drive to MORE-COLEMAN's ("Drizz's") residence ("I might just
try go over there and get the ride, that's what I think I'm gonna do").  I believe that Q. BRYANT
then stated that he would call another Unknown Male, he referred to as "Uncle Jim", to ask if
"Uncle Jim" could get BRYANT Jr.'s money for the heroin and then take Q. BRYANT to get his
vehicle ("Yeah um, I think I'm a call Uncle Jim, see if he could grab that off you, come get me and
take me to the, take me over there to get the ride"). I believe that BRYANT JR. asked Q. BRYANT
if he would ask "Drizz" if he could sell BRYANT Jr. four (4) bricks of heroin ("if he come and

get the money and you get over there, see if he still got room for me to get four, I'll take two, but if he can give four, I'll take it").

261.    On February 21, 2020, at approximately 1:58 p.m., Quamane BRYANT (QB), using TARGET TELEPHONE #5, received an incoming call from James BRYANT Jr. (JB), using (412) 689-4617. Below is a draft transcription of the call (U/I: Unintelligible):

QB:    Hello?

JB:    Anything?

QB:    Naw, **I'm bout to go over there now**, I'm bout to see, you gonna have to call Drizz, cause I don't really got no bread. I had tried to get Uncle Jim to come over there and grab it but you prolly was asleep

JB:    What, you called me?

QB:    Yeah. And he ain't never come grab me. **Just call Drizz and tell him I'm a be over there and shit, cause I'm prolly goin, only have, like three**. And **I was gonna try get like one at least and a dip or something**

JB:    Damn, aite, uh, Uncle Jim

QB:    I'll be, I'll be prolly on the East side later today with the car, going to get the car. I'm gonna go get the car now, but the traffic and shit is about to go hit and all that shit and I gotta do a couple things.

JB:    Aite

QB:    Just hit him and let him

262.    Based on my training and experience, and my knowledge of this case in particular, in the above call, I believe that Q. BRYANT told BRYANT Jr. that he was going to MOORE-COLEMAN's ("Drizz's") residence ("I'm bout to go over there now"), and asked that BRYANT JR. call MOORE-COLEMAN ("Drizz") to let him know that Q. BRYANT was on his way to conduct the heroin transaction ("Just call Drizz and tell him I'm a be over there and shit"), that he may only have $300 with him ("cause I'm prolly goin, only have, like three"), and that Q.

117

BRYANT also wanted to purchase one unit of an unknown type of narcotics and one (1) brick of heroin ("and I was gonna try get like one at least and a dip or something").

263.   On February 21, 2020, at approximately 4:37 p.m., Quamane BRYANT (QB), using TARGET TELEPHONE #5, made an outgoing call to James BRYANT Jr. (JB), using (412) 689-4617. Below is a draft transcription of the call (U/I: Unintelligible):

JB:   Yo

QB:   **Hey yeah call that nigga Grunt ite, he just, he just left from the hood. I sent, I sent 2 over.**

JB:   Aight uh, **what he give you?**

QB:   He gave me 4 of 'em. Well he gave me, he gave me 6 of them.

JB:   Huh?

QB:   **He gave me 6 of them. I gave him, I gave him a nickel.  He said we owe him for 2.**

JB:   He gave...

QB:   I gave him a nickel, put your 280 with it, for 360, he took the one off that he from the 360 he took one off of it.  So it came back it came back to 280 I guess. He made it 280 from 360 or 460. He made it 380 from 460 so, I didn't really wanna send of all of them motha fuckas over, I only wanted to send one over for real for real but

JB:   Nah, U/I, I'm goin though, I'm goin through that shit.

QB:   Nah, I, I'm saying with him and shit I ain't.

JB:   Who with Grunt?

QB:   Yeah

JB:   It doesn't matter he gonna go through, he ain't that type of nigga. He ain't, he ain't, he ain't doin that.

QB:   But he trying, he, he saying he need that bread and shit. He ain't sayin he need it, but he's made it like he trying to go back today like that's all he had he

tryin to go back today. Or he is supposed to go back today or some shit. I told him I was gonna try to get it to him and shit.

JB:     I'm a have I'm a try to get Jim to take it out, take me out there.  I'm a call him in a minute I gettin ready to eat somethin.

QB:     **He said it was a, he had another he had a he had a bag and shit he said it was the last of what he got,** I don't if he meant that shit he had left over was already gone or he was just on some nigga come on type shit it gonna be today, like it's gonna be today or tomorrow or you know what I'm sayin.  But I'm a try and get him I'm a try to get it to him however it come. I'm a try and knock one right now.

JB:     But we owe him for what? Two?

QB:     Yeah, cause if we gave him that 280 plus the 5, that's like for um, the "Q-ie".  You naw mean.

JB:     Yeah

QB:     That's the 4, so it's a little bit under 2 for real for real.

JB:     You don't want me to get the money to Grunt do you?

QB:     Naw not really. I mean you could tell Coach Jim to come grab me I was gonna go fuck with him anyway and shit or whatever.  You could get in touch with Coach Jim.  I'll prolly go out there, I'm supposed to be fuckin with Moo I told him I was goin prolly gonna go, was gonna go see Drizz and shit. Imma try and go out there today.

JB:     Aight

QB:      **Aight, but that shit is in there, that shit is sealed up I ain't I ain't even you know what I mean.**

JB:     Yeah, or you could U/I

QB:     I ain't wanna open that shit, huh?

JB:     **So you put them other ones up your mom's?**

QB:     **Yeah, yup yup. I stopped up there first, that's where I did that at, I'm up Lids right now.**

JB:     Bib up there?

QB:     Yeah Bib up there

JB:     Aight

QB:     Aight I'll call you

264.    Based on my training and experience, and my knowledge of this case in particular, in the above call, I believe that Q. BRYANT told BRYANT Jr. to call "Grunt" because Q. BRYANT just gave him two (2) bricks of heroin to deliver to BRYANT Jr. ("Hey yeah call that nigga Grunt ite, he just, he just left from the hood. I sent, I sent 2 over"). I believe that BRYANT Jr. asked Q. BRYANT what MOORE-COLEMAN ("Drizz") gave BRYANT ("what he give you?"), and Q. BRYANT advised that he obtained six (6) bricks of heroin from MOORE-COLEMAN ("Drizz"); I believe that Q. BRYANT expressed that he paid MOORE-COLEMAN ("Drizz") $500, and that they (Q. BRYANT and BRYANT Jr.) owed MOORE-COLEMAN ("Drizz") for two (2) of the six (6) bricks of heroin, as the two (2) additional bricks were provided on credit ("He gave me 6 of them. I gave him, I gave him a nickel.  He said we owe him for 2"). I believe they then discussed how much the bricks of heroin cost and how Q. BRYANT sent the heroin with Maurice ADAMS, a/k/a "Grunt". I believe that Q. BRYANT then told BRYANT Jr. that MOORE-COLEMAN (a/k/a "Drizz") indicated to BRYANT that this was the last of the heroin he had available for sale at that time ("He said it was a, he had another he had a he had a bag and shit he said it was the last of what he got"). I believe that Q. BRYANT and BRYANT Jr. continued to discuss how much they owed MOORE-COLEMAN ("Drizz") for narcotics, how much they paid for each brick of heroin, and how they would handle getting the money that they owed to MOORE-COLEMAN ("Drizz"). At the end of the call, I believe that Q. BRYANT advised BRYANT Jr. that he did not open the bricks of heroin that he sent with "Grunt" ("but that shit is in there, that shit is sealed up I ain't I ain't even you know what I mean"). I believe that BRYANT

Jr. asked if Q. BRYANT put the other four (4) bricks of heroin at Q. BRYANT's mother's residence ("So you put them other ones up your mom's?") (**Search Location 7**), to which Q. BRYANT replied in the affirmative ("Yeah, yup yup. I stopped up there first, that's where I did that at"), and that he was at his brother's residence at that time ("I'm up Lids right now").

265.     At approximately 5:05 p.m., investigators who were on surveillance at BRYANT Jr.'s residence at 338 Russelwood Dr., McKees Rocks, PA, 15136 (**Search Location 8**) witnessed a Honda CRV, bearing Pennsylvania registration JXA-1676, registered to Maurice ADAMS, arrive in front of the residence (**Search Location 8**).  Agents identified ADAMS (a/k/a "Grunt") through his vehicle and his Pennsylvania Driver's License photograph.  He was observed by agents exiting the vehicle and carrying a bag into the residence.  As stated in the call between Q. BRYANT and BRYANT JR., Q. BRYANT indicated that he was sending some of the bricks of heroin that they obtained from MOORE-COLEMAN ("Drizz") to BRYANT JR. with "Grunt".  Therefore, I believe that ADAMS is the individual referenced in the intercepted communications "Grunt" and that he acted as a courier to transport bricks of heroin that Q. BRYANT and BRYANT Jr. purchased from MOORE-COLEMAN (a/k/a "Drizz").

266.     Based on my training and experience, I believe that the quantity of heroin purchased from MOORE-COLEMAN ("Drizz") is not consistent with personal use; rather, I believe that this quantity is consistent with further distribution.

### E.     COMPLAINT #3 or CONSPIRACY #3: THE SUBJECTS AND THEIR ASSOCIATIONS TO THE SEARCH LOCATIONS

267.     As set forth herein, I believe that from in and around December 2019, and continuing thereafter until in and around January 2020, Ronald LEWIS III, and Victor SIMMONS, conspired with one another, and with persons both known and unknown, to distribute and possess with intent to distribute 28 grams or more of a mixture and substance containing a detectable

amount of cocaine base (in the form commonly known as "crack"), a Schedule II controlled substance, in violation of 21 U.S.C. § 846, in the Western District of Pennsylvania.

268.    As will be displayed below, I believe that Ronald LEWIS III supplied Victor SIMMONS with distribution amounts of cocaine base (i.e., "crack"), and that Victor SIMMONS then distributed smaller amounts of cocaine base (i.e., "crack") to his customers, including Dallas VICKERS.

### i.   *Victor SIMMONS* – *Identity and Association to Search Location*

269.    As set forth herein, law enforcement has determined that Victor SIMMONS is a street-level cocaine base (i.e., "crack") dealer who is supplied by Ronald LEWIS III.  Law enforcement has determined that SIMMONS redistributes the cocaine base (i.e., "crack") to individuals including Dallas VICKERS.

270.    Law enforcement has determined that Victor SIMMONS is the user of (412) 609-6813 (**TARGET TELEPHONE #2**), and resides at 924 Princeton Boulevard, Pittsburgh, PA 15221 (**Search Location 15**) based in part by the following: during the interception of TARGET TELEPHONE #2, on numerous occasions, the user of TARGET TELEPHONE #2 was addressed as "Victor" and at times stated that his name was "Victor" and "Victor SIMMONS".  Moreover, during intercepted communications, the user of TARGET TELEPHONE #2 stated that his address was "524 Princeton" (**Search Location 15**). Furthermore, between approximately October 2019 and February 2020, investigators received GPS/E911 geolocation data for TARGET TELEPHONE #2 (pursuant to warrant/order authorizing the disclosure of the same issued by a U.S. Magistrate Judge in the Western District of Pennsylvania), and through that data, saw that TARGET TELEPHONE #2 was frequently located, especially in the overnight hours, of 524 Princeton Blvd., Pittsburgh, PA 15221.

271.    Lastly, in November 2019, investigators installed a fixed surveillance camera in the area of 524 Princeton Blvd., and using this camera, along with physical surveillance, GPS/E911 location data, and the interception of wire and electronic communications, confirmed the user of TARGET TELEPHONE #2 was SIMMONS, and that SIMMONS utilizes **Search Location 15** as his primary residence.

272.    Based on information received from the Allegheny County Probation and Parole Department ("ACPP"), I am aware that on January 23, 2020, Allegheny County Probation Officers conducted an unannounced field visit at SIMMONS's residence (**Search Location 15**). I am aware that SIMMONS was on probation at the time and was being supervised by ACPP.  I was advised that SIMMONS answered the door to his residence and ACPP officers immediately smelled what they believed to be the odor of marijuana emanating from inside of SIMMONS's residence. ACPP Officers walked through SIMMONS's residence and noticed suspected marijuana and U.S. currency on the night stand in SIMMONS's room, which was in plain view. ACPP Officers then conducted a search of the residence, believing that SIMMONS was in violation of the terms of his supervision for possessing marijuana. Officers located the following items during their search: a large plastic baggie of suspected marijuana, a digital scale, sandwich baggies, four cellular phones, a Point Blank brand bullet resistant vest, and $1,739.00 in U.S. currency. The Wilkinsburg Police Department was contacted by the ACPP Officers, and SIMMONS was charged with violations of Pennsylvania law relating to the seized evidence described above.[40] From January 23, 2020, through approximately March 1, 2020, SIMMONS was detained in the Allegheny County Jail as a result of these charges (and the corresponding probation violations).

---

[40]    Your affiant learned that these charges were later dismissed.

273.    Investigators obtained a federal search warrants for the four (4) cellular telephones located by ACPP in **Search Location 15** – upon execution of these warrants, investigators identified one of the seized cellular telephones as being TARGET TELEPHONE #2 (which utilized telephone number (412) 609-6813).

274.    After SIMMONS was released from the Allegheny County Jail, investigators continued to monitor his activities via the stationary surveillance camera, which was in the area of **Search Location 15**. Recently, investigators have witnessed the following: on April 11, 2020, a white GMC SUV, with a front license plate was seen parking in front of **Search Location 15**; shortly thereafter, a silver Chevrolet Equinox, which has recently been utilized by SIMMONS, pulled up to the GMC SUV; the driver of the GMC SUV got into the Chevrolet Equinox and left the area. The Chevrolet Equinox returned approximately an hour later and dropped off an individual who got into the GMC SUV and left the area, while the driver of the Equinox went into **Search Location 15**.  This GMC SUV appeared to be the same make, model, color, etc. of a rental vehicle recently utilized by Ronald LEWIS III – a white GMC SUV, bearing Florida registration HKQ-E77. Based on this surveillance, I believe Ronald LEWIS III utilized the white SUV seen meeting with SIMMONS' vehicle. Moreover, I believe that SIMMONS is still in contact with Ronald LEWIS III.

275.    In addition, on the dates of April 9, April 14, April 15, April 16, April 21, April 23, and April 24, 2020, investigators monitoring the stationary surveillance camera in the area of **Search Location 15** witnessed vehicles known to be utilized by an individual identified as Dallas VICKERS (described below in calls and surveillance), who purchases cocaine base (i.e., "crack") from SIMMONS, at **Search Location 15**. The vehicles VICKERS is known to operate, and have been recently surveilled in the area of **Search Location 15** include a red Chevrolet

Silverado and a white Jeep Grand Cherokee with tinted windows and black rims, which have been observed parked in front of **Search Location 15**.  Through the stationary camera footage in and around April 9, April 14, April 15, April 16, April 21, April 23, and April 24, 2020, I am aware that SIMMONS met with the driver of the vehicle, whom I believe to be VICKERS, at which time agents observed brief meetings at the driver's side window, which I believe are consistent with narcotics transactions (based on previously witnessed transactions between the two in which SIMMONS would exit **Search Location 15**, walk up to the driver's side of VICKERS vehicle, and seconds later, walk back into **Search Location 15,** while VICKERS would drive away from the residence).

276.    In addition, investigators have seen SIMMONS also meet with unknown subjects in front of the residence, and get picked up by various vehicles in front of the residence. For example, on May 6, 2020, at approximately 2:40 p.m., a grey Dodge SUV pulled up in front of **Search Location 15**; at approximately 2:44 p.m., an unknown male exited the driver's seat of the vehicle and walked in the direction of **Search Location 15**; at approximately 2:47 p.m., the unknown male walked from the direction of **Search Location 15** to the Dodge SUV and got into the driver's seat. At approximately 2:54 p.m., Victor SIMONS walked from the direction of **Search Location 15** and got into the front passenger seat of the Dodge SUV, which left the area minutes later.

277.    Therefore, I believe that after SIMMONS was released from jail in March 2020, he returned to his residence, **Search Location 15**, which he continues to use as a meeting location for narcotics transactions with at least one of his customers, Dallas VICKERS.

278.    Furthermore, as investigators are currently in possession of the telephone previously utilized by SIMMONS (TARGET TELEPHONE #2), your affiant believes, based on

the above witnessed meetings between SIMMONS and VICKERS, that SIMMONS is utilizing another telephone to facilitate these narcotics transactions.

279. Therefore, based on the historical GPS/E911 location data for TARGET TELEPHONE #2, which showed SIMMONS routinely in the area of **Search Location 15**, the continued surveillance of SIMMONS going to and from the residence, and the recent surveillance of SIMMONS conducting what appear to be narcotics transactions with VICKERS, I believe that SIMMONS primarily resides at **Search Location 15**.

280. I have queried SIMMONS's criminal history, which consists of the following:

a. On June 12, 2014, SIMMONS was convicted of two (2) felony violations of Pennsylvania's Firearms Act stemming from separate arrests.

b. On September 24, 2014, SIMMONS pled guilty to misdemeanor drug charges for possession of cocaine base (i.e., "crack").

c. Finally, on July 13, 2016, SIMMONS was convicted of a felony drug offense involving the possession with intent to deliver/delivery of heroin.

  i. ***Ronald LEWIS III – Identity and Association to Search Location(s)***

281. As set forth herein, law enforcement has determined that Ronald LEWIS III is a mid-level cocaine base (i.e., "crack") distributor who supplies Victor SIMMONS with quantities of cocaine base (i.e., "crack"), which SIMMONS then redistributes to others.

282. Law enforcement has determined that Ronald LEWIS III utilizes telephone number (412) 927-6418, and that he utilizes the following residence: 412 Church Street, Pittsburgh, PA 15145 (**Search Location 16**).

283.    Investigators confirmed with Allegheny County Probation & Parole that LEWIS III provided the telephone number of (412) 927-6418 to their office, which they confirmed was current as of March 16, 2020. Your affiant learned, via law enforcement subpoena, that (412) 927-6418 is subscribed to "Ronald Lewis III, 810 Wood St., Pittsburgh, PA 15221".  In addition, investigators obtained a warrant/order authorizing the disclosure of GPS/E911 geolocation data for (412) 927-6418 on April 20, 2020; utilizing physical surveillance along with this geolocation data for the telephone, investigators confirmed the user of the telephone is LEWIS III. For example, on April 24, 2020, a white in color GMC SUV, Florida Registration HKQ-E77, (rented from Enterprise Rental Company by Latoya Reed), was seen parked in front of 412 Church Street, Turtle Creek, PA 15145 (**Search Location 16**) – at this time, the geolocation data for (412) 927-6418 was in this area. On April 27, 2020, investigators saw the same white in color GMC SUV, Florida Registration HKQ-E77, parked on Inglenook Place, Pittsburgh, PA 15208 – at this time the geolocation data for (412) 927-6418 was in this area.

284.    On April 30, 2020, investigators saw a new Enterprise Rental vehicle, a white in color minivan, PA Registration LGT-6474[41], parked in front of 412 Church Street, Turtle Creek, PA 15145 (**Search Location 16**); the location data confirmed that (412) 927-6418 was in this area. (Your affiant learned, via law enforcement subpoena, that Reed, the renter of the GMC SUV rental, exchanged the SUV on April 28, 2020 and got the minivan.) Also on April 30, 2020, investigators on surveillance witnessed the minivan leave **Search Location 16** and travel to Inglenook Place – at this time, the geolocation data for (412) 927-6418 also moved from the Turtle Creek area to that particular area of Pittsburgh. In addition, investigators confirmed that LEWIS III was the driver of the rental minivan.

---

[41]    This vehicle was also rented by Latoya REED.

285.     On May 5, 2020, investigators installed a stationary surveillance camera in the area of **Search Location 16**. Since the installation of this camera, investigators have witnessed the following (all times are approximate):

a.      On May 7, 2020, at 7:19 a.m., LEWIS III went to the front door of **Search Location 16**, then went around to the back of the residence. At 7:23 a.m., LEWIS III returned to the front porch, and went inside at 7:25 a.m. At 10:19 a.m., LEWIS III exited the front door of the residence, got into a silver in color Mazda SUV rental vehicle, and left the area.

b.      On May 7, 2020, at 12:22 p.m., LEWIS III returned in the Mazda SUV, FL Registration GHS-V43[42], and parked in front of **Search Location 16**; LEWIS III went inside through the front door at 12:24 p.m.; at 1:01 p.m., LEWIS III exited **Search Location 16**, got into the Mazda SUV, and left the area.

c.      On May 7, 2020, at 12:22 p.m., LEWIS III returned in the Mazda SUV, bearing FL registration GHS-V43,43 and parked in front of **Search Location 16**; LEWIS III went inside through the front door at 12:24 p.m.; at 1:01 p.m., LEWIS III exited **Search Location 16**, got into the Mazda SUV, and left the area; at 10:02 p.m., LEWIS III returned in the Mazda SUV and parked; at 10:16 p.m., LEWIS III exited the vehicle and went into **Search Location 16**; at 11:30 p.m., LEWIS III exited **Search Location 16**, got into the Mazda SUV, and left the area; at 11:38 p.m., LEWIS III returned in the Mazda SUV, left it running and parked in the street, and went inside **Search Location 16**; at 11:42 p.m., LEWIS III exited **Search Location 16**, got into the Mazda SUV, and left the area; at 11:56 p.m., LEWIS III returned in the Mazda

---

[42]     This vehicle was also rented by Latoya REED.

[43]     This vehicle was rented by Latoya REED.

SUV, parked in front of **Search Location 16**, and went inside at 12:07 a.m. (LEWIS III did not leave again until the next morning).

> d.      On May 8, 2020, at 8:11 a.m., LEWIS III exited **Search Location 16**, went to the Mazda SUV, started the vehicle, then went back inside the residence; at 8:15 a.m., LEWIS III, carrying a small, grey plastic-type bag containing an unknown item (with a bulbous shape) exited the residence, got into the Mazda SUV, and left the area; at 8:16 a.m., LEWIS III, driving the Mazda SUV in reverse, pulls up in front of the residence and exited the vehicle, leaving it running – LEWIS III walked up to the front door of Search Location 16 and appeared to check if it was locked, as he pulled on the door, then went back to the Mazda SUV and left the area.

> 286.    Investigators in this case have received information from confidential sources: two of those confidential sources, who are identified herein as "Confidential Source #1" ("CS1") and "Confidential Source #2" ("CS2"), have provided information regarding the drug trafficking conducted by Ronald LEWIS III. CS1 and CS2 have been cooperating intermittently over the course of several years. CS1 has been cooperating with the above investigation since February 2020. CS2 has been cooperating with the above investigation since early 2019. CS1 is cooperating in hopes to receive consideration for criminal charges. CS2 is currently motivated by the potential to receive monetary compensation. To date, no information received from CS1 or CS2 is believed to be dishonest or unreliable. Your affiant believes that CS1 and CS2 have provided reliable information for the following reasons: the information provided has been corroborated by physical surveillance and intercepted telephone calls during this investigation. Some of the information provided by CS1 has also been corroborated independently by CS2 and *vice versa*.

287.    The following information was provided by CS1 to investigators within the recent months:

a.    A black male known as "Sky", a/k/a "Ron Lew", distributes cocaine in and around the Homewood and Wilkinsburg areas of Allegheny County, PA;

b.    He has driven a grey Jeep Grand Cherokee and he possesses firearms;

c.    An address on Inglenook Place in Homewood is the location of his drug "stash house";

d.    When shown a picture of Ronald LEWIS III, CS1 identified the male as the person s/he knew as "Sky", a/k/a "Ron Lew".

288.    Investigators presented CS2 a photograph of Ronald LEWIS III, and CS2 identified the male as "Blue", whom CS2 knows to be a cocaine distributor.

289.    The following information was provided by CS2 to investigators within the past several weeks:

a.    LEWIS III was operating a white Chrysler minivan, bearing PA registration LGT-6474, in the Turtle Creek area, and went inside of 412 Church Street (**Search Location 16**). CS2 indicated that he/she believed that the minivan was a rental vehicle;

b.    CS2 knows that 412 Church Street (**Search Location 16**) is LEWIS's address, and that he will stay there;

c.    CS2 advised that an unnamed associate of CS2 confirmed that 412 Church Street (**Search Location 16**) is LEWIS' residence.

290.    Your affiant believes that the above information received from CS1 and CS2 is reliable for the following reasons.  First, law enforcement knows that Ronald LEWIS III has a street name of "Blue," which he utilizes on social media (I am aware that his Instagram name

is "moneymaking_blue"). Second, through physical surveillance during the course of this investigation, agents have observed Ronald LEWIS III operating a Jeep Grand Cherokee[44] as well as dealing cocaine in Wilkinsburg. And, on March 3, 2020, agents conducted physical surveillance at Inglenook Place, and observed Ronald LEWIS III walk up to Inglenook Place.

291.    I believe that the information set forth from CS1 and CS2 was sufficiently corroborated by independent law enforcement investigation and is therefore reliable.  Through the above-described intercepted communications, physical surveillance, and confidential source information, I believe that LEWIS III is involved in the distribution of controlled substances (i.e., cocaine and/or cocaine base).

292.    Therefore, based on the GPS/E911 location data for (412) 927-6418, which showed LEWIS III recently in the area of **Search Location 16**, the fact that vehicles associated with LEWIS III have been recently seen parked at or in front of **Search Location 16**, the recent surveillance camera footage showing LEWIS III going in and out of **Search Location 16**, and the confidential source information which indicates that LEWIS III resides at **Search Location 16**, I believe that LEWIS III resides at **Search Location 16**.

293.    I have queried LEWIS III's criminal history, which consists of the following:

a.    On each of March 31, 2008, and May 30, 2008, LEWIS III was convicted of a misdemeanor drug offense.

b.    On September 15, 2009, LEWIS III was convicted of a misdemeanor charge involving driving under the influence of alcohol or controlled substance.

---

[44]    On January 2, 2020, through physical surveillance and stationary camera surveillance, agents observed Ronald LEWIS III pull up to 524 Princeton Ave. in Wilkinsburg to deal cocaine base to Victor SIMMONS. LEWIS III was operating a dark Jeep Grand Cherokee with Virginia registration URY-9815.

131

c.      On October 8, 2009, LEWIS III was convicted of a misdemeanor drug offense.

d.      On October 16, 2012, LEWIS III was convicted of a felony drug offense.

e.      On October 27, 2014, LEWIS III was convicted of a felony drug offense, a felony firearms offense, and the misdemeanor offense of resisting arrest.

f.      On May 9, 2018, LEWIS III was convicted of a felony offense involving receiving stolen property, a felony firearms offense, a felony drug offense, and a misdemeanor offense involving resisting arrest.

294.    LEWIS III is currently supervised by Allegheny County Probation & Parole, with an anticipated release date of May 9, 2023.

**F.    COMPLAINT #3: INTERCEPTED COMMUNICATIONS EVIDENCING A CONSPIRACY TO DISTRIBUTE AND POSSESS WITH INTENT TO DISTRIBUTE 28 GRAMS OR MORE OF COCAINE BASE (IN THE FORM COMMONLY KNOWN AS "CRACK")**

295.    As set forth below, agents have intercepted wire and electronic communications which, combined with physical and electronic surveillance and other evidence set forth herein, establish probable cause to believe that from in and around December 2019, and continuing thereafter to in and around January 2020, LEWIS III, VICKERS, and others known as unknown, conspired to distribute and possess with intent to distribute 28 grams or more of cocaine base (in the form commonly known as "crack"), in violation of 21 U.S.C. § 846, and that evidence of this offense will likely be located at **Search Locations 15 and 16**.

> i. *December 2, 2020: LEWIS III distributes cocaine base to SIMMONS, who redistributes approximately five (5) grams of cocaine base to VICKERS.*

296.    As set forth herein, I believe that LEWIS III supplied SIMMONS with quantities of cocaine and/or cocaine base (in the form commonly known as "crack"), and that SIMMONS, in turn, distributed the substance(s) he obtained from LEWIS III to others, such as Dallas VICKERS.  I believe this based on intercepted communications and physical surveillance, some of which are set forth below.  For example:

297.    On December 2, 2019, at approximately 11:42 a.m., Victor SIMMONS, using TARGET TELEPHONE #2, made an outgoing call to Dallas VICKERS (DV) using (724) 875-8598. Based on the investigation and as set forth herein, your affiant is aware that VICKERS in a cocaine base (i.e., "crack") customer of Victor SIMMONS. Below is a draft transcription of the call:

DV:     Hello

VS:     Yeah bro, how much you got bro?

DV:     What's that buddy?

VS:     **How much you coming with**?

DV:     **Oh, um same.**

VS:     **Five?**

DV:     **Yeah**

VS:     Alright

DV:     Where are you umm, where you headed?

VS:     Wilkinsburg, just come this way.

DV:     Alright, there's no way, there's no way we can meet anywhere closer than your place?

VS:     Yeah, that is my place in Wilkinsburg.

DV:     Yeah, yeah, I know. I just didn't know if you were coming towards, like, Wilkinsburg's fine, Wilkinsburg's fine. I'll be there in like less than a half hour now.

VS:     Alright

298.    Based on my training and experience and my knowledge of this investigation, in the above call, I believe that VICKERS was arranging to purchase $500 worth of cocaine base from SIMMONS.   As set forth below, I believe that SIMMONS then contacted LEWIS III to obtain cocaine base that SIMMONS intended to redistribute to VICKERS.

299.    Based on stationary camera surveillance in the vicinity of SIMMONS's residence, shortly after this call, at 12:08 p.m., a black Nissan bearing Pennsylvania registration KWA-4708 (an Enterprise rental vehicle), pulled up in front of Victor SIMMONS's residence (**Search Location 15**) and parked behind SIMMONS's vehicle. The driver of this vehicle was later identified as Ronald LEWIS III when he returned to the vehicle at approximately 12:43 p.m. LEWIS III walked to the residence of SIMMONS and went inside. At 12:22 p.m., a red Chevrolet pickup truck bearing Ohio Registration GNN-8299 with a trailer attached (SWU-7093) pulled up in front of SIMMONS's residence. SIMMONS exited his residence, went to the passenger window of the red Chevrolet, and appeared to conduct a hand-to-hand transaction with the driver of the truck, which pulled away quickly thereafter. Physical surveillance officers positively identified the driver of the red Chevrolet truck as its registered owner, Dallas VICKERS. At 12:43 p.m., the black Nissan, driven by LEWIS III, left the residence and was followed by physical surveillance to 628 Karl St., Pittsburgh, PA, which is the residence that Ronald LEWIS III provides to Allegheny County Probation & Parole.

300.    Based on my training and experience, and my knowledge of this case in particular, in the above call, I believe that Victor SIMMONS asked Dallas VICKERS how much money he would be providing, ("How much you coming with"), to which VICKERS responded

134

by stating, "Oh, umm same".  I believe that this evidences an ongoing buyer-seller relationship between VICKERS and SIMMONS. I believe that when SIMMONS asked, "Five?", and VICKERS confirmed by stating, "Yeah", I believe that VICKERS expressed that he wished to purchase $500.00 in cocaine base (i.e., "crack") from SIMMONS. Your affiant is aware that when a mid-level cocaine base trafficker sells to lower-level distributors in the supply chain (and/or end-users of cocaine base, such as VICKERS), one (1) gram may sell for up to $100 per gram. Thus, I believe that based on the nature of the buyer-seller relationship between VICKERS and SIMMONS, I believe that $500 is consistent with the purchase price of approximately five (5) grams of cocaine base (i.e., "crack").[45]

301.    As indicated above, shortly before VICKERS arrived at **Search Location 15**, agents observed, via surveillance camera, LEWIS III arrive at SIMMONS's residence (**Search Location 15**) and go inside. Agents then observed VICKERS and SIMMONS conduct what appeared to be a hand-to-hand transaction, which I believe to be consistent with a drug transaction, after which VICKERS left, followed shortly thereafter by LEWIS III departing the area.  I believe based on the foregoing that VICKERS ordered $500 worth of cocaine base (i.e., "crack"), which I believe to be approximately five (5) grams, from SIMMONS.  I believe that SIMMONS then contacted his source of supply, LEWIS III, who delivered cocaine base to SIMMONS at **Search Location 15**.  I believe that SIMMONS then redistributed at least a portion of the cocaine base

---

[45]    Alternatively, and based on my experience, I know that the same purchase price has greater buying power as you move higher in the supply chain.  For example, I believe that a mid-level cocaine base dealer would receive approximately a half-ounce (i.e., 14 grams) of cocaine base (i.e., "crack") for $500.  Based on my training and experience, I know that each member of the supply chain expects to make a profit from the redistribution of the cocaine base (i.e., "crack"), which has the effect of increasing the price for the same quantity as you go down the supply chain.

(i.e., "crack") that was supplied to him by LEWIS III, to Dallas VICKERS, in exchange for $500 in U.S. currency.

      302.    The same day as the above-referenced meeting between SIMMONS and VICKERS – December 2, 2019 – at approximately 3:21 p.m., Victor SIMMONS ("VS"), using TARGET TELEPHONE #2, made an outgoing call to David SIMMONS ("DS") using (412) 427-7747, whom I believe to be Victor SIMMONS's brother. Below is a draft transcription of the call (U/I: Unintelligible):

DS:    Yo

VS:    Where you at? Huh?

DS:    I said what's up, what did you say?

VS:    Where you at?

DS:    I'm at work.

VS:    Oh, could you stop over here before you go to grandmas?

DS:    Yeah, what you need?

VS:    **I gotta give you something.**

DS:    **Is it for somebody or for me to put up?**

VS:    **For you to put up, another, uh, five.**

DS:    Five? Aight.

VS:    Aight, **I might give you 10.**

DS:    I probably won't be there till like uh, maybe 5:30- 6

VS:    When?

DS:    5:30-6

VS:    Alright

DS:    Alright I'll hit ya back

      303.    Based on my training and experience, and my knowledge of this case in particular, in the above call, I believe that SIMMONS asked his brother (D. SIMMONS) to come

to his residence so that he could provide D. SIMMONS with a sum of money, which your Affiant believes is $5,000 ("for you to put up…another five"), representing the proceeds from the distribution of narcotics (including cocaine base). I believe that D. SIMMONS agreed, and then SIMMONS advised that he may give him $10,000 ("I might give you 10").[46] Your Affiant notes that at approximately 5:33 p.m., David SIMMONS, using (412) 427-7747, advised Victor SIMMONS, using TARGET TELEPHONE #2, that he was "on his way".

304.    The following day, December 3, 2019, at approximately 9:03 p.m., Victor SIMMONS ("VS"), using TARGET TELEPHONE #2, received an incoming call from Taylor BROWN ("TB"), using (412) 867-9371. Below is a draft transcription of the call (U/I: Unintelligible):

VS:    Yo

TB:    U/I didn't leave any lights on?

VS:    Huh?

TB:    You didn't leave no lights on?

VS:    No, naw, I don't think I did. **I got, like my money on me so I got like 6 bands on me**. I gave Neph a band today to U/I

TB:    You need to, you on the, **you do too much around people and on the phone!**

VS:    I'm in the bathroom by myself

TB:    Just talk to me when you get home though!

VS:    Bye. See you.

305.    Based on my training and experience, and my knowledge of this case in particular, in the above call, I believe that SIMMONS advised BROWN that he had $6,000 on his person ("I got, like, my money on me so I got like 6 bands on me").  I am aware that the term

---

[46]    Your Affiant is aware from my training and experience that narcotics traffickers commonly keep narcotics and/or money at the residences of relatives or associates, so as to protect those assets from law enforcement seizure or from theft/robbery.

"bands" is slang for thousands of dollars (i.e., six (6) "bands" is the equivalent of six thousand dollars).  I further believe that this money represented the proceeds from the distribution of narcotics because BROWN scolded SIMMONS for being too open on the phone (and around others).  I believe that if the monies were legitimately earned, BROWN would not have scolded SIMMONS for discussing his money over the telephone ("you do too much around people and on the phone!").

     ii.  *December 26, 2019: VICKERS orders a quantity of cocaine base from SIMMONS; LEWIS III supplies SIMMONS with cocaine base who, in turn, redistributes cocaine base to VICKERS.*

306.    On December 26, 2019, at approximately 2:51 p.m., Victor SIMMONS, using TARGET TELEPHONE #2, received an incoming call from Dallas VICKERS, using (724) 875-8598. Below is a draft transcription of the call (U/I: Unintelligible):

    VS:    Yo

    DV:    What's up, um, leaving now.

    VS:    What you say? Huh?

    DV:    I'm leaving right now, I'm U/I.

    VS:    Come on.

307.    Shortly after the conclusion of this call, at 3:02 p.m., Victor SIMMONS left his residence of 524 Princeton Avenue (**Search Location 15**), which I am aware of through stationary camera surveillance in the vicinity of **Search Location 15**. At 3:15 p.m., based on GPS/E911 location data for TARGET TELEPHONE #2 (utilized by SIMMONS), your affiant determined that SIMMONS was located near the address of 628 Karl St., a known address of Ronald LEWIS III.  At 3:19 p.m., based on surveillance footage, I believe that SIMMONS returned to his residence (**Search Location 15**). At 3:24 p.m., Dallas VICKERS arrived at SIMMONS's

residence (**Search Location 15**) in the red Chevrolet pickup truck, and conducted what your affiant

believes to be a drug transaction (i.e., a hand-to-hand transaction) through the drivers' side window

with Victor SIMMONS.

> iii.  *January 2, 2020: VICKERS obtains cocaine base from SIMMONS,*
> *which was supplied to SIMMONS by LEWIS III; the cocaine base is*
> *seized from VICKERS by PSP following a traffic stop.*

308.    On January 2, 2020, at approximately 10:46 a.m., Victor SIMMONS (VS),

using TARGET TELEPHONE #2, received an incoming call from Dallas VICKERS (DV), using

(724) 875-8598. Below is a draft transcription of the call (U/I: Unintelligible):

VS:     Yo bro

DV:     **Hey I'm here, sorry**

VS:     Yeah, no... I'ma, I'm, **I'ma call see my mans real fa, I ain't, ain't know,**
**I been here sleep man** U/I

DV:     U/I 1030

VS:     I'll call you right back

DV:     What's that?

VS:     **I'll call you right back bro**

DV:     **Listen I'm here, I'm here, I just pulled in**

VS:     Alright

309.    Based on my training and experience, and my knowledge of this case in

particular, in the above call, I believe that VICKERS told SIMMONS that he was at SIMMONS's

residence (**Search Location 15**) ("Hey I'm here, sorry"). I believe that SIMMONS, who had been

sleeping, told VICKERS that he need to call his supplier ("I'ma call see my mans real fa, I ain't,

ain't know, I been here sleep man"), and would call VICKERS right back ("I'll call you right back

bro").

310.    At approximately 10:44 a.m. (two (2) minutes prior to the above call),

investigators monitoring the surveillance camera in the area of 524 Princeton Blvd. (**Search**

**Location 15**) observed a white Jeep Grand Cherokee – fitting the description of the Jeep registered to Dallas VICKERS – park in front of SIMMONS's residence (**Search Location 15**). A white male fitting the description of VICKERS exited the Jeep and walked up to the front porch area of 524 Princeton Blvd. (**Search Location 15**), waited for a short period of time, then returned to the Jeep.

        311.    Approximately two (2) minutes later, at 10:48 a.m., Victor SIMMONS (VS), using TARGET TELEPHONE #2, made an outgoing call to Dallas VICKERS (DV), using (724) 875-8598. Below is a draft transcription of the call:

DV:    What up

VS:    **Hey bro, my man said 15 minutes, can you wait that long?**

DV:    Yeah, are we gonna, are we going there, or is he coming here?

VS:    No, **he's comin here**, you just gotta sit there, I just woke up. What I was gonna say bro, how much you got all together?

DV:    Um, **I got 400, all together**

VS:    Alright alright alright alright

DV:    Will, will he actually be here in 15 minutes?

VS:    Yeah, but no later than 20 minutes, if he ain't, you just leave, I don't be on that, I don't be waiting on nobody either man.

DV:    No I can't, **I can't leave dude, um, I gotta have it**, so

VS:    Alright, he'll be here in a

(VS and DV talk over each other)

DV:    Can't, can't we go, can't we go to him?

VS:    No, he's, he's not even at home, he said he's doin something, that's why he comin from straight from what he doing, aite

DV:    Um, **you got a bud?**

VS:    Huh?

DV:    You got a bud?

VS:     **Yeah, I prolly, I'll bring it to you**, I gotta get up, I'm bout ta, I laying down, I'm bout to get up, here I come

DV:     Alright that's cool

312.    Based on my training and experience, and my knowledge of this case in particular, in the above call, I believe that SIMMONS relayed to VICKERS that SIMMONS's supplier would not arrive for approximately 15 minutes[47] ("Hey bro, my man said 15 minutes, can you wait that long?"), and indicated that SIMMONS's supplier would be coming to SIMMONS's residence (**Search Location 15**) ("he's comin here"). I believe that SIMMONS asked VICKERS how much money he had to provide for cocaine base (i.e., "crack"), which I believe was because VICKERS owed SIMMONS money from a previous cocaine base transaction on December 31, 2019 (which I am aware of through the wiretap of TARGET TELEPHONE #2 (utilized by SIMMONS)), and VICKERS indicated that he had $400 ("I got 400 all together"). I believe that SIMMONS again asked VICKERS if he could wait to conduct the transactions, and stated that he understood if VICKERS had to leave. I believe that VICKERS replied that he needed the cocaine base and would not leave ("I can't leave dude, um, I gotta have it"). At the end of the call, I believe that VICKERS asked SIMMONS if he had a small amount of marijuana ("you got a bud?"), and SIMMONS stated that he did and would bring it to VICKERS ("Yeah, I prolly, I'll bring it to you"), indicating to your affiant that the type of narcotics that SIMMONS had been selling to VICKERS was not marijuana.

313.    That same day, at approximately 11:21 a.m., investigators monitoring the surveillance camera in the area of **Search Location 15** saw SIMMONS exit his residence (**Search**

---

[47]    Your affiant notes there were no outgoing wire communications intercepted over TARGET TELEPHONE #2 between the call from VICKERS at 10:46 a.m., and the subsequent call to VICKERS at 10:48 a.m., indicating that SIMMONS likely contacted his source of supply (believed to be LEWIS III) via other means.

**Location 15**) and walk down to VICKERS's Jeep and get into the front passenger seat of the vehicle. At approximately 11:26 a.m., a different Jeep SUV (bearing Virginia registration URY-9815) pulled up on Princeton Blvd; SIMMONS exited VICKERS's vehicle and walked to the Jeep SUV that had just arrived. Seconds later, SIMMONS walked back to VICKERS's vehicle and completed what I believe was a hand-to-hand transaction with VICKERS, who then left the area. SIMMONS was then seen walking back to his residence (**Search Location 15**), followed by the male that arrived in the Jeep SUV. At approximately 11:33 a.m., the male exited SIMMONS's residence (**Search Location 15**), returned to the Jeep SUV, and left the area.

314.     After reviewing the surveillance video of the above events, investigators positively identified the male that arrived in the Jeep SUV to supply SIMMONS with cocaine base, who in turn supplied VICKERS with at least some of this cocaine base, as Ronald LEWIS III. Investigators identified LEWIS III after reviewing his Pennsylvania driver's license photograph, as well as through photographs of LEWIS III posted on LEWIS III's Instagram account, "moneymaking_blue".

315.     Investigators conducting surveillance were able to follow VICKERS out of the area and onto the Pennsylvania Turnpike heading east towards Greensburg, PA. Pennsylvania State Police troopers subsequently conducted a probable cause traffic stop of VICKERS's Jeep, and recovered a quantity of suspected crack cocaine and drug paraphernalia from VICKERS. VICKERS was released from the scene.  The suspected crack cocaine was submitted to a laboratory for further chemical testing, however, prior to submission, it was field tested by investigators and was presumptive positive for the presence of cocaine. Your affiant estimated that the quantity of cocaine base was over 2 grams.

316.    Based on the foregoing, I believe that VICKERS advised SIMMONS that he wanted to purchase a quantity of cocaine base (possibly $400 worth, however, based on the conversation, as well as other conversations I've reviewed between VICKERS and SIMMONS, part of the $400 may be to pay for cocaine base SIMMONS previously supplied VICKERS on consignment). SIMMONS did not have cocaine base to sell, so he contacted his supplier, LEWIS III, who met with SIMMONS at **Search Location 15** to supply him with a distribution quantity of cocaine base (at least 2 grams).

    iv.  *January 6, 2020, and January 9, 2020: SIMMONS obtains cocaine base from LEWIS III and redistributes to VICKERS*

317.    On January 6, 2020, at approximately 9:08 a.m., Victor SIMMONS (VS), using TARGET TELEPHONE #2, received an incoming call from Dallas VICKERS (DV), using (724) 875-8598. Below is a draft transcription of the call:

VS:    Yo

DV:    **I'll be there in like 5**

VS:    Hmn?

DV:    I'll be there in 5

VS:    Aite

DV:    Cool

318.    Just minutes later, at approximately 9:14 a.m., Victor SIMMONS (VS), using TARGET TELEPHONE #2, received an incoming call from Dallas VICKERS (DV), using (724) 875-8598. Below is a draft transcription of the call:

VS:    Hello

DV:    **Hey bro, I'm pullin in.**

VS:    Aite, you'll see my mans pull in behind you, then I'll be out.

DV:    Say what's that?

VS:    **My mans bout to pull up behind you, you'll see. Then I'll be out there.**

DV:     Okay, what's he in? **The same, that Jeep?**

VS:     I don't know.

DV:     Okay cool. He's gonna be here any minute?

VS:     Mmn hmn.

DV:     Okay cool.

319.    At approximately 9:16 a.m., investigators monitoring the surveillance camera saw a red Chevrolet Silverado fitting the description of VICKERS truck arrive in front of 524 Princeton Blvd. **(Search Location 15)** and park. Approximately five (5) seconds later, a black Jeep Grand Cherokee bearing Ohio registration HCK-2712 arrived in front of 524 Princeton Blvd (**Search Location 15**) and parked behind VICKERS's vehicle. At approximately 9:18 a.m., SIMMONS walked up to the Jeep Grand Cherokee's driver's side window, met with a person wearing an orange and red jacket (identified as LEWIS III later in the morning, when he exited **Search Location 15** at 10:32 a.m.) then walked to the driver's side window of VICKERS' truck, where he remained for a few seconds. VICKERS then left and SIMMONS walked back toward 524 Princeton Blvd. (**Search Location 15**) at approximately 9:21 a.m., followed by Ronald LEWIS III. At approximately 10:32 a.m., Ronald LEWIS III walked back to the Jeep (from the area of **Search Location 15**). Investigators attempted to follow LEWIS III to identify possible stash locations or residences but were unable to stay with LEWIS III after he left SIMMONS's residence (**Search Location 15**).

320.    Therefore, based on the above, I believe that VICKERS intended to purchase a quantity of cocaine base from SIMMONS, who did not have any at the time. SIMMONS contacted his supplier, LEWIS III, who arrived in the Jeep SUV; SIMMONS obtained cocaine base from LEWIS III at the window of the Jeep SUV, and distributed some of it to

VICKERS, who then left. LEWIS III then accompanied SIMMONS into his residence to possibly supply him with additional cocaine base, and/or obtain payment for the cocaine base.

321.    On January 9, 2020, at approximately 8:47 a.m., Victor SIMMONS (VS), using TARGET TELEPHONE #2, made an outgoing call to William KNIGHT (WK), using (412) 689-4604.[48] Below is a draft transcription of the call:

WK:    Yo

VS:    Bro, you got do somethin or somethin?

WK:    Naw, sittin here playin this game

VS:    Aite.

WK:    Why **what's up, you ready?**

VS:    Yeah, yeah, I'm, **you could come**, I'm, I ain't dressed and shit yet, but you could come.

WK:    Aite, well I'm gonna sit here in front of this game, call me, call me when you dressed

VS:    Aite

322.    Based on  my training and experience, and my knowledge of this case in particular, in the above call, I believe that KNIGHT asked SIMMONS if he was ready for KNIGHT to come over ("what's up, you ready?"), to which SIMMONS indicated that he was ("you could come").

323.    Shortly after this call, at approximately 9:12 a.m., Victor SIMMONS (VS), using TARGET TELEPHONE #2, made an outgoing call to William KNIGHT (WK), using (412) 689-4604. Below is a draft transcription of the call:

WK:    Yo

---

[48]    Your affiant believes this number was used by William KNIGHT, a/k/a "Willie B", throughout the investigation, as SIMMONS often referred to the user at "Willie", and the user was also identified via the surveillance camera on **Search Location 15** (such as when the user stated he would come over, KNIGHT was identified arriving at the residence), and was also identified during physical surveillance.

VS:     Yo bro, **I need you to stop at Blue's and come**

WK:     What?

VS:     I need you to come but stop at Blue's first

WK: Stop at Blue's?

VS: Yeah bro, like next 20 minutes, **I need you to be here. My man is on his way, and I ain't, you know what I mean? He here for real**.

WK: He sittin right, he, he there right now?

VS: **My man's damn near, like 10 minutes away**

WK: Oh, aite aite

VS: **I need you to stop at Blue's dude.**

WK: Aite I'm bout to do it, I'm bout to do it right now.

VS: Aite

324.     Based on my training and experience, and my knowledge of this case in particular, in the above call, I believe that SIMMONS instructed KNIGHT to proceed to the residence of LEWIS III, whom I know to utilize the alias "Blue", before he came to SIMMONS's residence (**Search Location 15**) ("I need you to stop at Blue's and come"). I believe that SIMMONS advised KNIGHT that his drug customer (VICKERS) was on his way to SIMMONS's house (**Search Location 15**) to obtain cocaine base (i.e., "crack"), and that SIMMONS did not currently did not have any cocaine base (i.e., "crack") to sell ("I need you to be here. My man is on his way, and I ain't, you know what I mean? He here for real" and "My man's damn near, like 10 minutes away"). I believe that SIMMONS reiterated that he needed KNIGHT to go to LEWIS III's residence to obtain cocaine base so that SIMMONS could then sell it to VICKERS ("I need you to stop at Blue's dude").

325.    Just six minutes later, at approximately 9:19 a.m., Victor SIMMONS (VS), using TARGET TELEPHONE #2, received an incoming call from William KNIGHT (WK), using (412) 689-4604. Below is a draft transcription of the call:

VS:    Yo

WK:    Yo

VS:    Yeah

WK:    **I'm bout to pull up at Blue's**

VS:    Aite

WK:    Aite

326.    At approximately 9:22 a.m., Victor SIMMONS (VS), using TARGET TELEPHONE #2, received an incoming call from William KNIGHT (WK), using (412) 689-4604. Agents intercepted Ronald LEWIS III (RL) in the background of this call. Below is a draft transcription of the call:

VS:    Yo

WK:    You tell him I was outside?

VS:    Gotta go knock. **He know you comin' though, knock while I'm on the phone**

WK:    Aite

VS:    He said U/I

WK:    Hold on, a lot a shit goin on, Blue hot as hell

VS:    He know you comin though

(In background - can hear WK say "What up")

VS:    Bro he mad

WK:    Huh?

VS:    He mad right now

WK:     You said he mad?

VS:     Mmn hmn.

WK:     U/I crazy nephs. The same ones I had.

VS:     Willie?

WK:     **I'm posed to be givin him some bread or something?**

VS:     Ut uh.

WK:     Oh.

(Can hear RL and WK in background talking to each other:

RL:     U/I 2-4

WK:     U/I bread. He right here on the phone

RL:     **Bout to ride over there yo**

VS:     **Come on then**

WK:     What you say?

VS:     Tell him come on

WK:     You hear that?

RL:     Yeah.

WK:     Aite

327.     Based on my training and experience, and my knowledge of this case in particular, in the above calls, I believe that KNIGHT told SIMMONS that he was at LEWIS III's residence ("I'm bout to pull up at Blue's"). I believe that SIMMONS told KNIGHT that LEWIS III was expecting him, and told KNIGHT to stay on the line while KNIGHT knocked on the door ("He know you comin' though, knock while I'm on the phone"). I believe that while KNIGHT was at LEWIS III's residence, he and SIMMONS discussed how LEWIS III was angered, and

KNIGHT asked SIMMONS if he was supposed to give LEWIS III money for cocaine base ("I'm posed to be givin him some bread or something?"), to which SIMMONS replied in the negative. Investigators could then overhear KNIGHT and LEWIS III talking to each other in the background of the intercepted call over TARGET TELEPHONE #2 (utilized by SIMMONS), and LEWIS III advised SIMMONS that he was going to come over to SIMMONS's residence himself (**Search Location 15**) ("Bout to ride over there yo"), as opposed to giving the cocaine base to KNIGHT for SIMMONS. SIMMONS told LEWIS III to come over to his residence (**Search Location 15**) ("come on then").

       328.    Shortly thereafter, at approximately 9:27 a.m., Victor SIMMONS (VS), using TARGET TELEPHONE #2, made an outgoing call to William KNIGHT (WK), using (412) 689-4604. During this intercepted call, agents overheard SIMMONS talking to VICKERS in the background.  Below is a draft transcription of the call:

> VS:    **What you got, four right?**
>
> DV:   I got four yeah
>
> -----------------
>
> WK:   Yo
>
> VS:    **Bro. You see that red, red truck when you pull up, just hand him that shit, he gonna give you the money**
>
> WK:   Hold on, what?
>
> VS:    That red truck right there! You'll see it when you pull up. Just hand it to him and he gonna give you the money.
>
> WK:   And then, **Blue ain't even give it to me, he said he bout to, he comin up there**
>
> VS:    Aite
>
> WK:   Yeah he on, I don't know, he, he mad as hell bout somethin (laughs)
>
> VS:    Why he didn't give it to you.

WK:    Ah, he said "man I'm comin up there!" I don't even know if he got it bro. You hear me? I think he might, I think he comin up there to tell you like, na mean? You either gotta wait or, he ain't got it right now.

VS:    Why would he do that?

WK:    I don't know, that's what he, that's what he actin like. I don't know bro.

VS:    Where you at? Outside?

WK:    **Naw we, we comin up Hill. I'm behind him.**

VS:    Oh alright.

WK:    Yeah. But we bout to be there though

VS:    Aite

WK:    Aite

329.    Based on my training and experience, and my knowledge of this case in particular, in the above call, I believe that in the background, SIMMONS was speaking with VICKERS on a separate telephone, and VICKERS indicated he had "four", meaning $400 for cocaine base. In the main call, SIMMONS, who may not have believed that LEWIS III was en route to his location, told KNIGHT to give VICKERS the cocaine base (i.e., "crack") and VICKERS would give KNIGHT the money ("Bro. You see that red, red truck when you pull up, just hand him that shit, he gonna give you the money"). I believe that KNIGHT responded that LEWIS III did not give him any cocaine base (i.e., "crack"), and that LEWIS III was coming to SIMMONS's residence ("Blue ain't even give it to me, he said he bout to, he comin up there"), and that they were almost at SIMMONS' residence (**Search Location 15**) ("Naw we, we comin up Hill. I'm behind him").

330.    Furthermore, investigators monitoring a surveillance camera in the area of 924 Princeton Blvd. (**Search Location 15**) witnessed the following:

a.    at approximately 9:26 a.m., VICKERS arrived in a red Silverado truck and parked in front of 524 Princeton (**Search Location 15**);

b.      at approximately 9:33 a.m., LEWIS III arrived in a Jeep with a front license plate, and parked behind VICKERS;

c.      at the same time, KNIGHT walked into 524 Princeton Blvd. (**Search Location 15**);

d.      at approximately 9:34 a.m., LEWIS III exited the Jeep and went into 524 Princeton Blvd. (**Search Location 15**)

e.      at approximately. 9:37 a.m., SIMMONS walked out of (**Search Location 15**) and went to the driver's side window of VICKERS's red Silverado truck and conducted what your affiant believed to be a hand-to-hand transaction consistent with a narcotics transaction;

f.      at approximately 9:38 a.m., LEWIS III exited 524 Princeton Blvd. (**Search Location 15**), and SIMMONS walked away from VICKERS's truck. LEWIS III then went to his Jeep and left the area, SIMMONS returned to his residence (**Search Location 15**), and VICKERS also left the area.

331.    Based on the above calls and surveillance, I believe that SIMMONS did not have any cocaine base (i.e., "crack") with which to supply to Dallas VICKERS. I believe that because VICKERS was on his way to SIMMONS's residence (**Search Location 15**) to purchase cocaine base (i.e., "crack"), SIMMONS instructed KNIGHT to go to SIMMONS's source of supply of cocaine base – LEWIS III (a/k/a "Blue"), obtain cocaine base (i.e., "crack") and deliver it to SIMMONS, who intended to redistribute it to VICKERS. I believe that once KNIGHT arrived at LEWIS III's residence, LEWIS III told KNIGHT and SIMMONS that he would deliver the cocaine base (i.e., "crack") directly to SIMMONS's residence (**Search Location 15**). Based on the ensuing surveillance (described above), including LEWIS III arriving at the residence, and

shortly thereafter, SIMMONS conducting what was consistent with a narcotics transaction with VICKERS, I believe that LEWIS III supplied SIMMONS with cocaine base (i.e., "crack"), which SIMMONS sold at least $400 worth, to VICKERS.

332.    On January 20, 2020, at approximately 12:04 p.m., Victor SIMMONS, using TARGET TELEPHONE #2, made an outgoing call to Ronald LEWIS III (RL) using (412) 927-6418. Below is a draft transcription of the call (U/I: Unintelligible):

> VS:     Hey, hey, look, I got some, **I got some Runts** right. I'm about to go umm, I'm about to go beat these nigga's up, in Wilkinsbur-, I mean in, in Mckeesport. I'ma pull up on you.
>
> RL:     Alright well let me know, cuz, uhh, I'ma call you.
>
> VS:     I had to go, I had- **I needed some shit earlier and last night.** You don't answer your phone no more but-
>
> RL:     No them phones, something happened bro. I'll talk to you bro, I'ma pull up on you bro.
>
> VS:     Aight
>
> RL:     Soon as I, I'ma pull up on you tonight. I'ma tell you everything that's going on.
>
> VS:     Alright
>
> RL:     Alright

333.    Based on my training and experience, and my knowledge of this case in particular, in the above call, I believe that when Victor SIMMONS told Ronald LEWIS III, "I got some Runts right", he was indicating that he had a known strain of marijuana.  I believe that when SIMMONS stated, "I needed some shit earlier and last night", SIMMONS was expressing that he needed some cocaine base from LEWIS III, but LEWIS III did not answer his phone, ("You don't answer your phone no more but.")

334.    As stated above, on January 23, 2020, Allegheny County Probation Officers conducted an unannounced field visit at SIMMONS's residence (**Search Location 15**), and

SIMMONS was subsequently arrested for violations of Pennsylvania law relating to the seized evidence described above, including suspected marijuana and paraphernalia.[49] From January 23, 2020, through approximately March 1, 2020, SIMMONS was detained in the Allegheny County Jail as a result of these charges (and the corresponding probation violations). In turn, the wiretap of TARGET TELEPHONE #2 was terminated, as the telephone was in FBI custody.

335.    After SIMMONS was released from the Allegheny County Jail, investigators continued to monitor his activities via the stationary surveillance camera, which was in the area of **Search Location 15**, as well as toll analysis for a telephone your affiant believes is currently utilized by SIMMONS: (412) 513-5528[50]. Your affiant believes this is utilized by SIMMONS, as it is subscribed to "Taylor Brown, 524 Princeton Blvd." (based on this investigation, your affiant knows that BROWN is SIMMONS's girlfriend and also lives at **Search Location 15**), and the top called number from (412) 513-5528 belongs to the telephone I know to be utilized by Taylor BROWN, which is (412) 867-9371. Furthermore, since March 1, 2020, telephone number (412) 513-5528 has had significant contact with the telephone number used by Dallas VICKERS, being (724) 875-8598.

336.    Therefore, based on the above recent physical and telephonic surveillance, I believe that SIMMONS has returned to distributing cocaine base from his residence, **Search Location 15**.

---

[49]      Your affiant learned that these charges were later dismissed.

[50]      Your affiant believes that SIMMONS utilized this as a secondary telephone prior to his arrest on January 23, 2020, as toll data indicates that in addition to TARGET TELEPHONE #2, it was also in contact with VICKERS and other subjects he communicated with over TARGET TELEPHONE #2.

337.    In reference to the time frame of the conspiracy (December 2019 through January 2020),  your affiant conducted pen register analysis of TARGET TELEPHONE #2 and (412) 513-5528, both of which were/are utilized by SIMMONS, to determine the approximate number of communications between SIMMONS and VICKERS.  Through that analysis, I know that there were over 120 communications between SIMMONS and VICKERS during this time frame.  Moreover, I am aware that there were over 15 *telephonic* communications between SIMMONS and LEWIS III during this time frame.[51]

338.    In addition, your affiant reviewed the surveillance camera footage and wiretap interceptions, so as to approximate the number of cocaine base transactions that have occurred between SIMMONS and VICKERS.  Through this analysis, your affiant approximates that there were over (18) transactions (occurring on different dates), which were surveilled by investigators. Based on these wiretap interceptions, your affiant learned that VICKERS would normally obtain $300 to $500 of cocaine base at a time, which corresponds with three (3) to five (5) grams of cocaine base per transaction. Therefore, your affiant believes that between December 2019 and January 2020, SIMMONS obtained over 54 grams of cocaine base from LEWIS III, which he, in turn, redistributed to VICKERS.

### G.    MARTIN LANGFORD AND SEARCH LOCATION # 9

339.    As set forth below, I believe that Martin LANGFORD is a high-level cocaine trafficker who supplies Quamane BRYANT (and others) with cocaine, and that LANGFORD will utilize multiple cellular telephones to facilitate his narcotics trafficking activities.

---

[51]    Your affiant learned during this investigation that SIMMONS often communicated with other subjects via FaceTime as well as iMessage, which are not captured through a pen register.

340.     Law enforcement has determined that Martin LANGFORD is the user of TARGET TELEPHONE #8 ((404) 788-6580) and that he resides at 924 Malvern Street, Apartment C, Bellevue, PA 15202 (**Search Location 9**) based in part by the following: your affiant, via law enforcement subpoena, requested subscriber information for TARGET TELEPHONE #8. In response thereto, Verizon indicated that the subscriber is "Martin LANGFORD, 1110 Steuben Street, Apt. 207, Pittsburgh, PA 15207".

341.     Your affiant, via law enforcement subpoena, learned that Martin LANGFORD is the current[52] Duquesne Light account holder and the current[53] Comcast account holder for 924 Malvern Road Apt. C, Bellevue, PA 15202 (**Search Location 9**), and that the telephone number he provided as his contact number is (404) 788-6580 (TARGET TELEPHONE #8).

342.     Since receiving authorization to intercept communications over TARGET TELEPHONE #5, which is utilized by Quamane BRYANT, as well as TARGET TELEPHONE #8 (utilized by LANGFORD), during several intercepted communications, the user of TARGET TELEPHONE #8 , identified himself and was addressed as, "Marty".

343.     On February 21, 2020, agents obtained an order authorizing the disclosure of GPS/E911 location data for TARGET TELEPHONE #8 from a United States Magistrate Judge for the Western District of Pennsylvania. On February 24, 2020, investigators were monitoring the GPS/E911 location data "pings" for the telephone and saw that during the late morning/early afternoon hours, the telephone was located at the Atlanta (GA) International Airport. In addition, as will be shown below, on the same date, Quamane BRYANT and the user of TARGET

---

[52]     This information is current as of May 1, 2020.

[53]     This information is current as of April 27, 2020.

TELEPHONE #8 spoke, and the user of TARGET TELEPHONE #8 stated that he was then at the airport in Atlanta and was traveling back to Pittsburgh that day. Investigators set up surveillance at the Pittsburgh International Airport, specifically at Gate D76 for Delta Flight 1154 from Atlanta to Pittsburgh. At approximately 2:47 p.m., investigators on surveillance witnessed Martin LANGFORD exit Gate D76. Furthermore, at or around the same time, GPS/E911 location data for TARGET TELEPHONE #8 indicated that the telephone was then "pinging" at the Pittsburgh International Airport. In addition, the GPS/E911 location data for TARGET TELEPHONE #8, (which investigators had for the approximate date range of February 21, 2020 through April 8, 2020), showed that the telephone was routinely located (especially in the overnight hours) in the area of **Search Location 9**. Furthermore, investigators identified a vehicle utilized by LANGFORD during the course of the investigation, which is a dark grey Dodge Ram rental vehicle, PA registration ZNV-7335. Agents have observed LANGFORD utilizing this vehicle as recently as May 7, 2020, and this vehicle has been seen parked in the early morning hours near **Search Location 9**, indicating that LANGFORD is still utilizing this vehicle.

344.    Therefore, based on the GPS/E911 location data for TARGET TELEPHONE #8, physical surveillance of LANGFORD's vehicle at **Search Location 9**, the fact that LANGFORD is the current Duquesne Light and Comcast account holder for **Search Location 9**, I believe that LANGFORD resides at **Search Location 9**.

345.    I have queried LANGFORD's criminal history, which includes the following:

a.      On October 14, 2004, LANGFORD was convicted of violating 21 U.S.C. § 846, conspiracy to distribute five (5) kilograms or more of cocaine, in the U.S. District Court for the Western District of Pennsylvania.

346.     Based on the information set forth below, I believe that evidence of violations of Title 21, United States Code, Sections 841(a)(1) and/or 846, will likely be found at **Search Location 9**, because I believe there is probable cause that LANGFORD, Quamane BRYANT, and James BRYANT Jr., conspired in February 2020 to distribute and possess with intent to distribute cocaine, a Schedule II controlled substance, in the Western District of Pennsylvania.  For example:

347.     On February 9, 2020, at approximately 11:09 a.m., Quamane BRYANT (QB), using TARGET TELEPHONE #5, made an outgoing call to Martin LANGFORD (ML) using the TARGET TELEPHONE #8. Below is a draft transcription of the call (U/I: Unintelligible):

ML:     Yo

QB:     Hey, what up Unc?

ML:     What up?

QB:     Nothing, **hey that's over there**. I'll be over there, I can't get over there for another like 40 minutes.

ML:     What's over there though?

QB:     **For, for that one**

ML:     **You got one over there?**

QB:     **Yeah**, but um. Call, call, **make sure you ah, U/I, to him cause I don't know if he is going to put something with it or not**.

ML:     Alright, I don't have um, I don't really have anyways. If you say you ain't going to be over there for 40 minutes, that's cool, you going to be over there by 12 o'clock?

QB:     Yeah

ML:     Alright, cause I got a um, you know U/I we got a U/I at 1 o'clock, so um, just call me at 12 o'clock I'll U/I be over there

QB:     Aite

348.     Based on my training and experience, and my knowledge of this case in particular (including calls occurring after the above call), in the above call, I believe that Q. BRYANT told LANGFORD that he had money at his father's house (**Search Location 8**) for LANGFORD for a quantity of previously supplied cocaine[54] equaling one unit ("hey that's over there", and "for that one"). I believe that LANGFORD asked Q. BRYANT if the amount of money Q. BRYANT had for LANGFORD was $1,000 ("you got one over there?"), which BRYANT confirmed, but told LANGFORD to check with BRYANT's father, James BRYANT Jr., because he was not sure if his father was adding additional money or not ("make sure you ah, U/I, to him cause I don't know if he is going to put something with it or not").

349.     At approximately 12:28 p.m., Quamane BRYANT, using TARGET TELEPHONE #5, received an incoming text from James BRYANT Jr. (Quamane's father), using (412) 689-4617, which stated: "**Do you want me too give this $ to martee?**" Your affiant believes that James BRYANT Jr. asked Quamane BRYANT if he wanted BRYANT Jr. to give the money Q. BRYANT was storing at BRYANT Jr.'s residence (**Search Location 8**) to Martin LANGFORD ("Martee") for cocaine.

350.     On February 9, 2020, at approximately 12:29 p.m., Quamane BRYANT (QB), using TARGET TELEPHONE #5, made an outgoing call to James BRYANT Jr. (JB), using (412) 689-4617. Below is a draft transcription of the call:

JB:     Yo.

QB:     Yeah, what up Dad?

JB:     **Yeah Marty outside man, does you want me to give him this money?**

---

[54]     Based on your affiant's experience, I believe that "one" is likely a reference to one ounce of cocaine, based on the amount that BRYANT owed LANGFORD, being $1,000. I am aware that $1,000 would be a reasonable price for one ounce of cocaine.

QB:    **Yeah.**

JB:    **He gotta be out Lincoln and shit at one**. I'm trying to call you.

QB:    Yeah um, I was supposed to be all, I'm on my way over there now but I ain't gonna be over there, I'm leaving the East Side.

JB:    He getting ready, he, that's where, Lincoln, he goin up Lincoln.

QB:    **Alright, I'm bout to call him.**

JB:    Alright.

351.    Based on my training and experience, and my knowledge of this case in particular, in the above call, I believe that James BRYANT Jr. told Quamane BRYANT that LANGFORD was outside of James BRYANT Jr.'s residence (**Search Location 8**), and asked if he should give LANGFORD Quamane BRYANT's money ("Yeah Marty outside man, does you want me to give him this money?"), which Quamane BRYANT replied in the affirmative ("yeah"). I believe that James BRYANT JR. then told Quamane BRYANT that LANGFORD told him that he needed to be in Lincoln (area of Pittsburgh) by one o'clock ("He gotta be out Lincoln and shit at one"), and Quamane BRYANT indicated that he would call LANGFORD at that time ("Alright, I'm bout to call him").

352.    On February 9, 2020, at approximately 12:30 p.m., Quamane BRYANT (QB), using TARGET TELEPHONE #5, made an outgoing call to Martin LANGFORD (ML), using the TARGET TELEPHONE #8. Below is a draft transcription of the call:

ML: **Man, why you tell me you had a stack at your dad's crib, dog?**

QB: I, **I, got that over there.**

ML: You got a stack at your dad's crib right now?

QB: Yeah.

ML: **Your dad don't even know where it's at, where is it at?**

QB: I'm...hey where you at?  You outside?

ML: Man, I gotta go man, I gotta go, I gotta be out there for this

QB: **Just go up there bro it's up there**, just go up there. That's why I said go up there.

ML: He don't even know what I'm talking about though.

QB: I don't know why, alright I'm about to call him back.

ML: Hold on, whatchu say he said he don't even know whatchu talkin about.

QB: **I gave him eight, I gave him my money when I ah, when I left the last time. Where he at?**

ML: **Your dad's in the crib**, did he just call you? Whatchu mean.

QB: Yeah he said, he said you was coming out Lincoln, I'm leaving from the East Side now, but I'll just.

ML: No, **I'm sittin in front of his crib right now**.  I just pulled off, spinned back around. But you two told me you had a stack over there, you ain't got a stack over there.

QB: Yeah, **I got a band over there bro.**

ML: Ok, **Mane call your dad real quick man and tell him.**

QB: Alright.

ML: I'm sitting out front right now.

353.    Based on my training and experience, and my knowledge of this case in particular, in the above call, I believe that LANGFORD, who sounded rushed and irritated, asked Q. BRYANT why he previously told LANGFORD that he had $1,000 at James BRYANT JR.'s house for LANGFORD ("Man, why you tell me you had a stack at your dad's crib, dog?"). I believe that Q. BRYANT confirmed that he, indeed, had $1,000 at his father's residence for LANGFORD ("I, got that over there").  I believe that LANGFORD told Q. BRYANT that James BRYANT Jr.

did not know where the money was located, and asked Q. BRYANT where it was located in the residence ("Your dad don't even know where it's at, where is it at?"). I believe that Q. BRYANT told LANGFORD to go inside the residence and get the money ("Just go up there bro it's up there"), and that he previously left $800 at James BRYANT Jr.'s residence the last time he was over there ("I gave him eight, I gave him my money when I ah, when I left the last time. Where he at?").

354.    I believe that LANGFORD advised Quamane BRYANT that his father was at the residence ("Your dad's in the crib"), and that he was currently sitting out front ("I'm sittin in front of his crib right now").  I believe that Quamane BRYANT again told LANGFORD that he had $1,000 inside of the residence for him, ("I got a band over there bro"), so LANGFORD asked that he call James BRYANT Jr. and tell him that ("Mane call your dad real quick man and tell him").

355.    On February 9, 2020, at approximately 12:31 p.m., Quamane BRYANT (QB), using TARGET TELEPHONE #5, made an outgoing call to James BRYANT Jr. (JB), using (412) 689-4617. Below is a draft transcription of the call:

JB:    Hello?

QB:    Yeah, he said he ain't comin out here right now. I'm uh, he just, he bull shittin. **You can just give him, could you give him that for me**? That I, that I left?

JB:    Yeah

QB:    **I think it's uh, $800. If you got, if you got a deuce or somethin, put it with it but, if not, fuck it**.

JB:    Yeah, **I don't got it right now.**

QB:    That's cool.

JB:    Yeah man, he must a pulled off though cause ain't nobody out there.

QB:    Yeah that's why I said, he said he was comin back around, I'm like I'll just

meet you out Lincoln like. **He's like, I was just outside, I'm comin back around.**

JB:     He said he ain't goin out Lincoln?

QB:     Yeah he said he ain't goin out there right now, but I only got, I only got like a nickel on my right now, so.

JB:     **Aite well this is him right here**.

QB:     Aite

JB:     Aite

356.    Based on my training and experience, and my knowledge of this case in particular, in the above call, I believe that Quamane BRYANT asked James BRYANT Jr. to give LANGFORD the money Q. BRYANT left for LANGFORD ("You can just give him, could you give him that for me?"), to which BRYANT Jr. stated he would.  I believe that Quamane BRYANT then told his father that he believed it was $800, and asked that his father add $200 to it if he could ("I think it's uh, $800. If you got, if you got a deuce or somethin, put it with it but, if not, fuck it."). I believe that James BRYANT Jr. then indicated that he did not have $200 to add to it ("I don't got it right now").  I believe that Quamane BRYANT told James BRYANT Jr. that LANGFORD was outside of the residence ("He's like, I was just outside, I'm comin back around"), and James BRYANT Jr. told Q. BRYANT that he either saw LANGFORD, or that LANGFORD was calling James BRYANT Jr.'s phone at that time ("Aite well this is him right here").

357.    On February 9, 2020, at approximately 12:35 p.m., Quamane BRYANT (QB), using TARGET TELEPHONE #5, made an outgoing call to Martin LANGFORD (ML), using TARGET TELEPHONE #8. Below is a draft transcription of the call (U/I: Unintelligible):

ML:     Why you always lyin man?

QB:     Whatchu say Unc?

ML:   **You always lyin', you know you ain't have no stack over here.**

QB:   Yeah, naw, that's why I was just calling you. I was just callin you about that.

ML:   **I'm bout to leave you something dog, I'm bout to leave you something**, I gotta get outta here. I'll holla at you in a minute.

QB:   Where you coming to cause **I'm gonna bump into you**.

ML:   Mane. I'm getting ready to come to Lincoln man.

QB:   **That's what I'm sayin, I'll run into you out there with that.**

ML:   Alright, Ok, I'm still U/I... alright.

QB:   Alright.

ML:   I gotta be there at one o'clock Mane.

QB:   Alright.

358.    Based on my training and experience, and my knowledge of this case in particular, in the above call, I believe that LANGFORD expressed his annoyance with Q. BRYANT and scolded him for lying about having $1,000 at his father's house for LANGFORD ("You always lyin', you know you ain't have no stack over here"). I believe that Quamane BRYANT stated that he was just calling LANGFORD about that ("I was just callin you about that"). I believe that LANGFORD indicated that he was going to leave an unknown quantity of cocaine at the residence for Q. BRYANT ("I'm bout to leave you something dog, I'm bout to leave you something"). I believe that Q. BRYANT asked LANGFORD where he was going, because he could meet LANGFORD to provide LANGFORD with the remainder of what Q. BRYANT owed LANGFORD for cocaine ("I'm gonna bump into you", and "That's what I'm sayin, I'll run into you out there with that").

359.   On February 9, 2020, at approximately 12:36 p.m., Quamane BRYANT (QB), using TARGET TELEPHONE #5, received an incoming call from Martin LANGFORD (ML), using the TARGET TELEPHONE #8. Below is a draft transcription of the call:

QB:   Hello?

ML:   **You got the rest of the bread with you?**

QB:   **Yeah.**

ML:   **Alright, you want me to bring this when we do this**?

QB:   **Naw, you don't gotta do that.**

ML:   Alright.

QB:   Alright.

360.   Based on my training and experience, and my knowledge of this case in particular, in the above call, I believe that LANGFORD confirmed that Quamane BRYANT had the rest of the money he owed LANGFORD with him ("You got the rest of the bread with you"), and then asked if he should bring the cocaine with him to meet BRYANT, as opposed to leaving it at Q. BRYANT's father's residence for him ("Alright, you want me to bring this when we do this?"), to which Q. BRYANT replied that LANGFORD did not have to bring the cocaine with him to their meeting ("Naw, you don't gotta do that").

361.   On February 9, 2020, at approximately 12:39 p.m., Quamane BRYANT (QB), using TARGET TELEPHONE #5, received an incoming call from James BRYANT Jr. (JB), using (412) 689-4617. Below is a draft transcription of the call:

QB:   What up dad?

JB:   Yo.

QB:   Yeah.

JB:   He, ah, **he just left**. But he, ah. **I was like yo what's up? I need some help right now, I'm fucked up**. He's like damn what you talk... **I'm like I need like** (call waiting beep) **seven**. You know what I mean, I said I need seven, I'm tryin' to. **Prolly whipped it up though**, he was like, alright yeah, then he was like I wish you would have been here so I could (call waiting beep). I'm like, man. **I'm like when you talking? Then he was like, the next time, the next flip, prolly Tuesday or Wednesday**. I'm like come on don't be, but he's like, I got you man, I got you. He was like...

362.   Based on my training and experience, and my knowledge of this case in particular, in the above call, I believe that James BRYANT, Jr. told Quamane BRYANT that LANGFORD just left his residence ("he just left"). I believe that James BRYANT Jr. then started to tell Q. BRYANT about a conversation he had with LANGFORD, in which James BRYANT Jr. asked LANGFORD to supply him with cocaine because he was having a hard time ("I was like yo what's up? I need some help right now, I'm fucked up" and "I'm like I need like U/I seven"). I believe that James BRYANT Jr. then stated, in an unknown context, "Prolly whipped it up though", which your affiant believes is a reference to processing cocaine into cocaine base (i.e., "crack"). I believe that James BRYANT Jr. stated that he asked LANGFORD when he would be able to supply BRYANT Jr. with cocaine, and told Quamane BRYANT that LANGFORD indicated that he could supply BRYANT Jr. that next time LANGFORD acquired cocaine, which would be Tuesday or Wednesday. ("I'm like when you talking? Then he was like, the next time, the next flip, prolly Tuesday or Wednesday"). I believe that James BRYANT Jr. continued to describe his conversation with LANGFORD to Quamane BRYANT, but the call was cut off.

363.   On February 9, 2020, at approximately 12:42 p.m., Quamane BRYANT (QB), using TARGET TELEPHONE #5, made an outgoing call to Martin LANGFORD (ML), using TARGET TELEPHONE #8. Below is a draft transcription of the call:

ML:   Where you at man?

QB:   I'm over here, I'm over here, like Forest, Forest Hills. **I'll meet you out**

**there**, I'll be, I'll be out there.

ML:   One o'clock.

QB: I'm uh, I'm um, I'm dropping my um, baby off now then I'm shooting right out there.

ML: Hey uh alright um you, you know where Lincoln is anyway right? We up, we up top where the, where the rec, you know where the, where, where the field is at?

QB: **Yea, I know where the field at.**

ML: Yea ok so right up top. Where you, you know what I mean. Where people be parking at and shit. Um, the building man is right over top, **Chadwick**.

QB: Oh yeah, yeah I know where the building is at, I know what you're talking about.

ML: **Yeah I'll be, you'll see my truck in the parking lot**.

QB: Alright

ML: Just call me when you get outside.

QB: Alright

364.    Based on my training and experience, and my knowledge of this case in particular, in the above call, I believe that LANGFORD asked Quamane BRYANT where he was located, and BRYANT indicated that he was in Forest Hills and would meet LANGFORD at his location ("I'll meet you out there"). I believe that BRYANT confirmed that he knew where LANGFORD would be, which was the Chadwick Playground/Football Field in Lincoln ("Yea, I know where the field at", and "Chadwick"). I believe that LANGFORD then stated that BRYANT would see LANGFORD's truck in the parking lot ("Yeah I'll be, you'll see my truck in the parking lot").

365.    Your affiant notes that at approximately 1:17 p.m., GPS/E911 location data for Quamane BRYANT's telephone (TARGET TELEPHONE #5) showed that he was in the area

166

of Chadwick Playground/Football Field. Furthermore, at approximately 1:19 p.m., in an intercepted communication between Quamane BRYANT and James BRYANT Jr., I believe that Quamane BRYANT stated that he had "just left from over there". This information leads your affiant to believe that Quamane BRYANT met with LANGFORD to provide him with the remaining amount of money he owed LANGFORD for previously supplied cocaine, as discussed during the intercepted communications.

366.    On February 24, 2020, at approximately 11:16 a.m., Quamane BRYANT (QB), using TARGET TELEPHONE #5, made an outgoing call to Martin LANGFORD (ML), using (404) 940-9632 (which I believe to be *a secondary telephone utilized by LANGFORD*). Below is a draft transcription of the call:

> QB:    What up, Unc?
>
> ML:    **Why you calling me on this phone, dog?**
>
> QB:    I, I, I**, I called you on my other joint, it don't seem like it's going through**, though.
>
> ML:    **I'm in the airport**.
>
> QB:    Alright, just, if, if you get a, if you like, get a missed call or something, I'm going to try to see if it go through.
>
> ML:    Alright, bye.

367.    Based on my training and experience, and my knowledge of this case in particular, in the above call, I believe that LANGFORD, who sounded annoyed during the call, asked BRYANT why he called this telephone (as opposed to TARGET TELEPHONE #8). I believe that BRYANT stated that he tried calling LANGFORD from BRYANT's other telephone ("I called you on my other joint"), but the call was not going through ("It don't seem like it's going through"). I believe that LANGFORD told BRYANT that it was likely because he was in the

airport ("I'm in the airport"). I believe that BRYANT then told LANGFORD that he is going to

try calling LANGFORD again (presumably from BRYANT's other phone).

368.    Approximately one minute after the above call, at 11:17 a.m., Quamane

BRYANT (QB), using TARGET TELEPHONE #5, received an incoming call from Martin

LANGFORD (ML), using TARGET TELEPHONE #8. Below is a draft transcription of the call:

> QB:    **Yeah, did it go through**?
>
> ML:    **I mean, I'm calling you now!** Know what I'm saying?
>
> QB:    That is weird.
>
> ML:    **I was on the tram in the airport, coming home from Atlanta**. **I'll hit you when I get in.**
>
> QB:    Alright, yeah I was just calling to, tried calling you for like a week or two, just to see if you was alright and all that.
>
> ML:    You ain't called me. You ain't call me for no week or two.
>
> QB:    I swear, my phone, ah ah, I'ma show you. Just, just call me, um, **I'ma come see you.** Just call me when you settle in.
>
> ML:    Alright. I'm not even in. I'm in Atlanta right now. I'm in the airport now on my way home.
>
> QB:    Oh, oh.
>
> ML:    Yeah, I'm on my way to Pittsburgh now.
>
> QB:    Okay, well. I just wanted to see you and shit cause you know I had my birthday weekend and all that.
>
> ML:    Alright, **I'll call you when I get in**, dog.
>
> QB:    Alright.
>
> ML:    Alright

369.    Based on my training and experience, and my knowledge of this case in

particular, in the above call, I believe that BRYANT asked LANGFORD if his call went through,

which LANGFORD stated that it did ("I mean, I'm calling you now!"). I believe that LANGFORD

told BRYANT that he was on the tram in the airport, and would call BRYANT when he got home

("I was on the tram in the airport, coming home from Atlanta. I'll hit you when I get in"). The two

discussed the last time they spoke, and I believe that BRYANT indicated that he wanted to meet

with LANGFORD upon his return ("I'ma come see you").  I believe that LANGFORD agreed, and

told BRYANT that he would call BRYANT when he was back ("I'll call you when I get in").

370.    On February 24, 2020, at approximately 9:20 p.m., Quamane BRYANT

(QB), using TARGET TELEPHONE #5, received and incoming call from James BRYANT Jr.

(JB), using (412) 689-4617. Below is a draft transcription of a portion of the call (which lasted

over six (6) minutes in duration):

> QB:    I'm trying to see what's up with old boy and shit. **I hit him up on this one,
> on, on, on my other joint but. He like "why you, naw mean, why you hit me
> on this?" I'm like, other joint ain't working and shit.** I don't know. But he
> picked up and shit.

> JB:    Who just left?

> QB:    Naw, I said he picked up, he picked up, he picked up when I called him.
> He like, you know mean.

> JB:    Who, **who cuzzo**?

> QB:    **Yeah**, but I called him on the other one and shit ain't work. It just not, it
> ain't working for whatever reason, I don't know what the fuck. Seem like, I don't
> know, something ain't right. I don't know. **But that mother fucka softy, that's
> what I'm missing out on. I'd a had like, I'd a had like 3, 4 hundred already.
> I'm hot**.

371.    Based on my training and experience, and my knowledge of this case in

particular, in the above call, I believe that BRYANT was telling his father, BRYANT Jr. about his

telephone problem and how he was having trouble calling LANGFORD; specifically, he called

LANGFORD from both of his telephones, and LANGFORD questioned BRYANT as to why he

was calling LANGFORD on telephone number (404) 940-9632 from TARGET TELEPHONE

#5[55] ("I hit him up on this one, on, on, on my other joint but. He like "why you, naw mean, why you hit me on this?" I'm like, other joint ain't working and shit"). I believe that BRYANT Jr. confirmed that BRYANT was referencing LANGFORD ("who cuzzo?"), which BRYANT confirmed ("yeah"). I believe that BRYANT then stated that because he had not spoken to and met with LANGFORD, that he has missed out on cocaine sales, totaling approximately $300 to $400 ("But that mother fucka softy, that's what I'm missing out on. I'd a had like, I'd a had like 3, 4 hundred already. I'm hot."), indicating to your affiant that LANGFORD supplies BRYANT with cocaine.

372.    On February 24, 2020, at approximately 9:34 p.m., Quamane BRYANT (QB) using TARGET TELEPHONE #5, made an outgoing call to Martin LANGFORD (ML), using (404) 940-9632 (*which I believe to be a secondary telephone utilized by LANGFORD*). Below is a draft transcription of the call:

> QB:    **Hey Unc, you gotta check ya phone.**
>
> ML:    Why?
>
> QB:    You probably got to turn ya, ya iMessage or some shit back on.
>
> ML:    My iMessage is on, what you talking bout.
>
> QB:    I can't get through to you, aite? **Every time I call, you ain't I don't know, even my messages it ain't even sending through, they all green and shit.**
>
> ML:    Hold on, Hold on real quick...
>
> (sound of a *phone dialing in background*)

---

[55]    Your affiant is aware that when narcotics traffickers utilize multiple telephones, they frequently will attempt to keep specific telephones for specific reasons (i.e. one telephone for drug trafficking, one for family and friends, etc.). I believe that when BRYANT used multiple telephones possessed by him to contact LANGFORD over multiple telephones, it, in essence, defeated the purpose of utilizing multiple telephones, as law enforcement will be able to obtain all the telephone numbers utilized by the SUJBECTS.

*(Call waiting beep heard over TT5 – Incoming Call from TARGET TELEPHONE #8 to TARGET TELEPHONE #5 at approximately 9:36 p.m.)*

ML:   **You getting my call now?**

QB:   This is the, this ain't the, **this is the other phone though**.

ML:   Man are you, listen I'm calling the number you on U/I. Are you getting it?

QB:   Yeah.

ML:   Alright. Hold on, I don't got you blocked nothing homie.

QB:   That shit don't make no sense. I'm going, I'm coming, I'm coming over there, I'm coming to work out tomorrow though. I needed to talk to you about something.

ML:   Alright just call me. I just, **did you get the text I just sent you?**

*(Incoming text over TARGET TELEPHONE #5 at approximately 9:36 p.m., from TARGET TELEPHONE #8 stating "Yo")*

QB:   **Yeah, that's not that phone though.**

ML:   What do you mean it ain't that phone? I can see you calling me, what are you talking bout!

QB:   **Yeah, I'm trying to get you on my other one is what I'm saying**.

ML:   What other one, I don't even know what the other one is.
QB:   The, **the one we be on the screen with.**

ML:   **What's the number?**

QB:   It's um, what is the number.

ML:   Hold on man

QB.   **It the 6, 0091.**

ML:   **I don't got that number in here dog**, I don't know. You got to, I don't know.

QB:   Yea, I'm I'm, what time you want me to come over tomorrow, I'm a be, I'm tryin, I got to see my dad in the morning. I was tryin'

ML:    I'll be around bout 1 o'clock.

QB:    Alright I'm gonna be at the gym or at my pops, I'm a be, I gotta go over there at like 12, I'm going to get a workout out in around 1230, 1.

ML:    Alright

373.    Based on my training and experience, and my knowledge of this case in particular, in the above call, I believe that BRYANT called LANGFORD, this time on LANGFORD's second telephone (not TARGET TELEPHONE #8), and told LANGFORD to make sure that his telephone was working correctly ("Hey Unc, you gotta check ya phone."), and that all the messages that BRYANT sent are not going through ("Every time I call, you ain't I don't know, even my messages it ain't even sending through, they all green and shit").  I believe that LANGFORD told BRYANT to hold on because he was receiving a call on the other line (a call waiting beep was heard over TARGET TELEPHONE #5, and an incoming call was seen from TARGET TELEPHONE #8 to TARGET TELEPHONE #5 at approximately 9:36 p.m.) I believe that LANGFORD asked BRYANT if he saw LANGFORD's call from TARGET TELEPHONE #8 ("You getting my call now?"). BRYANT indicated that he did, however that TARGET TELEPHONE #5 was the other phone, not the phone he was trying to call LANGFORD from ("this is the other phone though").  I believe that they discussed how things were not making sense with their telephones, and LANGFORD asked BRYANT if he received LANGFORD's text message ("did you get the text I just sent you?"). At approximately 9:36 p.m., there was an incoming text message over TARGET TELEPHONE #5, from TARGET TELEPHONE #8, stating "Yo".   I believe that BRYANT confirmed he received the text message, but stated that it was not the telephone BRYANT was referencing ("Yeah, that's not that phone though"). I believe that LANGFORD did not understand, so BRYANT explained that it was the telephone that BRYANT uses to FaceTime LANGFORD ("the one we be on the screen with"). I believe that

LANGFORD asked BRYANT what the number was to his telephone ("What's the number?"), and BRYANT provided a partial number of ("It the 6, 0091"). I believe that LANGFORD told BRYANT that he did not have that number in his phone ("I don't got that number in here dog"). At the end of the conversation, I believe that the two discussed trying to meet the next day.[56]

374.    Your affiant has continued to monitor pen register/trap and trace device data for TARGET TELEPHONE #8, and can confirm that LANGFORD continues to utilize this telephone throughout the day and night hours, indicating that he keeps the telephone with him, leading your affiant to believe that this telephone, along with other telephones utilized by LANGFORD, will be located in **Search Location 9** - LANGFORD's primary residence.

## VII.    CONCLUSION

375.    Based upon the foregoing, your affiant submits, there is probable cause in support of Criminal Complaints #1 – #3, and to conclude as follows:

a.    From in and around January 2020, and continuing thereafter to in and around May 2020 **Joseph CLANCY, Phillip ROBINSON (a/k/a "Pape"), Tyree CAMPBELL, Tracy BULLOCK, and Sanzio WILLIAMS** conspired with one another and with persons both known and unknown, in the Western District of Pennsylvania, to possess with intent to distribute and distribute 28 grams or more of a mixture and substance containing a detectable amount of cocaine base (in the form commonly known as "crack"), a Schedule II controlled substance, in violation of 21 U.S.C. § 846;

b.    From in and around February 2020, and continuing thereafter until in and around March 2020, **Andre MOORE-COLEMAN (a/k/a "Drizz") and James BRYANT**

---

56    There were no interceptions via TARGET TELEPHONE #5 on February 25, 2020 to indicate that BRYANT and LANGFORD met as discussed.

**Jr.** conspired with one another, and others both known and unknown, while in the Western District of Pennsylvania, to possess with intent to distribute and distribute a quantity of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance, in violation of 21 U.S.C. § 846;

c.     From in and around December 2019, and continuing thereafter to in and around January 2020, **Ronald LEWIS III** and **Victor SIMMONS** conspired with one another, and with persons known and unknown, while in the Western District of Pennsylvania, to possess with intent to distribute and distribute 28 grams or more of a mixture and substance containing a detectable amount of cocaine base (in the form commonly known as "crack"), a Schedule II controlled substance, in violation of 21 U.S.C. § 846.

376.    Your affiant further submits that there is probable cause that evidence of the TARGET OFFENSES will likely be found at the areas described herein as Search Locations 1–16, and your affiant requests that search warrants be issued for those locations to search for and seize the items listed in Attachment B, which incude evidence, fruits, and instrumentalities of the TARGET OFFENSES.

377.    Because this investigation is ongoing, I hereby request that this affidavit and the accompanying paperwork filed at the above-captioned Criminal Numbers be sealed.

The above information is true and correct to the best of my knowledge, information and belief.

/s/ Karen L. Springmeyer
Karen L. Springmeyer
Special Agent, FBI

Sworn to before me *telephonically*
pursuant to Fed. R. Crim. P. 4.1(b)(2)(A),
this 11th day of May, 2020.

HONORABLE PATRICIA L. DODGE
UNITED STATES MAGISTRATE JUDGE
Western District of Pennsylvania

**ATTACHMENT A-1**

**<u>DESCRIPTION OF AREA TO BE SEARCHED</u>**

<u>SEARCH LOCATION 1: 130 Santron Avenue, Pittsburgh, PA 15210</u>

This is a two story, single family residence located on Santron Avenue in the Carrick section of Pittsburgh, The residence is composed of tan brick and white siding and has a black in color roof. The residence is located higher than the street, and there is a set of cement stairs that lead from Santron Avenue up to a small concrete pad which then has another, smaller set of stairs that have brown in color railings on either side which go from the pad to the front porch of the residence. The front porch of the residence, which faces Santron Avenue, has an attached roof, which is supported by tan in color brick pillars. To the right of the stairs, attached to a small, brown in pillar on the porch, are the numbers "130" written vertically on the pillar in gold in color lettering. The front door, which faces Santron Avenue, is light in color, and has a white and glass type storm door attached.

**ATTACHMENT A-1**



**ATTACHMENT A-2**

**DESCRIPTION OF AREA TO BE SEARCHED**

<u>SEARCH LOCATION 2: 311 Burrows Street, Pittsburgh, PA 15213</u>

This is a two story residence which is located in a row of townhouses on Burrows Street in the Oak Hill section of Pittsburgh. The residence is ivory/light yellow in color siding, with green and white trim. The residence has a small front porch area that has an attached roof; this porch structure is white in color, and has picket-fencing on one side. The front porch area faces Burrows Street. Located vertically on one of the white porch posts that support the porch roof are the numbers "311" in black lettering. The front door of the residence, which faces Burrows Street, is dark blue in color, and to the right of the door, located on the siding of the residence, is a decorative porch light. To the right of the porch light, on the first level of the residence, are three windows which face Burrows Street.

**ATTACHMENT A-2**



**ATTACHMENT A-3**

**<u>DESCRIPTION OF AREA TO BE SEARCHED</u>**

<u>SEARCH LOCATION 3: 22D Locust Street, McKees Rocks, PA 15136</u>

This is an apartment located in Apartment Building 22 of the Hays Manor Apartments in McKees Rocks. Building 22 is a multi-level, red brick building, and has a cement sidewalk that leads from Locust Street to a set of cement stairs, which lead to a common front porch area. The common front porch has a roof that is brick and cement. Attached to the top of the porch roof are the numbers "22" in gold in color lettering. To access the apartment building, one would enter through the dark in color common door, which is located on the common front porch. Apartment 22D is located on the second floor of the building; the front door is light grey in color with a round, metal door handle. Affixed to the front door are the numbers "22D" in silver in color lettering.

**ATTACHMENT A-3**



**ATTACHMENT A-4**

**DESCRIPTION OF AREA TO BE SEARCHED**

SEARCH LOCATION 4: 820 Bryn Mawr Street, Pittsburgh, PA 15219

This is a two story, yellow brick single family residence located on Bryn Mawr Street. The residence has an attached front porch that faces Bryn Mawr Street. There is a concrete walkway that leads from the sidewalk to a small set of cement stairs that go to the front porch. The porch is partially enclosed with yellow brick, and is covered with a white in color awning that has yellow stripes. To the right of the cement stairs which lead to the porch, affixed to the yellow brick porch, are the numbers "820" in brown in color lettering with a brown in color background. There is a concrete driveway that runs along one side of the residence, to the left of the front porch. Located at the end of the driveway is a detached one car garage.

**ATTACHMENT A-4**



**ATTACHMENT A-5**

**DESCRIPTION OF AREA TO BE SEARCHED**

SEARCH LOCATION 5: 757 6th Street, Pitcairn, PA 15140

This is a two story, single family residence located on 6th Street in Pitcairn. The residence has tan in color siding with brown trim. The front porch of the residence faces 6th Street, and there is a small set of concrete stairs that lead from the sidewalk to the front porch. There is a brown in color railing attached to the stairs, and affixed to a post on the left side of the railing are the numbers "757" written vertically in dark lettering with a light tan in color background. The front porch has a covered roof that is attached to the residence. The front door, which faces 6th Street, is white in color and has glass-type inserts in the top half of the door. To the left of the front door is a mailbox that is attached to the residence. Above the mailbox are the numbers "757", also attached to the residence, in dark tan in color lettering.

**ATTACHMENT A-5**



**ATTACHMENT A-6**

**DESCRIPTION OF AREA TO BE SEARCHED**

<u>SEARCH LOCATION 6: 1318 Orangewood Avenue, Pittsburgh, PA 15216</u>

This is a two story, red brick, single family residence located on Orangewood Avenue. The residence has a narrow driveway the slopes down, below street level, towards a single-car garage with a white in color garage door. Above the garage door is a large, multi-paned window. The sides of the driveway are lined with a tall, concrete brick type retaining wall. There is a concrete walkway that leads from the sidewalk to the front porch of the residence. The front porch has an awning that is attached to the residence and is supported by white in color metal-type pillars. The roof is white in color, but has two red in color stripes on each end of the roof. The front door, which is on the front porch, faces Orangewood Avenue, and to the right of the door are the numbers "1318" affixed to the residence.

**ATTACHMENT A-6**



**ATTACHMENT A-7**

**DESCRIPTION OF AREA TO BE SEARCHED**

SEARCH LOCATION 7: 708 Webster Terrace, Pittsburgh, PA 15219

This is a two story, reddish-brown brick rowhouse style residence which is located on Webster Terrace, which is a small street that is only accessible via foot (not accessible with a vehicle), and is connected via steps to Webster Avenue. The front of the structure has four concrete stairs on the right side of the porch with a metal railing on the right side of the porch; the stairs lead up to the front porch of the residence. To the left of a steps is a gas meter. The front door is dark in color, and has a white in color storm door, and the numbers "708" are affixed to the structure to the left of the door. When walking from Webster Avenue onto Webster Terrace, the residence is the fifth rowhouse on the right hand side of Webster Terrace.

**ATTACHMENT A-7**





**ATTACHMENT A-8**

**DESCRIPTION OF AREA TO BE SEARCHED**

SEARCH LOCATION 8: 338 Russellwood Avenue, #3, McKees Rocks, PA 15136

This is a three story, multi-family residence located on Russellwood Avenue in McKees Rocks that houses three apartments. The residence is light in color brick and light in color siding and has green trim. There is a concrete walkway that leads from the sidewalk to a set of concrete stairs that have white in color railings on each side. These stairs lead to the front porch, which faces Russellwood. The porch has a roof that is attached the residence, as well as a green and white striped awning. The front door of the residence off the front porch is a common locked door – which provides access to three (3) separate apartments inside the building. To the left of the front common door are four (4) mailboxes, although only three (3) are marked – the mailbox for #3 is marked with BRYANT Jr.'s name. To the right of the front common door are three (3) unmarked doorbells. Once inside the front common door, there are two doors, and a narrow staircase that leads to the second and third floors of the house – to access Search Location 8, one would walk up the staircase, past the second floor landing, to the top floor, which is also the third floor. At the landing at the top of the staircase on the third floor is the access door to the residence, which is a white in color door with a gold in color door knob and a gold in color deadbolt lock.

**ATTACHMENT A-8**



**ATTACHMENT A-9**

**<u>DESCRIPTION OF AREA TO BE SEARCHED</u>**

<u>SEARCH LOCATION 9: 924 Malvern Road, Apartment C, Bellevue, PA 15202</u>

This is a single family, two story rowhouse style residence located on Malvern Road. To access the residence, there is a walkway that runs between Malvern Road and Cherry Alley. When looking at the front of the residence, the first level of the residence is red brick, and the second level of the residence is tan in color siding. The front door is dark in color, and has a white and glass storm door attached. To the right of the door is a black in color mailbox which has the numbers "924" and the letter "C" affixed to it – the letter and numbers are black in color with a gold, square background. Above this mailbox is a small porch light.

**ATTACHMENT A-9**





**ATTACHMENT-10**

**DESCRIPTION OF AREA TO BE SEARCHED**

SEARCH LOCATION 10:

A 2012 blue Buick sedan bearing Pennsylvania Registration KGZ-7829, and bearing VIN 1G4PP5SK6C4167106, registered to Jvon Phillips, 400 Swissvale Ave., Apt 22, Pittsburgh, PA 15221.



**ATTACHMENT A-11**

**DESCRIPTION OF AREA TO BE SEARCHED**

<u>SEARCH LOCATION 11: 1880 Lincoln Road, Pittsburgh, PA 15235</u>

This is a two story, single family residence physically located on Doak Street, however the Allegheny Tax Assessment Website indicates that the address is 1880 Lincoln Road. The residence is located above Doak Street, and there is a long set of concrete stairs that lead from Doak Street to the front area of the residence. At the top of these stairs is a white in color mailbox affixed to a brown in color post. The front door of the residence faces Doak Street, and is located on a raised porch that is accessed from the side of the residence. The lower portion of the front of the porch is covered in a brown in color lattice; attached to the top right corner of the lattice are the numbers "1880" in tan lettering. The porch is covered with a roof that is attached to the residence, and is supported by white in color metal-type pillars. The front door, which is on the front porch, is dark in color and has glass-type inserts. The residence is tan in color siding with brown trim.

**ATTACHMENT A-11**



**ATTACHMENT A-12**

**DESCRIPTION OF AREA TO BE SEARCHED**

SEARCH LOCATION 12: 111 Hyman Place, #208, Pittsburgh, PA 15213

This is an apartment located in an apartment building in the Oak Hill neighborhood of Pittsburgh. The main entrance to the apartment building is a common door that requires a key to access or access granted from a resident; this common door is located on the ground level and faces Hyman Place. Apartment 208 is located on the second floor of the building; the front door is maroon in color, and the numbers "208" are affixed to the wall to the right of the door.

**ATTACHMENT A-12**





**ATTACHMENT A-13**

**DESCRIPTION OF AREA TO BE SEARCHED**

SEARCH LOCATION 13: 2013 Honda Accord, PA Registration KYL-8079

This is a black in color Honda Accord bearing Pennsylvania registration plate KYL-8079, and bearing VIN 1HGCR3F80DA017724.





**ATTACHMENT A-14**

**<u>DESCRIPTION OF AREA TO BE SEARCHED</u>**

<u>SEARCH LOCATION 14: 906 Memory Lane, Pittsburgh, PA 15219</u>

This is a two-story, single family, red in color brick rowhouse style residence located on Memory Lane. Memory Lane is a "U" shaped street, and the residence of 906 Memory Lane would be considered in the back section of the road; across from the residence is a wooded hill (no houses). The residence is located between 902 and 908 Memory Lane. The front door, which faces Memory Lane, is tan in color and has a small awning above it that is white and brown in color. Above the front door is a glass-type window that has the numbers "906" painted in tan lettering. The back of the residence, which is located above a common parking lot, is covered in grey in color siding, and has an open back porch. There is a set of common stairs that lead from the common parking lot to the back area of the rowhouses which include 906 Memory Lane.

**ATTACHMENT A-14**



**ATTACHMENT A-15**

**DESCRIPTION OF AREA TO BE SEARCHED**

SEARCH LOCATION 15: 524 Princeton Blvd., Pittsburgh, PA 15221

This is a single family residence that is part of a duplex located on Princeton Boulevard. The building is red brick with a dark in color shingled roof. When looking at the duplex from Princeton Boulevard, 924 is located on the right side of the building. There is a small driveway associated with 924, which is also located on the right-hand side. The garage door is red in color. There is a set of concrete stairs that lead from the driveway up to a shared landing; this landing then has a shared set of stairs that lead to the shared front porch. The front door to 924 is on the right hand side of the porch (again when viewed from Princeton Boulevard), and has a white in color storm door. The front door is surrounded by red trim, and above the front door are the numbers "924".

**ATTACHMENT A-15**



**ATTACHMENT A-16**

**DESCRIPTION OF AREA TO BE SEARCHED**

<u>SEARCH LOCATION 16: 412 Church Street, Turtle Creek, PA 15145</u>

This is a single-family residence that is part of a row house located on Church Street. The entire row house is tan in color, and has a large front porch that spans the length of the building. The porch is covered by a roof that has brown shingles. This porch has a brown in color wall/fence which runs along the front of the porch and faces Church Street. There are three (3) cement staircases that lead from the sidewalk to the porch – the middle set of stairs leads to the area of the porch in front of 412. The front door to 412 is dark in color and it has a white and clear storm door in front of it. The door is surrounded by brown trim. To the right of the door, on the brown trim, are the numbers "412" in white, and they are positioned vertically. To the right of the door, along the front wall of the house, is a window that faces Church Street.

**ATTACHMENT A-16**





**ATTACHMENT B**

**DESCRIPTION OF ITEMS TO BE SEIZED**

All records, instrumentalities, fruits and evidence relating to violations of federal felony offenses enumerated in Title 18, United States Code, Section 2516; including, violations of Title 21, United States Code, Sections 841(a)(1)(possession with intent to distribute a controlled substance), 843(b)(unlawful use of a communication facility), and 846 (conspiracy), Title 18, United States Code, Sections 1956 and 1957, (money laundering), 922(g)(1)(possession of a firearm or ammunition by a convicted felon), 924(c)(possession of a firearm in furtherance of a drug trafficking crime), and Section 2 (aiding and abetting) (collectively referred to herein as "**the TARGET OFFENSES**"), including those items described in Sections I and II below.

**SECTION I**

1.      Controlled substances to include crack, cocaine, and heroin;

2.      Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, "stamp bags," microwave ovens, heat-sealing devices, and dilutants such as mannitol, mannite, inositol, fentanyl, and vitamin B12;

3.      Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances, travel for the purpose of acquiring and/or distributing controlled substances, and to monetary transactions involving the proceeds from the sale of controlled substances;

4.      Personal books, papers, cellular phones, and other electronic devices reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances, money laundering, and the criminal use of communication facilities;

5.      Cash, currency, and records relating to the generation of income from the sale of controlled substances and the expenditure of such income, including money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, as well as consumer items such as expensive televisions and other electronic equipment, precious metals such as gold and silver, and precious gems such as diamonds (this evidence often is located in a safe) – it should be noted that possession of the valuable items referenced in this paragraph, particularly by individuals with no substantial legitimate source of income, is evidence of drug trafficking as opposed to drug use;

6.      Documents and other records indicating travel in interstate and foreign commerce, such as maps, GPS coordinates, navigation coordinates, travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills and related communications;

1

7.      Firearms, ammunition, and other dangerous weapons and ammunition;

8.      Identification evidence and/or indicia (such as mail, deeds, leases, rental agreements, photographs, bills, and identification documents) that tend to identify the person(s) in residence, occupancy, control, or ownership of subject premises and/or subject communication devices.


## Section II

1.      Computers, cellular telephones, electronic tablet devices, and other electronic media utilized for communication, transportation, and data acquisition and retention purposes related to acquiring and distributing illegal drugs and proceeds, including incoming and outgoing call and text message logs, contact lists, photo and video galleries, sent and received text messages, online searches and sites viewed via the internet, online or electronic communications sent and received (including email, chat, and instant messages), sent and received audio files, navigation, mapping, and GPS files, telephone settings (including contact lists), and related identifying information such as telephone identification numbers, call forwarding information, messages drafted but not sent, and voice messages;

2.      Any computer equipment and storage device capable of being used to commit, further or store evidence of the federal offenses listed above;

3.      Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners capable of being used to commit, further or store evidence of the federal offenses listed above;

4.      Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants capable of being used to commit, further or store evidence of the federal offenses listed above;

5.      Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software;

6.      Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

7.      Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data;

8.      Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

**<u>Section III</u>**

Off-site searching of such hardware, software, documentation, and storage media may be conducted and shall be limited to searching for the items described in Sections I and II of this attachment and shall be done according to the procedures set out below.

The examination of electronic information may require authorities to employ techniques, including but not limited to, computer-assisted scans of the entire medium, which might expose many parts of the Subject Device to human inspection in order to determine whether it is evidence described by the warrant.

Agents are authorized to seize and remove from the premises the computer hardware, software, related documentation, and storage media, so that computer analysts can accurately retrieve the items authorized by this warrant in a laboratory or other controlled environment.  The retrieval process does not need to be completed within 10 days after the date of the warrant or before the return of the written inventory required by Fed. R. Crim. P. 41(a).